**THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT YET BEEN APPROVED BY THE COURT. THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN OF REORGANIZATION. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.**

## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

-------------------------------------------------------------------x

| | | |
|---|---|---|
| *In re* | : | Chapter 11 |
| | : | |
| **NEW WORLD PASTA COMPANY,** | : | **Case No. 1-04-02817 (MDF)** |
| **PASTA ACQUISITION CORP.,** | : | |
| **THE PRINCE COMPANY, INC.,** | : | **(Jointly Administered)** |
| **RONZONI FOODS INTERNATIONAL** | : | |
| **CORPORATION, and** | : | |
| **NEW WORLD DELAWARE, LLC,** | : | |
| | : | |
| **Debtors.** | : | |

-------------------------------------------------------------------x

### DEBTORS' SECOND AMENDED AND RESTATED DISCLOSURE STATEMENT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE

SAUL EWING LLP
2 North Second Street, 7th Floor
Harrisburg, Pennsylvania 17101
(717) 257-7500

Co-Attorneys for Debtors and
  Debtors-in-Possession

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153-0119
(212) 310-8000

Co-Attorneys for Debtors and
  Debtors-in-Possession

Dated: Harrisburg, Pennsylvania
        September 21, 2005

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ........................................................................................... 1

    A.      Summary of Joint Plan of Reorganization ............................................. 2

    B.      Classification and Treatment of Claims and Equity Interests under the Plan ........ 2

    C.      Who May Vote .................................................................................... 5

    D.      Procedures for Voting ......................................................................... 5

    E.      Confirmation Hearing ......................................................................... 6

II.     GENERAL INFORMATION ..................................................................... 7

    A.      Overview of Chapter 11 ...................................................................... 7

    B.      Description and History of the Debtors ............................................... 8

        1.      Overview of the Debtors' Businesses ....................................... 8

        2.      History of the Debtors' Businesses ........................................... 9

        3.      Ownership of the Debtors .......................................................... 9

    C.      The Debtors' Prepetition Capital Structure .......................................... 9

        1.      The Senior Loans ...................................................................... 9

        2.      9.25% Senior Subordinated Notes Due 2009 ......................... 10

        3.      The Term Loans ...................................................................... 10

        4.      Other Prepetition Indebtedness .............................................. 11

    D.      Events Leading to the Commencement of the Reorganization Cases ................ 11

III.    EVENTS DURING THE REORGANIZATION CASES .............................. 13

    A.      First Day Orders ................................................................................ 13

    B.      Financing ........................................................................................... 13

        1.      The DIP Facility ...................................................................... 13

        2.      Authority To Use Cash Collateral .......................................... 15

        3.      Exit Financing ......................................................................... 16

    C.      Management ....................................................................................... 17

    D.      Appointment of Creditors' Committee ............................................... 17

    E.      Creditors' Committee Standing Motion; Plan Negotiations ................ 18

    F.      Asset Dispositions ............................................................................. 20

    G.      Key Employee Retention Program and Discretionary Bonus Plan ..................... 20

Case 1:04-bk-02817-MDF    Doc 1356    Filed 09/21/05    Entered 09/21/05 12:38:08    Desc
                    Main Document        Page 2 of 94

H. Union/Pension Issues .................................................................. 21

I. Executory Contracts ................................................................... 22

J. Updating the Debtors' Information/Technology System .................................. 23

K. Lapse of Exclusivity; Case Management Stipulation ................................. 23

L. Bar Date and Claims Reconciliation ............................................ 24

IV. THE JOINT PLAN OF REORGANIZATION ............................................ 24

A. Administrative Expenses ............................................................. 25

B. Priority Tax Claims ................................................................ 26

C. Classification and Treatment of Claims and Equity Interests ........................... 26

   1. Priority Non-Tax Claims (Class 1) ......................................... 27

   2. Senior Lender Claims (Class 2) ............................................ 27

   3. Term Lender Claims (Class 3) ............................................... 27

   4. Other Secured Claims (Class 4) ............................................ 28

   5. General Unsecured Claims (Class 5) ....................................... 28

   6. Other Unsecured Claims (Class 6) ......................................... 30

   7. NWP Equity Interests (Class 7) ........................................... 30

D. Implementation of the Plan ......................................................... 31

   1. Substantive Consolidation ................................................. 31

   2. Compromise and Settlement ................................................ 33

   3. Restructuring Transactions ................................................. 33

   4. Issuance of New Common Stock ............................................ 34

   5. Issuance of Holdings Common Stock ...................................... 34

   6. Issuance of New Warrants ................................................... 34

   7. Enforcement of Subordination ............................................. 35

   8. Recognition of Guaranty Rights .......................................... 35

   9. Exit Facility ................................................................. 35

   10. Repayment of DIP Facility ................................................ 35

   11. Cancellation of Existing Securities and Agreements ..................... 35

   12. Surrender of Securities .................................................... 36

Case 1:04-bk-02817-MDF    Doc 1356    Filed 09/21/05    Entered 09/21/05 12:38:08    Desc
Main Document        Page 3 of 94

# TABLE OF CONTENTS
## (continued)

Page

| | | |
|---|---|---|
| 13. | Corporate Action | 36 |
| 14. | Exemption From Securities Laws | 37 |
| 15. | Exemption From Transfer Taxes | 38 |
| E. | Method of Distributions Under the Plan | 38 |
| 1. | Record Date for Distributions | 38 |
| 2. | Date of Distributions | 38 |
| 3. | Delivery of Distributions | 38 |
| 4. | Effectuation of Deliveries | 39 |
| 5. | Setoffs and Recoupments | 39 |
| 6. | Manner of Payment under the Plan | 40 |
| 7. | De Minimis Distributions | 40 |
| 8. | No Fractional Shares | 40 |
| 9. | Allocation of Consideration | 40 |
| 10. | Withholding and Reporting Requirements | 40 |
| 11. | Unclaimed Property | 41 |
| F. | Procedures for Treating Disputed Claims and Disputed Administrative Expenses | 41 |
| 1. | Objections | 41 |
| 2. | No Distributions Pending Allowance | 41 |
| 3. | Tax Treatment of Disputed Class 5 Claims Reserve | 43 |
| 4. | Determination | 43 |
| 5. | Preservation of Causes of Action and Rights to Settle Claims | 43 |
| G. | Executory Contracts and Unexpired Leases | 44 |
| 1. | General Treatment | 44 |
| 2. | Cure of Defaults | 45 |
| 3. | Rejection Damage Claims | 45 |
| 4. | Survival of Corporate Indemnification Obligations | 45 |
| 5. | Compensation, Benefit, and Insurance Plans | 46 |
| 6. | Retiree Benefits | 46 |
| H. | Effectiveness of the Plan | 46 |

# TABLE OF CONTENTS
## (continued)

| | | |
|---|---|---|
| 1. | Conditions Precedent to Confirmation | 46 |
| 2. | Conditions Precedent to the Effective Date | 47 |
| 3. | Waiver of Conditions | 47 |
| 4. | Revocation or Withdrawal of the Plan | 47 |
| 5. | Failure of Conditions to Effective Date | 48 |
| 6. | Substantial Consummation | 48 |
| 7. | Amendments | 48 |
| 8. | Revesting of Assets | 48 |
| 9. | Preference and Fraudulent Transfer Claims | 49 |
| 10. | Discharge | 49 |
| 11. | Limited Release | 50 |
| 12. | Exculpation | 51 |
| 13. | Injunction | 52 |
| I. | Retention of Jurisdiction | 53 |
| 1. | Jurisdiction of the Bankruptcy Court | 53 |
| J. | Miscellaneous Provisions of the Plan | 54 |
| 1. | Payment of Statutory Fees | 54 |
| 2. | Term of Injunctions or Stays | 54 |
| 3. | Dissolution of Creditors' Committee | 55 |
| 4. | Certain Indenture Trustee Fees and Expenses | 55 |
| 5. | Interest on Claims | 55 |
| 6. | Expedited Determination of Taxes | 55 |
| 7. | Waiver of Bankruptcy Rules 3020(e) and 7062 | 55 |
| 8. | Severability | 55 |
| 9. | Governing Law | 56 |
| 10. | Time | 56 |
| 11. | Notices | 56 |
| 12. | Filing or Execution of Additional Documents | 57 |
| 13. | Binding Effect | 57 |

V.    SECURITIES LAW MATTERS .................................................................... 57

      A.    Issuance and Resale of New Securities under the Plan............................ 57

      B.    Listing ......................................................................................... 58

      C.    Legends ........................................................................................ 58

VI.   FINANCIAL INFORMATION, PROJECTIONS AND VALUATION
      ANALYSIS ............................................................................................. 59

      A.    Historical Financial Information.......................................................... 59

      B.    Consolidated Projected Financial Statements ........................................ 59

            1.    Purpose of the Projections ........................................................ 59

            2.    Summary of Significant Assumptions ........................................ 60

            3.    Special Note Regarding Forward-Looking Statements ................. 63

      C.    Valuation....................................................................................... 63

VII.  CERTAIN FACTORS AFFECTING THE DEBTORS ................................... 66

      A.    Certain Bankruptcy Law Considerations .............................................. 66

            1.    Risk of Non-Confirmation of the Plan....................................... 66

            2.    Nonconsensual Confirmation.................................................... 66

            3.    Risk of Non-Occurrence of the Effective Date............................ 67

            4.    Risk of Competing Plans of Reorganization............................... 67

      B.    Factors Affecting Reorganized Debtors................................................ 67

      C.    Variances from Projections................................................................ 67

      D.    Certain Tax Matters ........................................................................ 68

      E.    Pending Litigation or Demands Asserting Prepetition Liability.................. 68

VIII. VOTING PROCEDURES AND REQUIREMENTS....................................... 68

      A.    Classes Entitled to Vote under the Plan ............................................... 68

      B.    Voting Requirements ........................................................................ 68

      C.    Acceptance by Classes of Claims ....................................................... 69

      D.    Withdrawal of Ballot or Master Ballot ................................................ 69

IX.   CONFIRMATION OF THE PLAN............................................................. 70

      A.    The Confirmation Hearing ................................................................ 70

      B.    Requirements for Confirmation of the Plan........................................... 71

# TABLE OF CONTENTS
## (continued)

|  |  |  |
|---|---|---|
| 1. | Consensual Confirmation | 71 |
| 2. | Nonconsensual Confirmation | 74 |
| X. | ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN | 76 |
| A. | Liquidation Under Chapter 7 | 76 |
| B. | Alternative Plan | 76 |
| XI. | CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN | 77 |
| A. | Consequences to the Debtors | 78 |
| 1. | Cancellation of Debt | 78 |
| 2. | Applicability of Changes in Ownership Rules on NOL Carryforwards and Other Tax Attributes | 79 |
| 3. | Formation of Holdings | 80 |
| 4. | Alternative Minimum Tax | 81 |
| B. | Consequences to the Holders of Certain Claims | 81 |
| 1. | Consequences to Holders of Allowed General Unsecured Claims | 81 |
| 2. | Consequences to Holders of Allowed Other Unsecured Claims | 84 |
| 3. | Distributions in Discharge of Accrued but Unpaid Interest | 84 |
| 4. | Ownership and Disposition of New Warrants; Constructive Distributions to Holders of Holdings Common Stock | 84 |
| 5. | Holdings Common Stock and New Warrants Held in Trust for Disputed Class 5 Claims | 85 |
| 6. | Information Reporting and Withholding | 86 |
| XII. | CONCLUSION AND RECOMMENDATION | 87 |

EXHIBIT A (Debtors' Joint Plan of Reorganization)

EXHIBIT B (Disclosure Statement Order)

EXHIBIT C (Debtors' Historical Financial Information)

EXHIBIT D (Debtors' Projected Financial Information)

EXHIBIT E (Debtors' Liquidation Analysis)

Case 1:04-bk-02817-MDF   Doc 1356   Filed 09/21/05   Entered 09/21/05 12:38:08   Desc
Main Document   Page 7 of 94

# I.

## INTRODUCTION

New World Pasta Company ("NWP"), together with its United States subsidiaries, Pasta Acquisition Corp. ("PAC"), The Prince Company, Inc. ("Prince"), Ronzoni Foods International Corporation ("Ronzoni"), and NWP Delaware, LLC ("NWP Delaware"), as debtors and debtors in possession (collectively, the "Debtors") submit this Second Amended and Restated Disclosure Statement (the "Disclosure Statement") pursuant to section 1125 of title 11 of the United States Code (the "Bankruptcy Code") to holders of Claims against and Equity Interests in the Debtors in connection with:  (a) the solicitation of votes to accept or reject the Debtors' Second Amended and Restated Joint Plan of Reorganization under chapter 11 of the Bankruptcy Code, dated September 21, 2005 (as the same may be amended, the "Plan") filed by the Debtors with the United States Bankruptcy Court for the Middle District of Pennsylvania (the "Bankruptcy Court"), and (b) the hearing to consider confirmation of the Plan (the "Confirmation Hearing") scheduled for [_____], 2005 at [_____] [__:___ _.m.] (Eastern Time).  Unless otherwise defined herein, all capitalized terms contained herein have the respective meanings ascribed to them in the Plan.  In the event of any inconsistency between the Plan and the descriptions in this Disclosure Statement, the terms of the Plan will govern.

Attached as Exhibits to this Disclosure Statement are copies of the following documents:

- The Plan (Exhibit A);

- Order of the Bankruptcy Court dated [_____], 2005 (the "Disclosure Statement Order") approving this Disclosure Statement and, among other things, establishing certain procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan (Exhibit B);

- The Debtors' Historical Financial Information (Exhibit C);

- The Debtors' Projected Financial Information (Exhibit D); and

- The Debtors' Liquidation Analysis (Exhibit E).

**THE DEBTORS BELIEVE THE PLAN WILL ENABLE THEM TO REORGANIZE SUCCESSFULLY AND ACCOMPLISH THE OBJECTIVES OF CHAPTER 11 AND THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS, THEIR CHAPTER 11 ESTATES, AND THEIR CREDITORS, AND AS SUCH, THE DEBTORS RECOMMEND THAT CREDITORS VOTE TO ACCEPT THE PLAN.  THE CREDITORS' COMMITTEE ASSUMES THE PLAN CONDITIONS (SECTION VII.A) WILL BE MET IN SUPPORTING THE PLAN AND IN RECOMMENDING THAT CREDITORS VOTE TO ACCEPT THE PLAN.**

A ballot for voting to accept or reject the Plan (the "Ballot") is enclosed with the Disclosure Statement Order for the holders of Claims that are entitled to vote to accept or reject the Plan, as explained below.

On [_____], 2005, after notice and hearing, the Bankruptcy Court issued the Disclosure Statement Order approving this Disclosure Statement as containing adequate information of a kind and in sufficient detail to enable hypothetical, reasonable investors typical of the Debtors' creditors to make informed judgments whether to accept or reject the Plan. **APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.**

The Disclosure Statement Order sets forth in detail the deadlines, procedures and instructions for voting to accept or reject the Plan and for filing objections to confirmation of the Plan. In addition, detailed voting instructions accompany each Ballot. Each holder of a Claim entitled to vote on the Plan should read this Disclosure Statement, the Plan, the Disclosure Statement Order, and the instructions accompanying the Ballot in their entirety before voting on the Plan. These documents contain important information concerning the classification of Claims and Equity Interests for voting purposes. No solicitation of votes to accept the Plan may be made except pursuant to section 1125 of the Bankruptcy Code.

**INTERNAL REVENUE SERVICE CIRCULAR 230 NOTICE: TO ENSURE COMPLIANCE WITH INTERNAL REVENUE SERVICE CIRCULAR 230, HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF CLAIMS OR EQUITY INTERESTS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING BY THE DEBTORS OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

A.   **Summary of Joint Plan of Reorganization**

As summarized below and set forth in greater detail in Section IV of this Disclosure Statement, the Plan classifies the Claims against, and Equity Interests in, the Debtors into seven groups of substantially similar Claims or Equity Interests (each, a "Class"), sets forth the treatment to be afforded the Claims and Equity Interests in each Class, provides the terms pursuant to which the Debtors will emerge from chapter 11, and allows for the discharge of Claims and Equity Interests in accordance with section 1141 of the Bankruptcy Code and a "fresh start" for the Debtors' reorganized businesses.

B.   **Classification and Treatment of Claims and Equity Interests under the Plan**[1]

The following briefly summarizes the classification and treatment of Claims and Equity Interests under the Plan.

---

[1] Reference should be made to the entire Disclosure Statement and the Plan for a complete description of the classification and treatment of Claims and Equity Interests.

| Class | Type of Claim or Equity Interest[2] | Treatment | Estimated Recovery[3] |
|---|---|---|---|
| N/A | Administrative Expenses (approximately $58,100,000) | Payment in full, in cash, on the later of the Effective Date and the date such Administrative Expense is Allowed. | 100% |
| N/A | Priority Tax Claims (approximately $200,000) | Payment in full, in cash, in equal annual installments commencing on the later of the Effective Date and the date on which such Claim is Allowed, and continuing over a period not exceeding six years after the date of assessment of such Claim, together with interest thereon calculated at the market rate from the Effective Date to the date of payment, subject to the Debtors' or Reorganized Debtors' sole option to prepay all or a portion of the Allowed Claim. | 100% |
| 1 | Priority Non-Tax Claims (approximately $18,500) | Unimpaired. On the later of the Effective Date and the date on which such Claim is Allowed, payment in full, in cash, together with postpetition interest. | 100% |
| 2 | Senior Lender Claims (approximately $146,600,000) | Unimpaired. On the Effective Date, cash in an amount equal to such holder's Allowed Claim, including accrued and unpaid interest calculated at the default rate (calculated at the Alternate Base Rate plus 10%, as set forth in the Old Credit Agreement) plus the reasonable, documented, accrued and unpaid fees and expenses of the Prepetition Agent and the Prepetition Agent's and Senior Lenders' legal advisors, financial advisors and consultants, net of amounts paid therefor prior to the Effective Date. | 100% |
| 3 | Term Lender Claims (approximately $168,000,000) | Impaired. On the Effective Date, pursuant to the Restructuring Transactions, distribution of 6,375,000 shares of Holdings Common Stock, which will constitute 85% of the Holdings Common Stock issued and issuable on or immediately after the Effective Date, subject to full dilution for the shares to be issued pursuant to the Management Incentive Plan, the New Warrants, and any issuance of equity or equity-linked distributions in connection with the Exit Facility. | 33.9% |

---

[2] The amounts stated herein are estimates of the total amount of the Allowed Claims in each Class. The actual Allowed amounts may differ.

[3] The actual recovery by each Class may be more or less than the recovery estimated herein.

| Class | Type of Claim or Equity Interest[2] | Treatment | Estimated Recovery[3] |
|---|---|---|---|
| 4 | Other Secured Claims (approximately $25,000) | Unimpaired.  On the Effective Date, at the Debtors' option, (i) reinstatement of the Claim, (ii) cash payment in full, (iii) surrender of the collateral securing such Allowed Claim, or (iv) treatment otherwise rendering the Allowed Claim unimpaired in accordance with section 1124 of the Bankruptcy Code. | 100% |
| 5 | General Unsecured Claims (approximately $185,256,062.50) | Impaired.  On the later of the Effective Date and the date on which each Claim becomes an Allowed Claim, pursuant to the Restructuring Transactions, distribution of each holder's Pro Rata Share of (i) 1,125,000 shares of Holdings Common Stock, which will constitute 15% of the Holdings Common Stock issued and issuable on or immediately after the Effective Date, subject to full dilution for the shares to be issued pursuant to the Management Incentive Plan, the New Warrants, and any issuance of equity or equity-linked distributions in connection with the Exit Facility, and (ii) the New Warrants.  In addition, on the later of the Effective Date or the date on which each General Unsecured Claim becomes an Allowed Class 5 Claim, each holder of an Allowed Class 5 Claim will automatically, regardless of whether such holder votes to accept or reject the Plan, executes the Securityholders Agreement or does not vote on the Plan, become a party to and bound by the Securityholders Agreement, unless such holder declines to accept the shares of Holdings Common Stock and New Warrants to which such holder would otherwise be entitled. | 8.2% |
| 6 | Other Unsecured Claims (approximately $1,500,000) | Impaired.  On the Effective Date, cash payment in an amount equal to 7.5%[4] of each Allowed Claim. | 7.5% |
| 7 | NWP Equity Interests | Impaired.  No distribution.  On the Effective Date, the Old NWP Common Stock will be canceled, and the holders of Equity Interests in Class 7 will not be entitled to, and will not receive or retain any property or interest in property on account of Equity Interests in NWP. | 0% |

---

[4]  The distribution to holders of Allowed Claims in Class 6 (Other Unsecured Claims) does not reflect and is not based upon the enterprise valuation of the Debtors by their financial advisor, Rothschild Inc. ("Rothschild"), in that the value of the recoveries by Other Unsecured Claims may be less than the value of the recoveries of holders of Allowed Class 5 Claims based on Rothschild's valuation.

## C.    Who May Vote

Pursuant to the provisions of the Bankruptcy Code, only holders of allowed claims or allowed equity interests in classes that are impaired and entitled to receive distributions under a proposed chapter 11 plan are entitled to vote to accept or reject such a plan. Classes of claims or equity interests that are unimpaired under a chapter 11 plan are conclusively presumed to have accepted the plan and are not entitled to vote to accept or reject the plan. Classes of claims or equity interests that are impaired and are not entitled to receive any distributions or retain any property under a proposed chapter 11 plan are deemed, under the Bankruptcy Code, to have rejected the plan and are not entitled to vote to accept or reject the plan.

The Debtors are soliciting votes on the Plan only from holders of Allowed Claims in Classes 3, 5, and 6. Classes 3, 5, and 6 are impaired, and the holders of Allowed Claims in such Classes will receive distributions under the Plan. Holders of Allowed Claims in such Classes are entitled to vote to accept or reject the Plan. Classes 1, 2 and 4 are unimpaired, and holders thereof are conclusively presumed to have accepted the Plan. Therefore, holders of Claims in such Classes are not entitled to vote to accept or reject the Plan. Class 7 is impaired, and holders of Equity Interests in NWP in Class 7 will receive no distributions under the Plan and, thus, are deemed to have rejected the Plan. As a consequence, holders of Equity Interests in Class 7 are not entitled to vote to accept or reject the Plan.

**ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE ENCOURAGED TO READ CAREFULLY AND CONSIDER THIS DISCLOSURE STATEMENT AND THE PROPOSED PLAN IN THEIR ENTIRETY.**

The Bankruptcy Code defines "acceptance" of a plan of reorganization by a class of claims as acceptance by creditors in that class that hold at least two-thirds in dollar amount and more than one-half in number of the claims that are voted to accept or reject the plan. For a more detailed description of the requirements for confirmation of the Plan, please see Section IX of the Disclosure Statement, entitled "Confirmation of the Plan."

## D.    Procedures for Voting

If you are entitled to vote to accept or reject the Plan, a Ballot is enclosed for voting your Claim. If you hold Allowed Claims in more than one Class that is entitled to vote, separate Ballots are enclosed for voting your Allowed Claim in each such Class. Please vote and return each Ballot to the respective location specified in the instructions accompanying each Ballot.

**DO NOT RETURN YOUR NOTES OR OTHER SECURITIES WITH YOUR BALLOT.**

**TO BE COUNTED, YOUR BALLOT (OR, IN THE CASE OF THE OLD NOTES, THE MASTER BALLOT CAST ON YOUR BEHALF) INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE RECEIVED BY FINANCIAL BALLOTING GROUP LLC, THE DEBTORS' VOTING AGENT (THE "VOTING AGENT") NO LATER THAN [__:____ _.m.] (EASTERN TIME), ON [_____], 2005 (THE "VOTING DEADLINE"). ANY BALLOT RECEIVED WHICH DOES NOT INDICATE**

**EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN WILL NOT BE COUNTED.**

Any Claim in an impaired Class as to which an objection or request for estimation is pending or which is scheduled by the Debtors as unliquidated, disputed, or contingent is not entitled to vote with respect to the Plan unless the holder of such Claim has obtained an order of the Bankruptcy Court or an agreement with the Debtors temporarily allowing such Claim solely for the purpose of voting on the Plan.

The Disclosure Statement Order establishes [_____], 2005 as the record date for voting on the Plan. Accordingly, only holders of Claims of record as of such date that are otherwise entitled to vote under the Plan will receive a Ballot and may vote on the Plan.

If you are a holder of a Claim entitled to vote on the Plan and did not receive a Ballot, received a damaged Ballot, or lost your Ballot, or if you have any questions concerning this Disclosure Statement, the Plan, or the procedures for voting on the Plan, please contact the Debtors' Voting Agent, Financial Balloting Group LLC, at (800) 609-4408.

**E.      Confirmation Hearing**

Pursuant to section 1128 of the Bankruptcy Code, the Confirmation Hearing will be held on [_____], 2005 at [__:____ _.m.] (Eastern Time), before The Honorable Mary D. France, United States Bankruptcy Judge, in Room 320 of the United States Bankruptcy Court for the Middle District of Pennsylvania, Harrisburg Division, Federal Building, 228 Walnut Street, Harrisburg, Pennsylvania 17101. The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be filed and served so that they are received on or before [_____], 2005 at [__:_____ _.m.] (Eastern Time). The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjourned date made at the Confirmation Hearing or at any adjourned Confirmation Hearing.

**THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED HEREIN, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT SHALL NOT CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION STATED SINCE THE DATE HEREOF. HOLDERS OF CLAIMS SHOULD CAREFULLY READ THIS DISCLOSURE STATEMENT IN ITS ENTIRETY, INCLUDING THE PLAN, BEFORE VOTING ON THE PLAN.**

**THIS DISCLOSURE STATEMENT HAS NOT BEEN FILED WITH, REVIEWED, APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC") AND THE SEC HAS NEITHER PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN.**

**THIS DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, AND NOTHING STATED HEREIN SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE**

IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON THE DEBTORS OR HOLDERS OF CLAIMS AGAINST OR EQUITY INTERESTS IN THE DEBTORS.  CERTAIN OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, BY NATURE, ARE FORWARD-LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS.  THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES.  ALL HOLDERS OF CLAIMS SHOULD CAREFULLY READ AND CONSIDER FULLY THE RISK FACTORS SET FORTH IN SECTION VII OF THIS DISCLOSURE STATEMENT BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

SUMMARIES OF CERTAIN PROVISIONS OF AGREEMENTS REFERRED TO IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE COMPLETE AND ARE SUBJECT TO AND QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE FULL TEXT OF THE APPLICABLE AGREEMENT, INCLUDING THE DEFINITIONS OF TERMS CONTAINED IN SUCH AGREEMENT.

## II.

## GENERAL INFORMATION

### A.     Overview of Chapter 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11, a debtor is authorized to reorganize its business for the benefit of itself, its creditors, and equity interest holders.  In addition to permitting rehabilitation of a debtor, another goal of chapter 11 is to promote equality of treatment for similarly situated creditors and similarly situated equity interest holders with respect to the distribution of the debtor's assets.

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the filing date.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

The consummation of a plan of reorganization is the principal objective of a chapter 11 reorganization case.  A plan of reorganization sets forth the terms for satisfying claims against, and equity interests in, a debtor.  Upon confirmation of a plan of reorganization, such plan is binding upon a debtor, any issuer of securities under the plan, any person acquiring property under the plan, and any creditor or equity interest holder of a debtor.  Subject to certain limited exceptions, the confirmation order discharges a debtor from any debts that arose prior to the date of confirmation of the plan of reorganization and substitutes therefor the obligations specified under the confirmed plan.

After a plan of reorganization has been filed, holders of certain claims against, or equity interests in, a debtor are permitted to vote to accept or reject such plan.  Before soliciting acceptances of the proposed plan, section 1125 of the Bankruptcy Code requires a debtor to

prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan. The Debtors are submitting this Disclosure Statement to holders of Claims against, and Equity Interests in, the Debtors to satisfy the requirements of section 1125 of the Bankruptcy Code.

This Disclosure Statement sets forth certain information regarding the Debtors' prepetition history, the nature of the Reorganization Cases, and the anticipated organization and operations of the Reorganized Debtors. This Disclosure Statement also describes the Plan, including certain alternatives to the Plan, certain effects of confirmation of the Plan, and the manner in which distributions will be made under the Plan. In addition, this Disclosure Statement discusses the confirmation process and the procedures that holders of Claims and Equity Interests, as well as the other parties in interest, must follow to object to confirmation of the Plan.

**B.** **Description and History of the Debtors**

    **1.** **Overview of the Debtors' Businesses**

The Debtors, together with their non-debtor affiliate, Ronzoni Foods Canada Corporation ("RFC," together with the Debtors, the "Company") are leading manufacturers, marketers and distributors of dry pasta and noodles in the United States and Canada. The Company's significant brands include Ronzoni, Creamette, San Giorgio, Catelli, Healthy Harvest, American Beauty, Prince, Lancia, Skinner, and Light N' Fluffy. The majority of the Company's businesses involves the retail dry pasta markets, including both branded and private label products. The Debtors also have a presence in the industrial dry pasta market, which sells pasta to food processors that use the pasta as a food ingredient in their own products.

The Debtors' United States operations are headquartered in Harrisburg, Pennsylvania. The Debtors currently operate three manufacturing plants in the United States in Fresno, California; St. Louis, Missouri; and Winchester, Virginia, while RFC operates a plant in Montreal, Canada. In addition, the Company has four primary distribution centers located throughout the United States and Canada.

The Debtors employ approximately 450 individuals in their facilities throughout the United States. With the exception of hourly employees at the Debtors' Winchester, Virginia plant, all hourly plant employees are represented by one of the following unions: The Bakery, Confectionery, Tobacco Workers and Grain Millers International Union or International Brotherhood of Teamsters. In total, approximately 40% of the Debtors' employees are unionized.

As of May 28, 2005, the Debtors had unaudited consolidated assets of approximately $125,000,000 and unaudited consolidated liabilities of approximately $589,000,000. For the five months ended May 2005, the unaudited consolidated net sales and EBITDAR[5] of the Debtors

---

[5] For purposes of this Section, "EBITDAR" means net income or loss plus the amounts of interest expense, income tax expense, depreciation, amortization of goodwill and intangibles, amortization of deferred financing costs, and any non-recurring expenses, including reorganization, bankruptcy, restructuring, and retention expenses; and it

Case 1:04-bk-02817-MDF    Doc 1356    Filed 09/21/05    Entered 09/21/05 12:38:08    Desc
Main Document      Page 15 of 94

were $100,000,000 and $7,000,000, respectively.  For the five months ended May 2004, the unaudited consolidated net sales and EBITDAR of the Debtors were $99,000,000 and ($3,000,000), respectively.

## 2. History of the Debtors' Businesses

On January 28, 1999, Hershey Foods Corporation ("HFC") effected a recapitalization pursuant to which New World Pasta, LLC, an acquisition corporation formed by JLL Partners Fund III, L.P. ("JLL Partners") and Miller Pasta LLC ("Miller"), acquired a controlling interest in the Hershey Pasta Group, a division of HFC and predecessor to NWP, for an aggregate purchase price of $457,000,000.

On July 30, 2001, NWP acquired the dry pasta business of Borden Foods Corporation and certain of its affiliates for an aggregate purchase price of $45,600,000 (the "Borden Acquisition," and the acquired companies, the "Borden Pasta Companies").  As a result of the Borden Acquisition, NWP acquired eleven pasta brands including Prince and Creamette and six pasta manufacturing facilities in the United States, Canada, and Italy.

## 3. Ownership of the Debtors

As of the Commencement Date, 88.5% of the common stock and voting equity of NWP, the parent corporation of PAC, Prince, Ronzoni, and NWP Delaware (together, the "Subsidiaries"), was held by New World Pasta, LLC ("NWPL"), a wholly owned holding subsidiary of JLL Partners.  Of the remaining 11.5% of the common stock of NWP, Miller held approximately 10.4%, HFC held approximately 0.6%, and John Denton, a former director and Chief Executive Officer of NWP, held approximately 0.6%.  The common stock of NWP is not publicly traded.  The Subsidiaries are wholly owned by NWP.

## C. The Debtors' Prepetition Capital Structure

## 1. The Senior Loans

The Debtors are party to the Credit Agreement, dated as of January 28, 1999 (the "Old Credit Agreement"), among NWP, as borrower, the Subsidiaries as guarantors, Morgan Stanley Senior Funding, Inc., as syndication agent, The Bank of Nova Scotia ("BNS"), as administrative agent,[6] and the lender parties thereto, pursuant to which the lenders under the Old Credit Agreement committed to lend the Debtors up to an aggregate of $250,000,000.  The Old Credit Agreement, as originally structured, consisted, in pertinent part, of a Term A Loan with a $50,000,000 financing commitment (the "Term A Loan"), a Term B Loan with a $150,000,000 financing commitment (the "Term B Loan"), and a revolving loan commitment in the amount of

---

excludes amounts for asset impairments and extraordinary items, as well as any gain or loss arising from the foreign exchange recognition on intercompany loans and transactions.

[6] The Bank of New York ("BNY" or the "Prepetition Agent") succeeded BNY Asset Solutions LLC ("BNY Asset Solutions"), which in turn had succeeded BNS, as the administrative agent under the Old Credit Agreement.

Case 1:04-bk-02817-MDF    Doc 1356    Filed 09/21/05    Entered 09/21/05 12:38:08    Desc
Main Document        Page 16 of 94

up to $50,000,000 (the "Revolving Loan," together with the Term A Loan and Term B Loan, the "Senior Loans" and the holders of the Senior Loans, the "Senior Lenders").

As of the Commencement Date, the Senior Loans were secured by first priority liens against, and security interests in, substantially all of the assets of NWP, and were guarantied, also on a first-priority, secured basis, by the Subsidiaries. Assuming the proposed Effective Date of November 26, 2005, the aggregate amount of Allowed Claims arising under the Senior Loans (the "Senior Lender Claims") will be approximately $146,568,689, consisting of the following amounts: (i) the outstanding principal amount of the Senior Loans as of the Effective Date, estimated to be $140,779,250; (ii) the interest accrued on the Senior Loans outstanding as of the proposed Effective Date, calculated at the default rate of interest set forth in the Old Credit Agreement, *i.e.*, the Alternate Base Rate (as defined in the Old Credit Agreement) plus 10%, estimated to be $5,789,439, which interest is estimated to accrue at a daily rate of approximately $63,639.94 (subject to changes in the Alternate Base Rate) thereafter;[7] and (iii) the reasonable fees and expenses of the Prepetition Agent and the Senior Lenders (as consistent with the Old Credit Agreement) outstanding as of the proposed Effective Date as described in Section I.B of the Disclosure Statement.

## 2. 9.25% Senior Subordinated Notes Due 2009

Shortly after entering into the Old Credit Agreement, NWP issued $160,000,000 of 9.25% senior subordinated notes due 2009 (the "Old Notes" and holders of the Old Notes, the "Old Noteholders") pursuant to the Senior Subordinated Indenture dated February 19, 1999 (the "Old Notes Indenture"). The Old Notes are general unsecured obligations of NWP subordinated in right of payment to the Senior Loans and Term Loans incurred under the Old Credit Agreement, and entitled to payment <u>pari passu</u> with other general unsecured obligations. As of the Commencement Date, the aggregate amount of Allowed Claims arising under the Old Notes (the "Old Note Claims") was approximately $171,056,062.

## 3. The Term Loans

In July 2001, the Debtors, the Senior Lenders, and BNS amended the Old Credit Agreement to add a new tranche of debt under the Old Credit Agreement in the aggregate principal amount of $51,402,000 (the "Term C Loan") to fund the Borden Acquisition and to pay certain transaction and other costs related thereto. The Term C Loan is secured by liens on substantially all of the Debtors' assets, which liens are junior to the liens securing the Senior Loans. On July 30, 2001, BNS and JLL Pasta, LLC ("JLL Pasta"), an affiliate of NWPL, entered into the Subordination and Participation Agreement pursuant to which JLL Pasta purchased a 100% participation interest in the Term C Loan from BNS. Miller Pasta II, LLC ("Miller Pasta II"), an affiliate of Miller, was a member of JLL Pasta.

---

[7] By authority granted in the DIP Order, the Debtors have paid a portion of the interest at the non-default rate of the Alternate Base Rate (as defined in the Old Credit Agreement) plus 8% on a provisional basis during the Reorganization Cases. The estimated amount set forth herein does not include amounts that have been paid or are expected to be paid on a provisional basis prior to the proposed Effective Date, assumes no change in the Alternate Base Rate, and assumes that all monthly interest payments at the non-default rate and all fees and expenses will be paid on a provisional basis through October 31, 2005.

In July 2002, the Debtors, the Senior Lenders, and BNS amended the Old Credit Agreement to add another tranche of debt under the Old Credit Agreement in the aggregate principal amount of up to $23,000,000 (the "Term D Loan") to provide the Debtors with additional working capital. JLL Pasta purchased a 100% participation interest in the Term D Loan from BNS pursuant to the Subordination and Participation Agreements, dated August 14, 2002.

After the Debtors' announcement on November 20, 2002 that they were unable to complete their financial statements for the three- and nine-month periods ended September 28, 2002 and therefore, that they could not file their quarterly reports with the SEC for such periods, the Old Credit Agreement was amended to incorporate another tranche of debt in the aggregate principal amount of up to $60,000,000, which was later increased to up to $90,000,000 (the "Term E Loan," together with the Term C Loan and Term D Loan, the "Term Loans"). As with the Term C Loan, the Term D Loan and the Term E Loan are secured by liens on substantially all of the Debtors' assets, which liens are junior to the liens securing the Senior Loans. JLL Pasta III, LLC ("JLL Pasta III," together with JLL Partners and JLL Pasta, and any Affiliates, Subsidiaries, current or former directors, partners, officers, employees and advisors of any of the foregoing entities that served at any time as directors of any of the Debtors, in such capacity, "JLL"), an affiliate of NWPL, purchased a 100% participation interest in Term Loan E from BNS pursuant to the Subordination and Participation Agreements, dated December 2, 2002. The Term Loans are guaranteed on a secured basis by the Subsidiaries. In conjunction with the purchase of participation interests in the Term Loans, the Debtors' issued warrants to purchase shares of the common stock of NWP to NWPL, Miller Pasta II, and JLL Pasta III. Those warrants were never exercised.

As the holder of the Term Loans, BNS (the "Term Lender") possesses both secured claims and a deficiency claim against the Debtors (the "Term Lender Secured Claims" and "Term Lender Deficiency Claim," respectively, and together, the "Term Lender Claims"). For all purposes of the Plan and Reorganization Cases, the Term Lender Claims will be deemed Allowed in the amount of $168,000,000.

### 4. Other Prepetition Indebtedness

As of the Effective Date, the Debtors will have approximately $15,700,000 in other general unsecured obligations, the majority of which relate to the Debtors' obligations to vendors, suppliers, and other trade creditors incurred in the operation of the Debtors' businesses.

## D. <u>Events Leading to the Commencement of the Reorganization Cases</u>

Prior to the Borden Acquisition, the Debtors began to integrate a new enterprise software system (the "Software System") for the management of certain financial and operating processes and information. However, the operational challenges thereafter posed by integrating the Borden Pasta Companies into the Debtors' existing businesses required the Debtors to focus their resources on the Borden Acquisition, which resulted in the Debtors being unable to devote sufficient attention to the implementation of the new Software System.

Case 1:04-bk-02817-MDF   Doc 1356   Filed 09/21/05   Entered 09/21/05 12:38:08   Desc
Main Document      Page 18 of 94

The Debtors have since determined that the initial implementation plan for the Software System was overly aggressive and inadequate. The Debtors believe that these implementation issues, occurring substantially contemporaneously with certain changes in and restructurings of the manufacturing and logistical operations of the Debtors (brought about in part by the Borden Acquisition), caused errors in and a lack of certain critical financial information being available to management. Accordingly, at a time when costs were increasing primarily as a result of the Borden Acquisition, management had incomplete or inaccurate financial information, especially critical information regarding the Debtors' inventories, manufacturing costs, and accounts receivable.

On November 20, 2002, the Debtors announced that they were not able to complete their financial statements for the three- and nine-month periods ending September 28, 2002, and that, therefore, they would be unable to timely file their quarterly reports for such periods with the SEC. This failure to file reports with the SEC was a default under the Old Credit Agreement and the Old Notes Indenture.

Also on November 20, 2002, independent counsel retained by the Debtors and representatives of the Audit Committee of NWP's Board of Directors contacted the SEC to advise it of the Debtors' inability to timely file financial reports and the initiation of an internal investigation by NWP's Audit Committee, and to pledge the Debtors' full cooperation in any SEC inquiry. Based upon the results of the internal investigation, which found no evidence of intentional misconduct, but rather, among other things, an overly ambitious Software System implementation program that was understaffed and poorly managed, the Debtors implemented recommended remedial action, hired a new senior management team and additional accounting and financial staff, and implemented additional controls and procedures. The Debtors also instituted a review of their operations to reduce costs and gain efficiencies.

As anticipated, the SEC undertook its own inquiry, in which the Debtors have cooperated fully. The Debtors believe that the SEC inquiry, which now includes another governmental investigative agency, is in its final investigative stages and that the facts support a finding that no intentional wrongdoing occurred.

In February 2004, the Debtors announced that cash generated from their operations would not be sufficient to fund their liquidity needs for calendar year 2004. As a result, the Debtors determined not to make the $7,400,000 interest payment due on the Old Notes on February 15, 2004.

After several months of discussions, the Debtors, the Senior Lenders, the Term Lender, and the Old Noteholders were unable to negotiate a mutually acceptable resolution of the payment and other defaults under the Old Credit Agreement and Old Notes Indenture or to otherwise agree on a restructuring of the Debtors' outstanding indebtedness. Moreover, because of the defaults under the Old Credit Agreement and the Old Notes Indenture, the Debtors could not obtain additional financing to meet their liquidity needs and satisfy their payment obligations, except by commencing the Reorganization Cases and obtaining post-Commencement Date financing in connection therewith. Accordingly, the Debtors commenced the Reorganization Cases to, among other things, restructure their balance sheet and operations

Case 1:04-bk-02817-MDF    Doc 1356    Filed 09/21/05    Entered 09/21/05 12:38:08    Desc
Main Document        Page 19 of 94

and emerge poised to leverage the Company's strong market share through the superior pasta and noodle grocery brands that the Company manufactures and distributes.

## III.

## EVENTS DURING THE REORGANIZATION CASES

On May 10, 2004, the Debtors commenced the Reorganization Cases in the Bankruptcy Court. The Debtors have continued to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

The following is a brief description of certain of the major events that have occurred during the Reorganization Cases:

### A. First Day Orders

On the Commencement Date, the Debtors submitted to the Bankruptcy Court a number of proposed "first day orders," along with supporting applications and affidavits, designed to enhance the Debtors' ongoing relationships with customers, vendors and employees as a consequence of the commencement of the Reorganization Cases. The Bankruptcy Court entered orders authorizing the Debtors to, among other things: (a) pay prepetition wages, compensation, and continue providing benefits to employees; (b) pay prepetition sales, use, personal property, corporate franchise, business license, and other taxes; (c) pay pre-Commencement Date obligations to certain critical vendors; (d) continue insurance programs and pay prepetition insurance premiums; (e) honor certain prepetition obligations to customers and maintain their customer programs on a postpetition basis, including trade promotions, customer discounts, customer refunds, and sales incentives; (f) pay pre-Commencement Date obligations to certain foreign vendors; (g) obtain debtor in possession financing and use cash collateral; and (h) maintain their cash management system and existing bank accounts.

### B. Financing

To facilitate the establishment of normal vendor relations, provide confidence to the marketplace, and address liquidity concerns, prior to the commencement of the Reorganization Cases, the Debtors negotiated an agreement to obtain an appropriate commitment for postpetition financing that would allow them to satisfy their ongoing obligations to vendors and suppliers, purchase raw materials and new inventory, and otherwise finance their operations. The Debtors' postpetition financing arrangements have been essential to the Debtors' continued viability and their prospects for a successful restructuring of their business operations.

#### 1. The DIP Facility

On May 10, 2004, the Debtors entered into the Senior Secured, Super-Priority Debtor in Possession Credit Agreement (as amended, the "DIP Agreement"), by and among the Debtors, as borrowers, Black Diamond Commercial Finance, LLC, as agent ("Black Diamond" or the "DIP Agent"), and the lenders party thereto (collectively, the "DIP Lenders"). The DIP Agreement was the result of considerable efforts on the part of the Debtors and their professionals who entertained other proposals for postpetition financing before executing the DIP Agreement.

Given the costs, due diligence requirements of other proposals, and the objections that were voiced by the Senior Lenders to financing by anyone else that would have precipitated a hotly-fought priming litigation, the Debtors determined that the DIP Lenders' proposal for postpetition financing was, under the circumstances, the most favorable available at the time.

On July 9, 2004, the Bankruptcy Court entered an order approving the DIP Agreement on a permanent basis (the "DIP Order").[8] There have been four amendments to the DIP Agreement. The first three amendments to the DIP Agreement, dated as of July 8, 2004, August 30, 2004, and December 17, 2004, were approved by the Bankruptcy Court by orders dated July 9, 2004, October 22, 2004, and January 14, 2005, respectively.

The proceeds made available under the DIP Agreement (the "DIP Loans") have been used to fund the working capital requirements and for other general corporate purposes of the Debtors, as well as to pay certain chapter 11 expenses, including the payment of professionals, subject to the terms of the DIP Agreement and the budget included therein. The Debtors' obligations under the DIP Agreement are secured by a first priority priming lien against and security interest in substantially all of the Debtors' assets pursuant to section 364(c)(2), 364(c)(3), and 364(d)(1) of the Bankruptcy Code, senior to the liens and security interests of the Debtors' prepetition lenders. In addition, the Bankruptcy Court granted superpriority administrative expense status under section 364(c) of the Bankruptcy Code to any claims arising under the DIP Agreement, subject to a "carve-out" for the payment of certain professional and other chapter 11 fees.

Notwithstanding the earlier amendments to the DIP Agreement, by early 2005, the Debtors determined that the DIP Agreement contained certain terms and covenants that were too restrictive and burdensome to the Debtors' estates. As a result, the Debtors negotiated replacement postpetition financing with Ableco Finance LLC (the "Replacement DIP") and, on March 11, 2005, filed a motion seeking the approval of the Replacement DIP. After a flurry of litigation with the DIP Lenders and the Senior Lenders over the Replacement DIP, the Debtors and the DIP Lenders negotiated the fourth amendment to the DIP Agreement, dated April 29, 2005 (the "Fourth DIP Amendment"), and approved by the Court on June 2, 2005. The Fourth DIP Amendment, among other things, restored the maximum amount of the DIP Loans to $45,000,000, adjusted certain financial covenants, and set forth that the financial covenants would be tested cumulatively and quarterly, as opposed to monthly. The Fourth DIP Amendment also reduced the interest rate under the DIP Agreement, extended the termination date of the DIP Loans to March 31, 2006, and eliminated, as an event of default, the filing of a plan of reorganization not fully supported by the DIP Lenders. On June 3, 2005, the Bankruptcy

---

[8] On August 24, 2004, the Creditors' Committee filed an appeal of the DIP Order (the "DIP Appeal") with the United States District Court for the Middle District of Pennsylvania (the "District Court"). In the DIP Appeal, the Creditors' Committee argued that the Bankruptcy Court erred when it (i) capped the DIP proceeds available to the Creditors' Committee for the purpose of investigating the validity of the Senior and Term Lenders' security interests in the Debtors' assets (the "Fee Cap Challenge") and (ii) approved the DIP Agreement which had as a default the filing of a plan of reorganization not pre-approved by the Senior Lenders (the "Plan-Filing Default Challenge"). On March 23, 2005, the District Court entered an order wherein it denied the Plan-Filing Default Challenge and remanded the Fee Cap Challenge to the Bankruptcy Court for further consideration after deciding the Committee Standing Motion.

Case 1:04-bk-02817-MDF    Doc 1356    Filed 09/21/05    Entered 09/21/05 12:38:08    Desc
                          Main Document        Page 21 of 94

Court entered an order amending the DIP Order (the "Amended DIP Order") to, among other things, incorporate the terms of the Fourth DIP Amendment.

As of June 30, 2005, there were approximately $24,000,000 of borrowings outstanding under the DIP Agreement, with available borrowing capacity under the DIP Agreement in the amount of approximately $21,000,000.

**2.      Authority To Use Cash Collateral**

As a result of the liens and security interests granted to the Senior Lenders and the Term Lender under the Old Credit Agreement, cash generated from the Debtors' operations constituted "cash collateral," which the Debtors obtained authority to use pursuant to the DIP Order.  As adequate protection and in exchange for the Senior Lenders' consent to the Debtors' use of the Senior Lenders' cash collateral, the Senior Lenders were granted replacement liens (subordinated to the DIP Lenders' liens) in certain postpetition collateral acquired by the Debtors, and superpriority administrative expense status (subordinated to the Claims of the DIP Lenders) for any claim arising from the decline in value of the Senior Lenders' interest in the cash collateral. The Debtors also agreed to make monthly interest payments on the Senior Loans at the Alternate Base Rate (as defined in the Old Credit Agreement) plus 8% and pay certain attorneys', accountants', financial advisors' and other fees and costs of the Prepetition Agent and Senior Lenders.

Similarly, pursuant to an order dated July 19, 2004, the Bankruptcy Court granted the Debtors authority to use the Term Lender's cash collateral (the "Cash Collateral Order") in exchange for adequate protection, consisting of replacement liens (subordinated to the Senior Lenders' lien) in certain postpetition collateral acquired by the Debtors, and superpriority administrative expense status (subordinated to the Senior Lender Claims) for any claim arising from the decline in the value of the Term Lender's interest in cash collateral.  The Debtors also agreed to pay up to $15,000 per month to the Term Lender on account of the reasonable fees of the Term Lender's attorneys, accountants, and financial advisors.

The time period reserved under the Amended DIP Order for the Creditors' Committee and other parties in interest to investigate and challenge the validity of the Senior Lenders' claims and liens on the Debtors' assets expired on August 22, 2004.  A similar provision relating to the investigation and challenge to the validity of the Term Lender's claims and liens was incorporated in the Cash Collateral Order, except that the investigation period was extended for the Creditors' Committee (but not for any other entity) solely with respect to the Term Lender's liens and claims.  The Creditors' Committee subsequently filed the Committee Standing Motion (as defined in Section III.E of the Disclosure Statement) in a timely manner and resolved the issues described therein as part of a settlement that is incorporated in the Plan.  Accordingly, as a result of the expiration of the investigation periods under the Amended DIP Order and the Cash Collateral Order and the settlement among the Debtors, the Term Lender, the Creditors' Committee, and JLL, with respect to all parties in interest (i) the Senior Loans and Term Loans constitute allowed secured claims, not subject to subordination, recharacterization or avoidance, for all purposes in the Debtors' Chapter 11 cases and any Successor Case (as defined in the Cash Collateral Order), (ii) the liens securing the Senior Loans and Term Loans are legal, valid, binding, enforceable, perfected and not subject to subordination, recharacterization or avoidance

for purposes in the Debtors' chapter 11 cases and any Successor Case, (iii) the releases of the Claims and Defenses in the Amended DIP Order and the Cash Collateral Order are binding on all parties in interest in the Debtors' chapter 11 cases and any Successor Case and (iv) the Senior Loans and Term Loans, the liens securing the Senior Loans and Term Loans, releases of the Claims and Defenses and payment of or non-cash distributions to the Prepetition Agent, Senior Lenders and Term Lender are not subject to any other or further claims, causes of action, objection, contest, setoff, defense or challenge by any party in interest for any reason, including, without limitation, any successor to or estate representative of the Debtors, in the chapter 11 cases or successor Case; *provided*, that as between the Creditors' Committee and the Term Lender, all such results relating to the Terms Loans are subject to the occurrence of the Effective Date of the Plan, as further described in Section III.E of the Disclosure Statement.

### 3.    Exit Financing

A key element of the restructuring of the Debtors under the Plan and a condition precedent to the effectiveness of the Plan is the availability of exit financing that provides sufficient funding for the Debtors to meet their cash obligations under the Plan and their working capital requirements as of and after the effective date of the Plan.  In connection with the Debtors' efforts to secure exit financing, the Debtors contacted, or were contacted, by approximately eighty financial and banking institutions.  After reviewing preliminary, non-binding financing proposals proffered by certain of these institutions, the Debtors narrowed the group of prospective lenders to seven entities (the "Potential Exit Lenders") that presented the best preliminary exit financing proposals (the "Exit Financing Proposals").  The Exit Financing Proposals of the Potential Exit Lenders were chosen from the proposals received because of their favorable proposed lending structures, their consistency with industry terms, and their reputations for closing similar transactions.

Thereafter, the Debtors received binding commitment letters from four Potential Exit Lenders.  Of the four commitments, the Debtors determined that the exit financing offered by Morgan Stanley Senior Funding, Inc. ("Morgan Stanley"), Wells Fargo Foothill, Inc. ("WFF"), and General Electric Capital Corporation ("GECC," and together with Morgan Stanley and WFF, the "Exit Lenders") for a proposed exit financing of $240,000,000 was the most favorable available to the Debtors at that time.  Accordingly, on August 31, 2005, the Debtors executed the commitment letter and the fee letter with the Exit Lenders (together, the "Commitment Letter") providing for a senior secured credit facility (the "Exit Facility"), which will be comprised of a revolving line of credit for $35,000,000 (including a $15,000,000 letter of credit subfacility) and two term loans, one known as Term Loan B for $140,000,000 and the other known as Term Loan C for $65,000,000, all of which loans will mature on the fifth anniversary of the Effective Date and will be secured by liens and security interests on or against all or substantially all of the assets of the Reorganized Debtors, and guaranteed by NWP Holdings, Inc. ("Holdings"), a newly formed Delaware corporation that will become the parent of Reorganized NWP on the Effective Date.  The Exit Facility will provide the Debtors with total exit financing in the maximum amount of $240,000,000.  The documents related to the Exit Facility will be included in the Plan Supplement.  On September 1, 2005, the Debtors filed a motion with the Court seeking approval of the Commitment Letter and the payment of fees and expenses and provision of indemnification in connection therewith.  [That motion was granted by order of the Court, dated September [___], 2005.]

## C. __Management__

Shortly after the commencement of the Reorganization Cases, the Debtors determined that they could benefit from the specialized assistance of crisis and turnaround managers possessing significant expertise operating complex businesses in competitive markets within the confines of chapter 11. To this end, the Debtors sought, and the Bankruptcy Court approved, the Debtors' retention of AP Services LLC ("AP Services"). AP Services was retained for this purpose and has provided the Debtors with management services including instituting cost reduction-profit improvement initiatives, selling non-core assets, developing and implementing sales growth initiatives, and directing financial reporting and planning, including the development of the Debtors' 2005 Budget and long-term business plan, which includes five years of financial projections using the 2005 Budget as a basis for such projections. Members and employees of AP Services replaced most of the Debtors' senior management, including the Debtors' Chief Executive Officer ("CEO"), Chief Financial Officer ("CFO"), Chief Operating Officer ("COO"), and Chief Information Officer ("CIO"). Currently, Lisa J. Donahue and John R. Castellano, a managing director and director, respectively, of AP Services, serve as the Debtors' CEO and CFO.

## D. __Appointment of Creditors' Committee__

On May 26, 2004, the United States Trustee for the Middle District of Pennsylvania (the "U.S. Trustee") appointed the Creditors' Committee to represent the interests of unsecured creditors of the Debtors. Although the relationship between the Debtors and the Creditors' Committee was difficult early in these chapter 11 cases, since then, the Debtors and their professionals have kept the Creditors' Committee and its professionals informed about their operations and have sought the concurrence of the Creditors' Committee for actions and transactions outside of the ordinary course of the Debtors' businesses.

The Creditors' Committee was originally comprised of seven (7) members, three (3) of which subsequently resigned. At the time the Creditors' Committee approved the stipulation resolving the Committee Standing Motion (as later defined), there were five (5) members of the Creditors' Committee, all of whom supported the stipulation. The current members of, and the attorneys and advisors retained by, the Creditors' Committee are set forth below:

**Creditors' Committee Members**

| | |
|---|---|
| Mark Paules, Vice President | James M. Meyer, Vice President |
| C-P Flexible Packaging | U.S. Durum Milling, Inc. |
| 15 Grumbacher Road | 7900 Van Buren |
| York, Pennsylvania 17402 | St. Louis, Missouri 63111 |
| | |
| Martin Feig, Vice President | David Fox, Director, Corporate Credit |
| The Bank of New York, as Indenture Trustee | Caraustar Custom Packaging Group |
| 101 Barclay Street (8W) | 50 Chestnut Ridge Road |
| New York, New York 10286 | Montvale, New Jersey 07645 |

Case 1:04-bk-02817-MDF    Doc 1356    Filed 09/21/05    Entered 09/21/05 12:38:08    Desc
Main Document    Page 24 of 94

**Creditors' Committee Professionals**

Attorneys                                   Financial Advisor

Fried, Frank, Harris, Shriver &             Jefferies & Company, Inc.
  Jacobson LLP                    520 Madison Avenue
One New York Plaza                          New York, New York  10022
New York, New York 10004                    Attn:  Thane Carlston
Attn:  Bonnie Steingart                           Thomas Carlson
    Vivek Melwani        Telephone:  (212) 284-2000
Telephone:  (212) 859-8000

Blank Rome LLP
1201 Market Street
Suite 800
Wilmington, Delaware 19801
Attn:  Bonnie Glantz Fatell
    Mark J. Packel
Telephone:  (302) 425-6400


**E.     Creditors' Committee Standing Motion; Plan Negotiations**

On July 22, 2004, the Creditors' Committee filed a motion (the "Committee Standing Motion") seeking authorization to commence on behalf of the Debtors and their estates certain causes of action against JLL, the Term Lender, and BNY Asset Solutions related to the Term Loans.  The Committee Standing Motion asserted, in relevant part, that JLL breached its fiduciary duty to NWP by using its insider status to induce NWP to incur the Term Loans that benefited JLL.  The Creditors' Committee sought, among other remedies, the equitable subordination and/or recharacterization of the claims of the Term Lender as equity investments and the recovery of damages against JLL and the Term Lender.  On September 13, 2004, the Debtors, JLL and the Term Lender objected to the Committee Standing Motion.

On February 3, 2005, the parties appeared for oral argument before the Bankruptcy Court in connection with the Committee Standing Motion.  Shortly thereafter, the parties entered into discussions in an effort to resolve the issues on mutually beneficial terms.  Those discussions culminated in a compromise and settlement of the issues which is incorporated in and will be implemented by and pursuant to the Plan.  A stipulation resolving and settling all such issues (the "Committee Standing Settlement") was negotiated and finally signed by the parties on June 24, 2005.  On June 24, 2005, the Debtors and the Creditors' Committee filed their joint motion seeking the Court's approval of the Committee Standing Settlement.  An order approving this compromise and settlement was approved by the Bankruptcy Court on July 15, 2005 (the "Settlement Approval Order").

Pursuant to the Committee Standing Settlement, the parties thereto agreed that the Debtors would propose an "Acceptable Plan" that would provide for the allowance and payment in full in cash of the Senior Lender Claims.  In addition, such an Acceptable Plan would provide

that the holder of the Term Lender Claims will receive 85% of the Holdings Common Stock issued and issuable on or immediately after the Effective Date, subject to dilution, and each holder of an Allowed General Unsecured Claim would receive (i) its Pro Rata Share of 15% of the Holdings Common Stock issued and issuable on or immediately after the Effective Date, plus (ii) its Pro Rata Share of New Warrants, which will consist of (A) New Class A Warrants to purchase 833,333 shares of Holdings Common Stock with a strike price based on a total enterprise value of $275,000,000, and (B) New Class B Warrants to purchase 925,926 shares of Holdings Common Stock with a strike price based on a total enterprise value of $300,000,000, in each case subject to dilution. One condition of the Committee Standing Settlement is that Allowed General Unsecured Claims not exceed $200,000,000 in the aggregate. In addition, an Acceptable Plan is required to provide that the Board of Directors of Holdings (as successor to Reorganized NWP) will consist of seven members, comprised of the CEO, five directors nominated by the Term Lender, and one director nominated by the Creditors' Committee. The Plan is an Acceptable Plan.

Pursuant to the Committee Standing Settlement and Settlement Approval Order, the Committee Standing Motion is to be held in abeyance pending the Effective Date of the Plan, whereupon the Committee Standing Motion and all proceedings related thereto will be deemed withdrawn with prejudice and all the claims and causes of action that could have been asserted by or on behalf of the Debtors by any other person or entity, including, without limitation, those alleged in the Committee Standing Motion (collectively, the "Derivative Claims"), will be deemed to have been dealt with and resolved in the manner set forth in and contemplated by the Committee Standing Settlement, the Settlement Approval Order, and the Plan.

All settlements, compromises, releases, discharges, injunctions and exculpations set forth in the Plan will be effective and binding on all persons and entities who may have or have had standing to assert any Derivative Claims against the Term Lender or JLL, and no other person or entity shall possess standing to assert such Derivative Claims or causes of action against the Term Lender or JLL after the Effective Date.

In addition, pursuant to the Committee Standing Settlement, each member of the Creditors' Committee that executed the Committee Standing Settlement agreed not to (i) vote against an acceptable Plan or object to the confirmation or effectiveness of an acceptable Plan, (ii) oppose any action taken by the Debtors in furtherance of an acceptable Plan, and (iii) sell, assign or otherwise transfer its claims against the Debtors, except to a transferee who agrees in writing to be bound by such terms of the Committee Standing Settlement.

The Debtors believe that the consideration provided to holders of Claims as a result of the compromise and settlement among the Debtors, the Creditors' Committee, the Term Lender and JLL reflects a fair, reasonable and appropriate resolution of the claims asserted in the Committee Standing Motion and other issues among these constituencies, taking into account the differing nature and priority (including applicable contractual subordination) of such claims and the fair value of the Debtors' assets. In addition, the Debtors are realizing the very significant benefit of accomplishing an emergence from chapter 11 in a much shorter time than otherwise would be possible. This also benefits all creditors, for a prolonged chapter 11 process would risk severe deterioration and perhaps destruction of values for all creditors. For these reasons, the Debtors

believe that the compromise and settlement is fair, equitable, reasonable and in the best interests of the creditors.

## F.    Asset Dispositions

During the course of the Reorganization Cases, the Debtors have completed an analysis of the Company's manufacturing and distribution footprint taking into account the Company's manufacturing capacity, the capacity of the dry pasta industry, and the potential growth of the Company's distribution channels.  This analysis served as the foundation for the Company's 2005 Budget, long-term business plan and the proposed Plan. In connection with the completion of that analysis, the Debtors identified core and non-core assets, and divested non-core assets. These non-core assets included (i) the Debtors' manufacturing facility located in Louisville, Kentucky, (ii) the Debtors' manufacturing facility, warehouse, and equipment located in Omaha, Nebraska, (iii) certain surplus land located adjacent to the Debtors' Winchester, Virginia facility, (iv) certain excess and unused pasta-manufacturing equipment located at the Debtors' St. Louis, Missouri, Winchester, Virginia, Fresno, California, and Montreal, Canada facilities, and (v) the Debtors' 1977 Cessna 421C aircraft.  After receiving the requisite approval from the Bankruptcy Court, the Debtors disposed of those assets, which yielded proceeds in the aggregate amount of approximately $9,461,698.  As a result of these asset divestures, among others, the Debtors have been able to streamline their businesses, reduce unnecessary costs associated with maintaining unused and underutilized properties, and raise funds that will contribute to a successful reorganization.

In addition, the Debtors determined that their operations in Italy represented a net cash drain and were not integral to their ongoing operations.  Therefore, on October 1, 2004, the Debtors filed a motion seeking authorization to sell all of NWP's interests in (i) Albadoro S.p.A. ("Albadoro"), a wholly owned, non-debtor subsidiary of NWP, which produces dry pasta in Italy, and (ii) Monder Aliment S.p.A., a wholly owned subsidiary of Albadoro, which produces specialty dry-filled pasta in Italy, to Barbero SRL for aggregate cash proceeds of approximately $1,735,000 (the "Albadoro Sale").  Pursuant to an order dated November 1, 2004, the Court approved the Albadoro Sale, which was consummated on November 4, 2004.

With the acquisition of the Borden Pasta Companies on July 30, 2001, the Company acquired a manufacturing facility located in Lethbridge, Alberta, Canada (the "Lethbridge Facility").  In the second half of 2001, the Company determined that the Lethbridge Facility was not integral to their combined ongoing operations.  The Lethbridge Facility was subsequently closed and marketed for sale by CB Richard Ellis in Calgary, Alberta.  An agreement of purchase and sale was made on July 6, 2004 between RFC and Hobgoblin Holdings Limited for aggregated cash proceeds of approximately $490,607 Canadian dollars (the "Lethbridge Sale"). The Lethbridge Sale was consummated on September 20, 2004.

## G.    Key Employee Retention Program and Discretionary Bonus Plan

Pursuant to an order of the Bankruptcy Court, dated December 10, 2004, the Debtors were authorized to institute a retention program (the "Key Employee Retention Program") to induce the continued employment of more than thirty senior executives and middle managers that possess unique knowledge, skills, and experience, as well as customer and supplier

relationships vital to the Debtors' businesses. The Key Employee Retention Program provides for the payment of stay bonuses in the aggregate amount of approximately $863,200 and incentive bonuses depending upon the extent of the Debtors' achievement of certain target EBITDAR during the six-month reporting periods that ended December 2004 and June 2005, respectively. Because the target EBITDAR for the measuring periods were not met, the incentive bonuses were not paid. The Key Employee Retention Program also provides for the establishment of a discretionary bonus pool in the amount of $200,000 that is available to NWP's CEO to reward certain key personnel on an as-needed basis.

The Debtors have implemented a severance plan pursuant to which all non-union employees who are terminated without cause are eligible to receive a severance payment equal to two weeks of salary, plus eligible medical, dental, and vision coverage for the two-week severance period.

## H.    Union/Pension Issues

The vast majority of the Debtors' hourly employees working in their manufacturing plants in Fresno, California and St. Louis, Missouri are unionized. Prior to closing the plants in Louisville, Kentucky and Omaha, Nebraska, the hourly employees at those facilities also were unionized. Pursuant to certain collective bargaining agreements, the Debtors are required to fund and administer the following pension plans for their unionized employees: (i) the New World Pasta Company Omaha Retirement Plan (the "Omaha Pension Plan"), (ii) the New World Pasta Company St. Louis Retirement Plan (the "St. Louis Pension Plan"), and (iii) the New World Pasta Company Louisville Retirement Plan (the "Louisville Pension Plan"). For the Debtors' unionized employees in Fresno, the Debtors are required to make and have made contributions to a pension plan administered by the International Brotherhood of Teamsters (the "IBT Fresno Pension Plan"). Since the Commencement Date, the Debtors have made contributions to the Louisville and St. Louis Pension Plans, including a $111,944.00 contribution made to the Louisville Pension Plan on September 15, 2004 and a $91,266.00 contribution to the St. Louis Pension Plan on April 15, 2005. Although the Louisville and St. Louis Pension Plans may be underfunded, pursuant to the Plan, the Debtors have agreed to assume and continue the St. Louis Plan and Louisville Plan (the "Assumed Plans") in accordance with their terms, satisfy the minimum funding standards pursuant to 26 U.S.C. § 412 and 29 U.S.C. § 1082, and administer the Assumed Plans in accordance with their terms and the provisions of ERISA. Furthermore, nothing in the Plan will be construed as discharging, releasing, or relieving the Debtors, including the Reorganized Debtors, [or any party, in any capacity,] from any liability imposed under any law or regulatory provision with respect to the Assumed Plans, including to the extent applicable, the United States Pension Benefit Guaranty Corporation (the "PBGC"). The PBGC and the Assumed Plans will not be enjoined or precluded from seeking to enforce such liability as a result of any provision of the Plan or Confirmation Order. The Debtors have also continued to meet their postpetition obligations under the IBT Fresno Pension Plan.

As of February 2005, the Debtors ceased making contributions to the Omaha Pension Plan as a result of the closing of the Debtors' Omaha facilities in September 2004. The liabilities of the Omaha Pension Plan exceed its assets, and the Debtors have been in discussions with the PBGC concerning the PBGC's assumption of the Omaha Pension Plan. With respect to the Omaha Plan, the PBGC is currently conducting an administrative investigation concerning the

Case 1:04-bk-02817-MDF    Doc 1356    Filed 09/21/05    Entered 09/21/05 12:38:08    Desc
Main Document      Page 28 of 94

potential termination of the Omaha Plan by the PBGC pursuant to the provisions of 29 U.S.C. § 1342(a). The Debtors believe that the Omaha Plan does not have assets available to pay benefits which are currently due under the terms of the Omaha Plan and that the PBGC is obligated to guarantee the payment of benefits under such plan by terminating such plan. *See* 29 U.S.C. § 1342(a). The PBGC's administrative investigation involves collecting and assessing participant and financial data regarding the Omaha Plan in order to determine the accuracy of the Debtors' position and to establish an administrative record that supports administrative action. The termination of a pension plan that is covered by Title IV of ERISA can only be effected by the methods set forth in Title IV and may not be effected by rejecting the pension plan as an executory contract pursuant to the Bankruptcy Code. *See Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 446-48 (1999); *Phillips v. Bebber*, 914 F.2d 31, 34 (4th Cir. 1990).

Title IV of ERISA provides that the PBGC is a joint and several creditor of all the members of a controlled group that includes the sponsor of a defined benefit pension plan. *See* 29 U.S.C. §§ 1301(a)(18), 1307(e)(2), 1362(a), 1362(b), 1362(c); 29 U.S.C. §§ 1082(c)(11); 26 U.S.C. § 412(c)(11). The PBGC opposes the substantive consolidation of the Debtors because it asserts that such consolidation will improperly abrogate its statutory right to treatment as a joint and several creditor.

On November 4, 2004, the PBGC filed a proof of claim against the Debtors for unpaid prepetition and postpetition contributions to the Omaha Pension Plan in the amount of $698,287.00. The PBGC also filed contingent proofs of claim against the Debtors for unpaid premiums and potential underfundings related to the pension plans in the amounts of $2,258,600 (Louisville), $6,132,300 (St. Louis) and $4,364,100 (Omaha), which amounts the Debtors believe are excessive. The Debtors intend to continue funding all such plans other than the Omaha Pension Plan.

## I.     Executory Contracts

In connection with their restructuring efforts and the development of their long-term business plan, during the Reorganization Cases, the Debtors undertook a comprehensive review of their executory contracts and unexpired leases. In furtherance thereof, the Debtors have assumed certain executory contracts and unexpired leases that they identified as necessary to their ongoing operations, including certain warehousing, material-handling, and brokerage agreements, and rejected or will reject certain other executory contracts and unexpired leases that they identified as unnecessary and burdensome to the estates.

NWP is party to two Amended and Restated Mill Agreements with Miller Milling Company ("Miller Milling"), dated March 10, 2000, together with various contracts of sale (collectively, the "Mill Agreements"), pursuant to which Miller Milling supplies the Debtors with semolina flour for use in the Debtors' manufacturing plants in Winchester, Virginia and Fresno, California. The semolina flour provided by Miller Milling is a key ingredient in the Debtors' pasta products. Following extensive negotiations with Miller Milling, on December 20, 2004, the Debtors filed a motion to assume Mill Agreements as amended by agreement between the parties, and pay a cure in the amount of $2,833,659. The Court entered an order approving that motion on December 23, 2004, and the Debtors have paid the entire cure amount due thereunder.

Case 1:04-bk-02817-MDF    Doc 1356    Filed 09/21/05    Entered 09/21/05 12:38:08    Desc
Main Document      Page 29 of 94

## J.    Updating the Debtors' Information/Technology System

As discussed in Section II.D hereof, entitled "Events Leading to the Commencement of the Reorganization Cases," the challenges that confronted the Debtors as a result of instituting the new Software System were a factor precipitating the commencement of the Reorganization Cases. Both before and after the Commencement Date, the Debtors continued to evaluate the Software System and their information/technology systems subsequent to the Commencement Date, the Debtors concluded that they needed to outsource the task of updating and rebuilding their information/technology systems in order to reduce operational and financial risks, improve operational efficiencies, provide comprehensive end-user support, enhance software, and make available important management tools. To this end, the Debtors requested and considered proposals from a number of information/technology providers. Of the proposals submitted, the Debtors determined that the proposal submitted by Corio, Inc. ("Corio") was the most appropriate for the Debtors.

Following negotiations with Corio, on December 23, 2004, the Debtors filed a motion for an order authorizing the Debtors to enter into a Master Services Agreement and accompanying Full Service Solution Schedule and Statements of Work (collectively, the "IT Services Agreement") with Corio for the provision of new information/technology services. On January 13, 2005, the Court entered an order authorizing the Debtors to enter into the IT Services Agreement.

## K.    Lapse of Exclusivity; Case Management Stipulation

On September 7, 2004, the 120-day period during which the Debtors would have had the exclusive right to propose a plan of reorganization under section 1121 of the Bankruptcy Code expired, and the Debtors did not file a motion to extend this exclusive period before such period expired. In an effort to proceed in a orderly and efficient fashion, and to enable the Debtors to implement restructuring initiatives and realize the benefits of such initiatives, on October 6, 2004, the Debtors filed a motion for a case management order that would establish procedures for the filing and prosecution of plans of reorganization and disclosure statements in these chapter 11 cases (the "Case Management Motion"). The Case Management Motion petitioned the Court to employ its "inherent powers" under section 105 of the Bankruptcy Code to establish appropriate and efficient procedures with respect to the filing of plans of reorganization and disclosure statements and the scheduling of related hearings in these chapter 11 cases.

On December 10, 2004, the Debtors, JLL, the Creditors' Committee, BNY, BNS, and Black Diamond executed a stipulation (the "Case Management Stipulation"), pursuant to which it was agreed that none of the signing parties would file or support the filing of a plan for a period of not less than thirty (30) days after the date of entry of an order approving the stipulation. The Case Management Stipulation also provided that once this initial thirty-day period expired, any signatory that desired to file or support the filing of a plan was required to provide fifteen-days' notice to the other signatories before terminating the Case Management Stipulation. Under the Case Management Stipulation, the Debtors adjourned the Case Management Motion, but reserved the right, upon receipt of a notice of termination of such stipulation, to restore it for hearing. The Court approved the terms of the Case Management Stipulation by order dated December 10, 2004.

Case 1:04-bk-02817-MDF    Doc 1356    Filed 09/21/05    Entered 09/21/05 12:38:08    Desc
Main Document    Page 30 of 94

On June 6, 2005, BNY served a notice terminating the Case Management Stipulation. As a result, as of June 21, 2005, and unless otherwise agreed, any signatory to the Case Management Stipulation was able to file a plan of reorganization for the Debtors and/or join in and/or support a plan of reorganization filed by any other party in interest in these cases. The Debtors were advised that BNY intended to file a plan of reorganization for the Debtors and a related disclosure statement. In response, on June 24, 2005, the Debtors filed an amended and restated case management motion for an order establishing procedures for the prosecution of plans of reorganization and disclosure statements in these chapter 11 cases (the "Amended Case Management Motion"). On July 8, 2005, the Debtors and the Senior Lenders reached an agreement to resolve the issues raised by the Amended Case Management Motion, pursuant to which they agreed, among other things, that the Debtors would file the Plan on or before July 15, 2005, and the Senior Lenders would delay the filing of any competing plan of reorganization to September 1, 2005. On September 1, 2005, the Prepetition Agent informed the Debtors that it would not file a competing plan of reorganization on that date and that it reserved its rights and the rights of the Senior Lenders to do so in the future.

### L.   Bar Date and Claims Reconciliation

On July 23, 2004, the Debtors filed their Statements of Financial Affairs, Schedules of Assets and Liabilities, and Schedules of Executory Contracts and Unexpired Leases (collectively, the "Schedules").

By order dated September 3, 2004 (the "Bar Date Order"), pursuant to rule 3003(c)(3) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), the Bankruptcy Court established 4:00 p.m. on November 8, 2004 (the "Bar Date") as the date and time by which all claimants, including "governmental units" as such term is defined in section 101(27) of the Bankruptcy Code, were required to file proofs of claims in the Reorganization Cases.[9] In accordance with the Bar Date Order, on or about September 9, 2004, a proof of claim form, a notice regarding the scheduling of each claim, and a notice regarding the Bar Date Order was mailed to all creditors listed on the Debtors' Schedules. Approximately 887 Claims have either been scheduled or filed in the Reorganization Cases.

### IV.

### THE JOINT PLAN OF REORGANIZATION

The Debtors believe that under the Plan, holders of Allowed Claims receiving distributions under the Plan will obtain a greater recovery from the estates of the Debtors than the recovery that they would receive if the assets of the Debtors were liquidated under chapter 7 of the Bankruptcy Code. The Debtors also believe that the Plan will afford the Debtors the opportunity and ability to preserve going concern value and continue in business as a viable going concern, serving the interests of all of the Debtors' constituencies, including creditors, vendors, customers, and employees.

---

[9]   Pursuant to a stipulation approved by the Court on June 3, 2005, the SEC's bar date to file proofs of claim against the Debtors was extended to September 16, 2005 at 4:00 p.m.

**THE PLAN IS ANNEXED HERETO AS EXHIBIT A AND IS AN INTEGRAL PART OF THIS DISCLOSURE STATEMENT. THE SUMMARY OF THE PLAN SET FORTH BELOW IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE FULL TEXT OF THE PLAN. IN THE EVENT OF ANY INCONSISTENCY BETWEEN THE PROVISIONS OF THE PLAN AND THE SUMMARY CONTAINED HEREIN, THE TERMS OF THE PLAN WILL GOVERN.**

## A.    <u>Administrative Expenses</u>

An Allowed Administrative Expense is any right to payment constituting a cost or expense of the administration of any of the Reorganization Cases under sections 503(b) and 507(a)(1) of the Bankruptcy Code, including without limitation, any actual and necessary costs and expenses of preserving the Debtors' estates, any actual and necessary costs and expenses of operating the Debtors' businesses and any indebtedness or obligations incurred or assumed by the Debtors, as debtors in possession, during the Reorganization Cases. Administrative Expenses include, without limitation, unpaid amounts owed by the Debtors to vendors and trade creditors for goods and services provided after the commencement of the Reorganization Cases, payroll and payroll-related amounts, unpaid amounts owed under the Key Employee Retention Program, cure amounts owed to contract or lease counterparties in connection with the Debtors' assumption of executory contracts and unexpired leases, unpaid obligations under the DIP Agreement, and Allowed amounts owed to professionals retained in the Reorganization Cases for compensation for professional services rendered and reimbursement of expenses incurred in connection therewith. The Debtors estimate that on the Effective Date, the Allowed Administrative Expenses will aggregate approximately $58,100,000, including approximately $36,500,000 of Claims arising under the DIP and approximately $19,600,000 in estimated professional fees and expenses.

Except as set forth in Section II.B.2 of the Plan with respect to requests for compensation for professional services rendered or reimbursement of expenses, and except to the extent that a holder of an Allowed Administrative Expense agrees to a different treatment, the Reorganized Debtors are required to pay to each holder of an Allowed Administrative Expense cash in an amount equal to the Allowed amount of such Administrative Expense on the later of the Effective Date and the date such Administrative Expense is Allowed or as soon thereafter as practicable. Allowed Administrative Expenses representing liabilities incurred in the ordinary course of the Debtors' businesses will be paid by the Debtors or the Reorganized Debtors, as applicable, in the ordinary course of business, consistent with past practice and on the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to, such transactions. On the Effective Date, all amounts owed under the DIP Agreement will be indefeasibly paid in full in cash and the commitments thereunder terminated. Outstanding letters of credit issued under the DIP Agreement, if any, will be returned to the issuer undrawn and marked canceled and new letters of credit will be provided pursuant to the Exit Facility to replace the outstanding letters of credit issued under the DIP Agreement. Any outstanding letters of credit that are not canceled or replaced by new ones will be cash collateralized. Effective upon payment or satisfaction in full of all DIP Obligations in accordance with the terms of the DIP Agreement, all liens granted to secure such obligations will be terminated and of no further force or effect. Any amounts owing under the DIP Agreement will be treated as an Administrative Expense.

All entities seeking awards by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date under sections 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code will be required to (a) file their respective final applications for allowances of compensation for services rendered and reimbursement of expenses incurred on or before the deadline specified in the Confirmation Order and (b) be paid in full in such amounts as are Allowed by the Bankruptcy Court (including amounts incurred in connection with the investigation or prosecution of Claims and Defenses (as defined in the Amended DIP Order)) (i) upon the later of (A) the Effective Date and (B) the date upon which the order relating to any such Allowed Administrative Expense becomes a Final Order, or (ii) upon such other terms as may be mutually agreed upon between such holder of an Allowed Administrative Expense and the Reorganized Debtors. The Debtors are authorized to pay compensation for services rendered and reimbursement of expenses incurred after the Effective Date in the ordinary course and without the need for Bankruptcy Court approval.

**B.      Priority Tax Claims**

A Priority Tax Claim is any unsecured Claim of a governmental unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code, such as certain income taxes, property taxes, sales and use taxes, excise taxes, and employment and withholding taxes. The Debtors estimate that on the Effective Date, the Allowed amount of Priority Tax Claims that have not been previously paid pursuant to an order of the Bankruptcy Court will be approximately $200,000.[10]

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a different treatment, each Allowed Priority Tax Claim will be paid in full, in cash, in equal annual installments commencing on the later of the Effective Date and the date on which such Claim is Allowed, or, in each case, as soon thereafter as practicable, and continuing over a period not exceeding six years after the date of assessment of such Claim, together with interest thereon at a market rate from the Effective Date to the date of payment, subject to the Debtors' or the Reorganized Debtors' sole option to prepay all or a portion of the balance thereof at any time. All Allowed Priority Tax Claims that are not due and payable on or before the Effective Date will be paid in the ordinary course of business as such obligations become due.

**C.      Classification and Treatment of Claims and Equity Interests**

In accordance with section 1122 of the Bankruptcy Code, and as discussed below, the Plan classifies Claims and Equity Interests separately and provides different treatment for the different classes based on the different rights of the holders of Claims or Equity Interests in each class.

---

[10]   This amount is exclusive of any Priority Tax Claim that may be asserted against Ronzoni by Canadian taxing authorities. No such Claim has ever been asserted, but there is no assurance that one will not be asserted in the future. Any such Claim probably would be based upon an assertion by the relevant taxing authority that Ronzoni, a United States corporation without an office or employees in Canada, transacted business in Canada. If such a claim is asserted, Ronzoni would dispute such Claim and, in any event, a substantial portion thereof is subject to an indemnity in favor of Ronzoni from Borden Foods Corporation and Borden Chemical, Inc. The balance of any such Claim, if ultimately established, would be a liability of Ronzoni.

1.      **Priority Non-Tax Claims (Class 1)**

A Priority Non-Tax Claim is any Claim, other than a Priority Tax Claim, entitled to priority in payment as specified in sections 507(a)(2), (3), (4), (5), (6), (7), or (9) of the Bankruptcy Code.  Such Priority Non-Tax Claims include certain compensation and benefit plan Claims of the Debtors' employees earned within 90 days prior to the Commencement Date in the aggregate amounts up to $4,925 per employee.  The Debtors estimate that on the Effective Date, the Allowed amount of Priority Non-Tax Claims will aggregate approximately $18,500.

Except to the extent that a holder of an Allowed Claim in Class 1 agrees to a less favorable treatment, on the later of the Effective Date and the date on which such Claim is Allowed, each Allowed Priority Non-Tax Claim will be paid in full, in cash, together with postpetition interest, and thereby rendered unimpaired in accordance with section 1124 of the Bankruptcy Code.

Class 1 is unimpaired.  Pursuant to section 1126(f) of the Bankruptcy Code, the holders of Claims in Class 1 are conclusively presumed to have accepted the Plan.

2.      **Senior Lender Claims (Class 2)**

The Senior Lender Claims are the Claims arising under the Old Credit Agreement with respect to the Senior Loans.  The Debtors' estimate of the Allowed amount of Senior Lender Claims, as of the Effective Date, is described in Section II.C.1 of the Disclosure Statement.  The Senior Lender Claims are Allowed under the Plan and not subject to setoff or recoupment.

Except to the extent that a holder of an Allowed Claim in Class 2 agrees to a less favorable treatment, on the Effective Date, (i) each holder of an Allowed Senior Lender Claim will receive cash in an amount equal to such holder's Allowed Claim in Class 2, including accrued and unpaid interest calculated at the default rate, *i.e.*, the Alternate Base Rate plus 10%, as set forth in the Old Credit Agreement (net of prior payments made at the non-default rate); (ii) the reasonable, documented accrued and unpaid fees and expenses of the Prepetition Agent and the Prepetition Agent's and Senior Lenders' legal advisors, financial advisors and consultants will be paid in full, in cash; and (iii) the Prepetition Agent, the Senior Lenders and their respective legal advisors, financial advisors and consultants will be permitted to retain all interest, fees and expenses paid on or prior to the Effective Date.

On the Effective Date, the Disbursing Agent will make all distributions required under the Plan to holders of Allowed Class 2 Claims to the Prepetition Agent.  Such distributions will be in complete satisfaction and discharge of the Debtors' obligations to the holders of Class 2 Claims.

Class 2 is unimpaired by the Plan.  Pursuant to section 1126(f) of the Bankruptcy Code, the holders of Claims in Class 2 are conclusively presumed to have accepted the Plan.

3.      **Term Lender Claims (Class 3)**

The Term Lender Claims are Claims arising under the Old Credit Agreement with respect to the Term Loans.  For all purposes of the Plan and Reorganization Cases, the Term Lender

Claims will be deemed Allowed in their entirety in the amount of $168,000,000, not subject to any defenses, offsets, counterclaims, subordination, recharacterization, or avoidance. On the Effective Date the holder of the Allowed Term Lender Secured Claims in Class 3 will receive, pursuant to the Restructuring Transactions (defined and described in the Plan and Section IV.D.3 below), 6,375,000 shares of Holdings Common Stock, which will constitute 85% of the Holdings Common Stock issued and issuable on or immediately after the Effective Date, subject to full dilution for the shares to be issued pursuant to the Management Incentive Plan, the New Warrants, and any issuance of equity or equity-linked distributions in connection with the Exit Facility. For a description of the terms and value of the Holdings Common Stock, see Sections IV.D.5 and VI.C of the Disclosure Statement, entitled "Issuance of Holdings Common Stock" and "Valuation," respectively. The Term Lender will be entitled to retain any payments received after the Commencement Date pursuant to the Cash Collateral Order.

No distributions will be made or will be deemed to have been made on account of the Term Lender Deficiency Claim, and the Term Lender Deficiency Claim will be deemed waived by the Term Lender and discharged as of the Effective Date by the Term Lender's acceptance of the Plan.

On the Effective Date, the Disbursing Agent will make all distributions required under the Plan with respect to Allowed Term Lender Secured Claims to the Term Lender in accordance with the Restructuring Transactions. Such distribution will be in complete satisfaction and discharge of the Debtors' obligations to the holder of the Allowed Term Lender Claims.

Class 3 is impaired by the Plan. The holder of the Allowed Term Lender Claims in Class 3 is entitled to vote to accept or reject the Plan.

### 4. Other Secured Claims (Class 4)

The Other Secured Claims consist of all Secured Claims not constituting a Senior Lender Claim or Term Lender Claim. These Other Secured Claims include mainly claims for amounts owed under secured equipment financing agreements. The Debtors estimate that on the Effective Date, the Allowed Other Secured Claims will aggregate approximately $25,000.

Except to the extent that a holder of an Allowed Claim in Class 4 agrees to a less favorable treatment, on the Effective Date, each Allowed Other Secured Claim will be, at the Debtors' option, (i) reinstated, (ii) paid in full, in cash, (iii) satisfied by the Debtors' surrender of the collateral securing such Allowed Claim, or (iv) otherwise rendered unimpaired in accordance with section 1124 of the Bankruptcy Code. The Debtors believe that the distribution to Class 4 will represent a recovery of 100% of the Allowed Other Secured Claims.

Class 4 is unimpaired by the Plan. Pursuant to section 1126(f) of the Bankruptcy Code, the holders of Allowed Claims in Class 4 are conclusively presumed to have accepted the Plan.

### 5. General Unsecured Claims (Class 5)

A General Unsecured Claim is any prepetition Claim against any of the Debtors that is not (a) a Priority Tax Claim, Priority Non-Tax Claim, Senior Lender Claim, Term Lender Claim, Other Secured Claim, or Other Unsecured Claim or (b) subject to subordination pursuant to

section 510(b) of the Bankruptcy Code. The Debtors estimate that on the Effective Date, the Allowed amount of General Unsecured Claims will aggregate approximately $190,000,000. Pursuant to the Plan, the Old Note Claims will be deemed Allowed in the amount of $171,056,062, not subject to any defenses, offsets, counterclaims, subordination, recharacterization, or avoidance.

Each holder of an Allowed Class 5 Claim will receive pursuant to the Restructuring Transactions (defined and described in the Plan and Section IV.D.3 below), on the later of the Effective Date and the date on which its Class 5 Claim becomes an Allowed Claim, its Pro Rata Share of (i) 1,125,000 shares of Holdings Common Stock, which will constitute 15% of the Holdings Common Stock issued and issuable on or immediately after the Effective Date subject to full dilution for the shares to be issued pursuant to the Management Incentive Plan, the New Warrants, and any issuance of equity or equity-linked distributions in connection with the Exit Facility, and (ii) the New Warrants. The Debtors believe that the distribution to Class 5 will represent a recovery of approximately 8.2% of the Allowed General Unsecured Claims. For a description of the terms and value of the Holdings Common Stock, and New Warrants, see Sections IV.D.5, IV.D.6, and VI.C of the Disclosure Statement, entitled "Issuance of Holdings Common Stock," "Issuance of New Warrants," and "Valuation," respectively.

In addition, on the later of the Effective Date or the date on which each General Unsecured Claim becomes an Allowed Class 5 Claim, each holder of an Allowed Class 5 Claim will automatically, regardless of whether such holder votes to accept or reject the Plan, executes the Securityholders Agreement or does not vote on the Plan, become a party to and bound by the Securityholders Agreement, unless such holder declines to accept the shares of Holdings Common Stock and New Warrants to which such holder would otherwise be entitled. The principal terms of the Securityholders Agreement will include, but are not limited to, composition of the Board of Directors of Holdings, restrictions on transfer, tag-along, and drag-along rights, and other customary terms. In addition, a Registration Rights Agreement for the benefit of large holders of Holdings Common Stock will be included in the Plan Supplement.

On the Effective Date, the Debtors and Holdings will make all distributions required under the Plan to the holders of Allowed Old Note Claims in Class 5 to the Indenture Trustee. Such distributions will be in complete satisfaction and discharge of the Debtors' obligations to the holders of Class 5 Claims under the Old Notes and the Old Notes Indenture. The Indenture Trustee will make the distributions to the holders of Old Notes. Pursuant to the Plan, on the Effective Date, any Claims scheduled or filed with respect to the Old Notes will be disallowed as duplicative of the Claim filed by the Indenture Trustee.

All other Class 5 distributions will be made by the Disbursing Agent on the later of (a) the date such Class 5 Claim becomes an Allowed Class 5 Claim or (b) the Effective Date.

Class 5 is impaired by the Plan. Each holder of an Allowed Claim in Class 5 is entitled to vote to accept or reject the Plan.

Case 1:04-bk-02817-MDF    Doc 1356    Filed 09/21/05    Entered 09/21/05 12:38:08    Desc
Main Document        Page 36 of 94

### 6. Other Unsecured Claims (Class 6)

An Other Unsecured Claim is any prepetition non-priority, unsecured Claim that is not an Old Note Claim against any of the Debtors and that is (a) Allowed in an amount of not more than $1,000 or (b) that is greater than $1,000 and is reduced by the holder of such Claim to $1,000 by written election made on a validly executed and timely delivered Ballot. Other Unsecured Claims include, but are not limited to: (a) prepetition Claims of the Debtors' trade vendors, suppliers and service providers, (b) prepetition Claims for damages resulting from the rejection of unexpired leases of non-residential real property and executory contracts, or (c) prepetition Claims relating to personal injury, property damage, or products liability or other similar Claims that have not been compromised and settled or otherwise resolved. The Debtors estimate that on the Effective Date, the Allowed amount of Other Unsecured Claims will aggregate approximately $1,500,000.

If the holder of a Claim that would otherwise constitute a General Unsecured Claim fails to make a valid and timely election into Class 6 by properly completing, executing and delivering an appropriate Ballot containing such an election, such holder's Claim, if otherwise timely, will be subject to classification and treatment as a General Unsecured Claim in Class 5.

Each holder of an Allowed Class 6 Claim will receive on the later of the Effective Date and the date on which its Class 6 Claim becomes an Allowed Claim, cash in an amount equal to 7.5%[11] of the Allowed amount of such Other Unsecured Claim (up to a Claim of $1,000).

Class 6 is impaired by the Plan. Each holder of an Allowed Claim in Class 6 is entitled to vote to accept or reject the Plan.

### 7. NWP Equity Interests (Class 7)

The NWP Equity Interests are the interests of any holder of an equity security in NWP represented by any issued and outstanding shares of common stock or other instrument evidencing a present ownership interest in NWP, whether or not transferable, including any option, warrant, call, subscription, or other right, contractual or otherwise, to acquire any such interest.

On the Effective Date, the shares of common stock of NWP issued, outstanding or authorized to be issued, and any other instrument evidencing an Equity Interest in NWP will be canceled and terminated, and the holders of all Equity Interests in NWP in Class 7 will not receive or retain any property or interest in property on account of any Equity Interests in NWP.

Class 7 is impaired. Pursuant to section 1126(g) of the Bankruptcy Code, each holder of an Equity Interest in Class 7 is deemed to have rejected the Plan.

---

[11]   The distribution to holders of Allowed Claims in Class 6 (Other Unsecured Claims) does not reflect and is not based upon the enterprise valuation of the Debtors by Rothschild in that the value of the recoveries by Other Unsecured Claims may be less than the value of the recoveries of holders of Allowed Class 5 Claims based on Rothschild's valuation.

Case 1:04-bk-02817-MDF    Doc 1356    Filed 09/21/05    Entered 09/21/05 12:38:08    Desc
Main Document        Page 37 of 94

### D. Implementation of the Plan

#### 1. Substantive Consolidation

Substantive consolidation is an equitable remedy that a bankruptcy court may employ in chapter 11 cases such as the Debtors. Substantive consolidation treatment involves the pooling and merging of the debtors' assets and unsecured liabilities for plan voting, plan treatment, and plan distribution purposes. All of the debtors in a substantively consolidated group are treated, for plan purposes only, as if they were a single corporate and economic entity. Consequently, a creditor of one substantively consolidated debtor is treated as a creditor of the substantively consolidated group of debtors, and issues of individual corporate ownership of property and individual corporate liability on obligations are ignored. Distributions to creditors are thus based upon all pooled assets and pooled liabilities, as if the debtors were a single economic and legal entity. Therefore, cross-corporate guaranties by one debtor of the liabilities of other debtors, duplicate claims against more than one debtor, claims asserting joint and several liability against multiple debtors, and intercompany claims among the debtors (all of which would be dilutive of the amounts ultimately payable to holders of allowed claims against the debtors) are eliminated by substantive consolidation.

Section 105(a) of the Bankruptcy Code empowers bankruptcy courts to authorize substantive consolidation. Although there is no statutory provision dictating when substantive consolidation is appropriate, the United States Court of Appeals for the Third Circuit has recently held that substantive consolidation is proper when (i) prepetition, the entities seeking to be substantively consolidated disregarded their separateness so significantly that their creditors relied on the breakdown of entity borders and treated them as one legal entity, or (ii) postpetition the assets of the entities to be substantively consolidated are so scrambled that separating them is prohibitive and hurts all creditors. *In re Owens Corning*, __ F.3d __, No. 04-4080, 2005 WL 1939796, at *10 (3d Cir. Aug. 15, 2005).

The Debtors believe substantive consolidation treatment is warranted in the Reorganization Cases. The five Debtors, although separate legal entities, operate collectively as a single, integrated enterprise under the control and direction of NWP, with PAC and Ronzoni playing limited and specialized roles completely dependent upon NWP, and with Prince and NWP Delaware existing solely as shell companies. With the exception of PAC, NWP owns and controls all of the Debtors' assets, formulates the Debtors' business plan, procures all raw materials required for the Debtors' products, operates all of the Debtors' pasta-making plants and facilities, markets and distributes the Debtors' pasta products within the United States, pays all of the Debtors' employees (directly or indirectly), borrows on behalf of all the Debtors, reaches agreements with third parties on behalf of all the Debtors, pays insurance on behalf of all the Debtors, and manages all of the Debtors' cash. PAC is a holding company for the Debtors' St. Louis facility, equipment located therein, and certain pasta-making patents. However, PAC plays no role in the operation of the St. Louis plant—it neither hires nor pays the employees working in the St. Louis plant, nor negotiates collective bargaining agreements covering the St. Louis plant, nor pays for the maintenance or repair of the St. Louis plant, nor purchases raw materials, utilities or services for the operation of the St. Louis plant. Ronzoni markets and sells the Debtors' pasta outside of the United States, but it does not possess a bank account. Its assets (primarily accounts receivable) are pledged as collateral under the Old Credit Agreement, and

together with its liabilities, are managed by NWP. Ronzoni purchases all of the products it sells from NWP, does not have its own employees or pay its own expenses, but rather, depends upon NWP to cover these expenses. Neither Prince nor NWP Delaware owns, holds, or controls any assets. Through this integration, there is a "commingling" or "entangling" of all of the Debtors' business functions, and it is nearly impossible to value any of the Debtors other than NWP as an independent entity capable of reorganizing apart from the other Debtors. *See In re Owens Corning*, 2005 WL 1939796, at *10 n.4 (substantive consolidation appropriate where the entities' assets have been "'hopelessly commingled'") (quoting *FDIC v. Hogan (In re Gulfco Inv. Corp.)*, 593 F.2d 921, 929 (10th Cir. 1979)

NWP dictates corporate policy for the Subsidiaries with unified management, direction, and control being administered by NWP from NWP's central headquarters in Harrisburg, Pennsylvania. In fact, the directors of the Subsidiaries are all employees of NWP and meet only when needed to approve corporate initiatives conceived of and implemented by NWP.

The Debtors operate a consolidated cash management system with all of the Debtors' cash held in an account belonging to NWP, from which the costs and expenses of operating the Debtors' businesses are paid. The Debtors also file joint and consolidated tax returns and financial reports. Neither PAC, Prince, nor NWP Delaware possess their own books and records and there are no intercompany transfers recorded between NWP and PAC, Prince, or NWP Delaware. Ronzoni exists only to sell NWP products outside of the United States.

As a result of the foregoing, the Plan is premised on the substantive consolidation treatment of the five Debtors. Absent substantive consolidation treatment, assets and liabilities would have to be allocated among the legal entities and the liquidation and reorganization values of the five Debtors would have to be determined separately, none of which could be performed with any degree of certainty because the Debtors have always functioned as a single enterprise on an economic, as well as operational, basis and, as a result, their assets and liabilities have been "hopelessly commingled." Thus, the Debtors would incur additional professional fees in what may ultimately constitute a protracted and unsuccessful undertaking. The difficulty untangling the Debtors' affairs would be exacerbated by the fact that there are no intercompany transfers recorded between NWP and PAC, Prince, or NWP Delaware that could serve as a basis for determining with any degree of accuracy each Debtor's assets and liabilities. Moreover, even if any benefit could be obtained by a creditor from non-consolidation, that benefit would be eclipsed by the significant professional fees that would be incurred in the effort to untangle the Debtors' affairs. As the Third Circuit held in *Owens Corning*, the rationale of substantive consolidation is "at bottom one of practicality," and in these Reorganization Cases, it would be completely impractical to untangle the Debtors' assets and liabilities. *See id.*

Accordingly, on the Effective Date, all of the Debtors and their estates will, for Plan purposes only, be treated as merged and (i) any Intercompany Claims will be treated as canceled and no distribution will be made on account thereof, (ii) all assets and liabilities of the Debtors will be treated as merged, (iii) all guaranties by any of the Debtors of the obligations of any other Debtor arising prior to the Effective Date will be treated as canceled so that any Claim against any Debtor and any guaranty thereof executed by any other Debtor and any joint and several liability of any of the Debtors will be treated as one obligation of the consolidated Debtors, and (iv) each and every Claim filed or to be filed in the Reorganization Cases will be treated as filed

against the consolidated Debtors and will be treated as one Claim against, and obligation of, the consolidated Debtors. Such substantive consolidation, however, will not (other than for Plan voting, treatment, and distribution purposes) affect (i) the legal and organizational structure of the Debtors, (ii) the equity interests in the Subsidiaries, or (iii) the Claims being reinstated and unimpaired, and the legal, equitable, and contractual rights to which the holders of any such Claims are entitled will be left unaltered by the Plan.

All principal creditor constituencies, including the DIP Lenders, Senior Lenders, Term Lender, and the Creditors Committee, have consented to or do not oppose the substantive consolidation proposed in the Plan. The PBGC opposes substantive consolidation because it asserts that such consolidation will improperly abrogate its statutory right to treatment as a joint and several creditor.

## 2. Compromise and Settlement

The Plan incorporates and implements the compromise and settlement of all issues among the Debtors, the Creditors' Committee, the Term Lender, and JLL as set forth in the Committee Standing Settlement. For a detailed discussion of the Committee Standing Settlement, see Section III.E of the Disclosure Statement, entitled "Creditors' Committee Standing Motion; Plan Negotiations."

## 3. Restructuring Transactions

On the Effective Date, subject to the treatment of Disputed Class 5 Claims, the following restructuring transactions, among others, will occur, in the following order (the "Restructuring Transactions"):

> (a) All Allowed Claims in Class 3 will be contributed pursuant to the terms of the Plan to Holdings in exchange for Holdings Common Stock, as provided in Section II.D.3 of the Plan.

> (b) All Allowed Claims in Class 3 (*i.e.*, the Claims acquired by Holdings, above) and all Allowed Claims in Class 5 will be satisfied and discharged in exchange for 100% of the New Common Stock, to be allocated between such Classes consistent with their relative economic rights under the Plan. The New Common Stock distributable in satisfaction of Allowed Claims in Class 5 will be held by the Disbursing Agent on behalf of the holders of such Claims.

> (c) The New Common Stock held by the Disbursing Agent on behalf of the holders of Allowed Claims in Class 5 will be exchanged for Holdings Common Stock and New Warrants, as provided in Section II.D.5 of the Plan.

Where an Allowed Class 5 Claim is against a Debtor that is a Subsidiary of NWP, the distribution of New Common Stock under the preceding paragraph in respect of such Claim will be made on behalf of the applicable debtor. Accordingly, the distribution of such stock by Reorganized NWP will be treated as a transfer, either directly or indirectly, by Reorganized NWP to the applicable Debtor, and then as a distribution by the applicable Debtor.

Case 1:04-bk-02817-MDF    Doc 1356    Filed 09/21/05    Entered 09/21/05 12:38:08    Desc
Main Document      Page 40 of 94

4. **Issuance of New Common Stock**

Pursuant to the Plan and effective on the Effective Date, the issuance of the New Common Stock by Reorganized NWP will be authorized without the need for any further corporate action. The New Common Stock will consist of 10,000,000 authorized shares of new common stock of Reorganized NWP, $0.01 par value per share. A total of 7,500,000 shares will be issued and distributed, in accordance with the Restructuring Transactions, to the holders of Allowed Claims in Classes 3 and 5 pursuant to Section IV of the Plan, which shares will have been duly authorized, fully paid, and nonassessable shares of capital stock of Reorganized NWP. A portion of the shares from the Class 5 distribution will be reserved for distribution to holders of Disputed General Unsecured Claims, in accordance with Section V of the Plan and the Restructuring Transactions, if and when such Claims become Allowed Claims. Shares will also be reserved for distribution in accordance with the Management Incentive Plan. The remaining authorized shares will be reserved for such future corporate purposes as are determined by the Board of Directors of Reorganized NWP consistent with its Restated Charter.

5. **Issuance of Holdings Common Stock**

Pursuant to the Plan and effective on the Effective Date, the issuance of the Holdings Common Stock by Holdings will be authorized without the need for any further corporate action. The Holdings Common Stock will consist of 40,000,000 authorized shares of new common stock of Holdings, $0.01 par value per share. A total of 7,500,000 shares of Holdings Common Stock will be issued and distributed, in accordance with the Restructuring Transaction, to the holders of Allowed Claims in Classes 3 and 5 pursuant to Section IV of the Plan, which shares will be duly authorized, fully paid, and nonassessable shares of capital stock of Holdings. A portion of the shares from the Class 5 distribution will be reserved for distribution to holders of Disputed General Unsecured Claims, in accordance with Section V of the Plan and the Restructuring Transactions, if and when such Claims become Allowed Claims. Shares willl also be reserved for distribution (i) in accordance with the Management Incentive Plan, and (ii) in the amount of 1,759,259 shares in accordance with the exercise of the New Warrants. The remaining authorized shares will be reserved for such future corporate purposes as are determined by the Board of Directors of Holdings consistent with its charter.

6. **Issuance of New Warrants**

Pursuant to the Plan and effective on the Effective Date, the issuance of the New Warrants by Holdings will be authorized pursuant to the Plan without the need for any further corporate action. The New Warrants will consist of (i) New Class A Warrants to purchase 833,333 shares of Holdings Common Stock with a strike price of $9.28 per share based on a total enterprise value of $275,000,000, and (ii) New Class B Warrants to purchase 925,926 shares of Holdings Common Stock with a strike price of $12.28 per share based on a total enterprise value of $300,000,000 (subject to dilution for any further adjustments that may be incorporated in the New Warrant Agreement). The New Warrants will be distributed, in accordance with Section V of the Plan and the Restructuring Transactions, to the holders of Allowed Claims in Class 5 pursuant to Section IV of the Plan and will expire on the fifth (5th) anniversary of the Effective Date.

### 7. Enforcement of Subordination

The Plan takes into account the relative priority of the Claims in each class in connection with any contractual subordination provisions relating thereto. Accordingly, (i) the distributions to the holder of the Allowed Senior Lender Claims, Allowed Term Lender Secured Claims and the holders of Allowed Old Note Claims in Class 5 will not be subject to further levy, garnishment, attachment, or other legal process by reason of claimed contractual or equitable subordination rights and (ii) the confirmation of the Plan will permanently enjoin, effective as of the Effective Date, all enforcement or attempts to enforce any further rights with respect to the distributions under the Plan to the holders of Claims in Class 3 and Old Note Claims in Class 5 (other than enforcement by the holders of such Allowed Class 3 and Old Notes Claims in Class 5 to receive such distributions in accordance with the Plan).

### 8. Recognition of Guaranty Rights

The classification of and manner of satisfying all Claims and Equity Interests under the Plan takes into consideration (a) the existence of guaranties by the Debtors and (b) the fact that the Debtors may be joint obligors with each other or other entities, with respect to an obligation. All Claims against any of the Debtors based upon any such guaranty or joint obligation will be discharged as provided in the Plan.

### 9. Exit Facility

On the Effective Date, Holdings and Reorganized NWP expects to enter into the Exit Facility having principal terms and conditions consistent with the market for such credit facilities and will issue, execute and deliver the promissory notes to be issued, guarantied and secured by the Reorganized Debtors and Holdings in connection with the Exit Facility (the "Exit Facility Notes") and such other documents and instruments as are required by such facility.

### 10. Repayment of DIP Facility

On the Effective Date, all amounts owed under the DIP Agreement will be indefeasibly paid in full in cash, the commitments thereunder will be terminated, and (a) outstanding letters of credit issued under the DIP Agreement, if any, will be returned to the issuer undrawn and marked canceled and (b) new letters of credit will be provided pursuant to the Exit Facility to replace the outstanding letters of credit issued under the DIP Agreement. Upon payment or satisfaction in full of all DIP Obligations in accordance with the terms of the DIP Agreement, all liens and security interests granted to secure such obligations will be deemed terminated and will be of no further force or effect.

### 11. Cancellation of Existing Securities and Agreements

On the Effective Date, the DIP Agreement, the Old Credit Agreement, the Old Notes, the Old NWP Common Stock (including any options, warrants, calls, subscriptions, or other similar rights or other agreements or commitments, contractual or otherwise, obligating NWP to issue, transfer, or sell any shares of Old NWP Common Stock, or any other capital stock of NWP) will each be canceled and terminated without further action by NWP or Reorganized NWP. On the Effective Date, except to the extent the Plan or the Confirmation Order provides otherwise, all

liens, security interests, and pledges securing the obligations arising under the DIP Agreement and obligations of the Debtors incurred pursuant to the Old Credit Agreement or otherwise will be terminated and released. The filing of the Confirmation Order with any federal, state, or local agency or department will constitute good and sufficient evidence of, but will not be required to effect, the release and termination of such liens, security interests, and pledges. Except for purposes of effectuating the distributions under the Plan, on the Effective Date, the Old Notes Indenture will be canceled.

## 12. Surrender of Securities

As a condition to receiving any distribution under the Plan, each holder of a promissory note, certificate, or other instrument evidencing a Claim must surrender such promissory note, certificate, or other instrument to Reorganized NWP, except with respect to the notes evidencing Senior Lender Claims and Term Lender Claims, all of which will be cancelled and of no further force and effect following the Effective Date. Any holder of a Claim that fails to (i) surrender such instrument, or (ii) execute and deliver an affidavit of loss and/or indemnity reasonably satisfactory to Reorganized NWP before the later to occur of (a) the first anniversary of the Effective Date and (b) six months following the date such holder's Claim becomes an Allowed Claim, will be deemed to have forfeited all rights and Claims with respect thereto, may not participate in any distribution under the Plan on account thereof, and all cash, securities, and other property owing with respect to such Allowed Claims will be retained by Reorganized NWP.

## 13. Corporate Action

(a) **Charters and Bylaws**. On the Effective Date, each Reorganized Debtor will file its Restated Charter with the Secretary of State of its respective jurisdiction of incorporation or organization. The Restated Charter for each of the Reorganized Debtors will prohibit the issuance of non-voting equity securities to the extent required by section 1123(a)(6) of the Bankruptcy Code. The Restated Charter for Reorganized NWP will authorize the issuance of 10,000,000 shares of New Common Stock. On or before the Effective Date, Holdings will file its charter with the Secretary of State of its respective jurisdiction of incorporation or organization. The charter for Holdings will prohibit the issuance of nonvoting equity securities to the extent required by section 1123(a)(6) of the Bankruptcy Code. The charter for Holdings will authorize the issuance of 40,000,000 shares of Holdings Common Stock and 10,000,000 shares of undesignated preferred stock as to which the Board of Directors of Holdings, without action by its stockholders, may designate the rights, preferences, and privileges in one or more series. The Bylaws of Holdings will be deemed adopted by its Board of Directors as of the Effective Date.

(b) **Boards of Directors**. The initial Board of Directors of Holdings will consist of seven (7) members consisting of (i) five (5) directors designated by the Term Lender, (ii) the then current CEO of Holdings, and (iii) one (1) director designated by the Creditors' Committee. The identity of the persons designated as directors pursuant to clauses (i) and (iii) of Section III.J.2 of the Plan will be disclosed at or prior to the Confirmation Hearing. The Boards of Directors of the other Debtors will be as set forth in such filings as may be made with the Bankruptcy Court prior to the Effective Date. Each of the members of the initial Board of

Directors of each of the Reorganized Debtors will serve in accordance with such Reorganized Debtor's Restated Charter and New Bylaws and applicable non-bankruptcy law. On the Effective Date, any control provisions and rights to select directors between the Debtors and any other person will be cancelled and terminated.

(c) **Officers**. The officers of the respective Debtors immediately prior to the Effective Date will serve as the initial officers of the respective Reorganized Debtors on and after the Effective Date and in accordance with any employment agreement with the Reorganized Debtors and applicable non-bankruptcy law, except that a new CEO, CFO, and Chief Legal Officer for Holdings, whether or not identified prior to the Confirmation Date, will be appointed by Holdings' Board of Directors as soon as practicable following the Effective Date.

(d) **Management Incentive Plan**. Holdings will adopt the Management Incentive Plan as of the Effective Date. The solicitation of votes on the Plan will include, and be deemed to be, a solicitation for approval of the Management Incentive Plan. Entry of the Confirmation Order will constitute such approval. The Management Incentive Plan will provide that Holdings will issue or reserve for issuance to certain members of management of the Reorganized Debtors options to purchase a number of shares of Holdings Common Stock in an amount not to exceed 10% of the equity of Holdings, on a fully diluted basis, in any combination of Holdings Common Stock, stock options, and warrants.

(e) **Merger/Dissolution of Corporate Entities**. As of the Effective Date, and without the need for any further action by the stockholders or directors of Holdings, the Debtors, or the Reorganized Debtors, any Affiliate (as defined in the Plan) of NWP may be (a) dissolved or (b) merged into NWP, Reorganized NWP, Holdings, or any of their respective Affiliates.

(f) **Due Authorization**. On the Effective Date, the adoption of the Restated Charters, the New Bylaws, and the Management Incentive Plan will be authorized and approved in all respects to be effective as of the Effective Date, in each case without further action under applicable law, regulation, order, or rule, including without limitation, any action by the directors or stockholders of Holdings, the Debtors, or the Reorganized Debtors. On the Effective Date, the cancellation and termination of all Equity Interests in NWP, the authorization and issuance of the New Common Stock, the Holdings Common Stock, and the New Warrants, the entering into and effectuation of the Exit Facility and issuance of the Exit Facility Notes and all related documents and instruments, the New Warrant Agreement, and all other matters provided in the Plan involving the corporate structure of the Reorganized Debtors or corporate action of the Reorganized Debtors will be deemed to have occurred, been authorized, and be in effect from and after the Effective Date, in each case without further action under applicable law, regulation, order, or rule, including without limitation, any action by the stockholders or directors of Holdings, the Debtors, or the Reorganized Debtors.

## 14. Exemption From Securities Laws

The issuance pursuant to the Plan of the Holdings Common Stock, New Common Stock, New Warrants, and shares of Holdings Common Stock issued upon exercise of the New Warrants will be exempt from any securities laws registration requirements to the fullest extent

Case 1:04-bk-02817-MDF    Doc 1356    Filed 09/21/05    Entered 09/21/05 12:38:08    Desc
Main Document      Page 44 of 94

permitted by section 1145 of the Bankruptcy Code. To the maximum extent permitted by applicable securities law, the Exit Facility Notes will be exempt from registration under the Securities Act. For a further discussion of section 1145 of the Bankruptcy Code and securities laws, see Section V of this Disclosure Statement, entitled "Securities Law Matters."

### 15. Exemption From Transfer Taxes

Pursuant to section 1146(c) of the Bankruptcy Code, the issuance, transfer, or exchange of notes or equity securities under the Plan, the creation of any mortgage, deed of trust, or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, will not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax.

### E. Method of Distributions Under the Plan

#### 1. Record Date for Distributions

The Distribution Record Date (as defined in the Plan) with respect to any Claims other than the Old Note Claims will be the Effective Date. On the Distribution Record Date, the claims register will be closed and any transfer of any Claim therein will be prohibited. Any party responsible for making distributions pursuant to Section IV.D of the Plan will instead be authorized and entitled to recognize and deal for all purposes under the Plan with only those record holders stated on the claims register as of the close of business on the Distribution Record Date. With respect to any Old Note Claims, distributions under the Plan will be made as soon as practicable after the Effective Date.

#### 2. Date of Distributions

Each distribution or delivery to be made on a specific date will be deemed to have been made on such date if actually made on the later of such date and the date on which such Administrative Expense or Claim is Allowed, or as soon thereafter as practicable. Unless otherwise provided herein, all initial distributions and deliveries to be made under the Plan will be made on the Effective Date or as soon thereafter as is practicable. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day (as defined in the Plan), then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but will be deemed to have been completed as of the required date.

#### 3. Delivery of Distributions

Subject to Bankruptcy Rule 9010, distributions under the Plan will be made by Reorganized NWP as Disbursing Agent to the holders of Allowed Claims, (i) at the addresses set forth on the Schedules unless superseded by proofs of claims or transfers of claims pursuant to Bankruptcy Rule 3001, (ii) at the last known addresses of such holders if the Debtors have been notified in writing of a change of address, (iii) in the case of Old Note Claims to the Indenture Trustee, (iv) in the case of the Senior Lender Claims, at the addresses last known to the Prepetition Agent, or (v) in the case of the Term Lender Claims, at the address of the Term Lender last known to the Debtors.

4. **Effectuation of Deliveries**

    (a)    **Distributions by Reorganized NWP**

        (i)    **Disbursing Agent.**  Distributions to be made by Holdings and the Reorganized Debtors will be made by Reorganized NWP, as Disbursing Agent, or by such other entity or entities as may be designated as Disbursing Agent(s) by Reorganized NWP.  A Disbursing Agent will not be required to give any bond, surety, or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court; and, in the event that a Disbursing Agent is otherwise so ordered, all costs and expenses of procuring any such bond or surety will be borne by the Reorganized Debtors.

        (ii)    **Powers of the Disbursing Agent**.  The Disbursing Agent will be empowered to effect all actions and execute and deliver all agreements, instruments, and other documents necessary to perform its duties under the Plan, make all distributions contemplated hereby, employ professionals to represent it with respect to its responsibilities, and exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as the Disbursing Agent may deem necessary and proper to implement the provisions of the Plan.

        (iii)    **Expenses Incurred on or after the Effective Date.**  Except as otherwise ordered by the Bankruptcy Court, the amount of the reasonable fees of, and expenses incurred by, the Disbursing Agent on or after the Effective Date (including without limitation, taxes) and any reasonable compensation and expense reimbursement claims (including without limitation, reasonable attorneys' fees and expenses) made by the Disbursing Agent will be paid in cash by the Reorganized Debtors.

    (b)    **Distributions by Indenture Trustee**

        Distributions under the Plan to holders of Allowed Old Note Claims in Class 5 will be made by Reorganized NWP to the Indenture Trustee, in accordance with the Restructuring Transactions, which, in turn, will make the distributions to holders of Allowed Old Note Claims.  The Indenture Trustee will receive from Reorganized NWP reasonable compensation for its distribution-related services and reimbursement of reasonable expenses incurred in connection therewith and upon the presentation of satisfactory invoices to Reorganized NWP.  These payments will be made on customary terms agreed to by Reorganized NWP and the Indenture Trustee.

    (c)    **Distributions by Prepetition Agent**

        Distributions under the Plan to holders of Allowed Claims in Class 2 and Class 3 will be made by the Disbursing Agent to the Prepetition Agent and Term Lender, respectively, which, in turn, will make the distributions to holders of such Allowed Claims.

5. **Setoffs and Recoupments**

    The Reorganized Debtors may, but will not be required to, set off against or recoup from any Claim (for purposes of determining the Allowed amount of such Claim on which distribution

Case 1:04-bk-02817-MDF    Doc 1356    Filed 09/21/05    Entered 09/21/05 12:38:08    Desc
Main Document       Page 46 of 94

will be made), any claims of any nature whatsoever that the Reorganized Debtors may have against the holder of such Claim, but neither the failure to do so nor the allowance of any Claim under the Plan will constitute a waiver or release by the Debtors or Reorganized Debtors of any such claim the Reorganized Debtors may have against the holder of such Claim, *provided*, *however*, that the Reorganized Debtors may not setoff or recoup any claim against the Allowed Senior Lender Claims, Allowed Term Lender Claims, or the Allowed Old Note Claims.

### 6. Manner of Payment under the Plan

At the option of the Debtors or the Reorganized Debtors, as applicable, any cash payment to be made under the Plan may be made by a check or wire transfer or as otherwise required or provided in applicable agreements. All distributions to the creditors of each of the Debtors under the Plan will be made by, or on behalf of, the applicable Debtor, and in accordance with the Restructuring Transactions.

### 7. De Minimis Distributions

No distribution of less than $10.00 will be made by the Reorganized Debtors to any holder of a Claim unless a request therefor is made in writing to the Reorganized Debtors.

### 8. No Fractional Shares

No fractional shares of New Common Stock, Holdings Common Stock or New Warrants or cash in lieu thereof will be distributed. For purposes of distribution, fractional shares of New Common Stock, Holdings Common Stock, or New Warrants of one-half or more will be rounded up to the next whole number and fractional shares of less than one-half will be rounded down to the next whole number.

### 9. Allocation of Consideration

To the extent that any Allowed Claim entitled to a distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution will be allocated to the stated principal amount (as determined for federal income tax purposes) of the Allowed Claim first, and then to accrued but unpaid interest.

### 10. Withholding and Reporting Requirements

In connection with the consummation of the Plan, Holdings, the Debtors, the Reorganized Debtors and the Disbursing Agent(s), as the case may be, will comply with all applicable withholding and reporting requirements imposed by any federal, state or local taxing authority, and all distributions under the Plan will be subject to any such withholding or reporting requirements. Notwithstanding the above, each holder of an Allowed Claim that is to receive a distribution under the Plan will have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding and other tax obligations, on account of such distribution. Any party issuing any instrument or making any distribution under this Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.

### 11.    Unclaimed Property

In the event that any distribution to any holder is returned as undeliverable, Reorganized NWP, or the Prepetition Agent, as applicable, will use commercially reasonable efforts to determine the current address of such holder, but no distribution to such holder will be made unless and until the Disbursing Agent, or the Prepetition Agent has determined the then current address of such holder, at which time such distribution will be made to such holder without interest; *provided,* that such distributions will be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the date of the initial distribution.  After such date, all unclaimed property or interest in property will revert to Reorganized NWP, and the Claim of any other holder to such property or interest in property will be discharged and forever barred.  In the event that any securities are returned as unclaimed property, such securities will be canceled.

## F.    Procedures for Treating Disputed Claims and Disputed Administrative Expenses

### 1.    Objections

As of and after the Effective Date, objections to, and requests for estimation of, Administrative Expenses and Claims may be interposed and prosecuted only by the Reorganized Debtors.  Such objections and requests for estimation will be filed with the Bankruptcy Court and served upon the respective claimant on or before the date that is the later of (i) thirty (30) days after the Effective Date, and (ii) such other date as may be fixed by the Bankruptcy Court, after notice and hearing, whether fixed before or after the date specified in clause (i), above.  On or prior to the Effective Date, the Debtors will retain a person or firm satisfactory to the Creditors' Committee and the Debtors to monitor the claims objection process on behalf of Class 5 Creditors after the Effective Date.  The Reorganized Debtors have agreed to use reasonable good faith efforts to prosecute objections to and/or estimations of Disputed Class 5 Claims.

### 2.    No Distributions Pending Allowance

(a)    Notwithstanding any other provision of the Plan, if any portion of a Claim or Administrative Expense is Disputed (as defined in the Plan), no payment or distribution provided under the Plan will be made on account of such Claim or Administrative Expense unless and until such Disputed Claim or Administrative Expense becomes Allowed.  To the extent that a Disputed Administrative Expense or Disputed Claim is Allowed after the Effective Date, the holder thereof will receive the distribution to which the Plan entitles such holder in respect of such Allowed Administrative Expense or Allowed Claim, plus interest on the amount to be distributed on account thereof, calculated from the date on which the distribution would have been made if such Administrative Expense or Claim had been Allowed on the Effective Date, to the actual date of distribution, calculated at the average rate of interest earned on such amounts by the Reorganized Debtors from and after the Effective Date; *provided,* that holders of Disputed Class 5 Claims will not be entitled to receive interest on account of the delay in distribution on their Claims when they become Allowed Claims and will only be entitled to receive any dividends or distributions on the Holdings Common Stock that have been paid on, or distributed to the holders of, Holdings Common Stock during such period (net of any applicable taxes).

Case 1:04-bk-02817-MDF    Doc 1356    Filed 09/21/05    Entered 09/21/05 12:38:08    Desc
Main Document          Page 48 of 94

(b)     On the Effective Date, the Reorganized Debtors will transfer to a reserve account (the "Disputed Class 5 Claims Reserve") held by the Disbursing Agent the number of shares of Holdings Common Stock and New Warrants that would be distributable on account of the aggregate amount of all Disputed Class 5 Claims if they were Allowed in the Maximum Amounts thereof.  The Holdings Common Stock and New Warrants held in the Disputed Class 5 Claims Reserve will be held in trust for the holders of Disputed Class 5 Claims.  To the extent that a Disputed Class 5 Claim is disallowed, in whole or in part, all holders of Allowed Class 5 Claims will be entitled to receive an additional distribution of their respective Pro Rata Share of Holdings Common Stock and New Warrants held in the Disputed Class 5 Claims Reserve on account of the full amount of such disallowed Class 5 Claim, and any dividends or distributions made thereon (net of any applicable taxes).  The Disbursing Agent will make such distributions from the Disputed Class 5 Claims Reserve on the earlier of (a) each six-month anniversary of the Effective Date and (b) the date when the total number of shares of Holdings Common Stock to be so distributed is at least ten thousand (10,000).

(c)     In the event and to the extent that a transaction is consummated after the Effective Date pursuant to which fifty percent (50%) or more of all then outstanding Holdings Common Stock is to exchanged for new securities and/or cash ("New Consideration"), Holdings is authorized:

(i)     with respect to the Holdings Common Stock, to exchange up to the full amount of Holdings Common Stock then held in the Disputed Class 5 Claims Reserve for (A) such New Consideration, or (B) to the extent such New Consideration includes securities, in the sole discretion of the Reorganized Debtors, cash in lieu of such securities comprising such New Consideration in an amount per share reasonably determined by the Reorganized Debtors, applying the same valuation adopted by the Board of Directors with respect to the applicable transaction, to be equal in value to the per share consideration to be received by holders of the Holdings Common Stock in such transaction, and

(ii)     with respect to the New Warrants, to exchange up to the full amount of New Warrants then held in the Disputed Class 5 Claims Reserve for (C) such New Consideration or (D) to the extent such New Consideration includes new securities, in the sole discretion of the Reorganized Debtors, cash in lieu of such new securities comprising such New Consideration, in each case of (C) and (D) in an amount per share (assuming that the New Warrants have been exercised immediately prior to the consummation of such transaction) reasonably determined by the Reorganized Debtors, applying the same valuation adopted by the Board of Directors with respect to the applicable transaction, to be equal to the per share consideration to be received by holders of the Holdings Common Stock in such transaction multiplied by the number of shares of Holdings Common Stock subject to the New Warrants, less the aggregate Exercise Price payable upon exercise in full of such New Warrants; *provided*, in each case of any exchange pursuant to (i) or (ii) above, such New Consideration and or cash (as applicable) will be held in and distributed from the Disputed Class 5 Claims Reserve in place of the securities deposited therein on the Effective Date (net of any applicable taxes) in accordance with paragraph (b) above.

Case 1:04-bk-02817-MDF    Doc 1356    Filed 09/21/05    Entered 09/21/05 12:38:08    Desc
Main Document        Page 49 of 94

### 3. Tax Treatment of Disputed Class 5 Claims Reserve

(a)     Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the Disbursing Agent of a private letter ruling if the Disbursing Agent so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Disbursing Agent), the Disbursing Agent shall (i) treat the Disputed Class 5 Claims Reserve as a discrete trust for federal income tax purposes, consisting of separate and independent shares to be established in respect of each Disputed Class 5 Claim, in accordance with the trust provisions of the Tax Code (section 641 *et seq.*), and (ii) to the extent permitted by applicable law, shall report consistent with the foregoing for state and local income tax purposes.  All holders of Disputed Class 5 Claims shall report, for tax purposes, consistent with the foregoing.

(b)     The Disbursing Agent may request an expedited determination of taxes of the Disputed Class 5 Claims Reserve under section 505(b) of the Bankruptcy Code for all tax returns filed for or on behalf of the Disputed Class 5 Claims Reserve for all taxable periods through the date of dissolution of such reserve.

### 4. Determination

Disputed Claims will be determined and liquidated, at the option of the Reorganized Debtors, either in (i) the Bankruptcy Court or (ii) administrative or judicial tribunals in which such Claims (A) are pending on the Effective Date or (B) could have been resolved had the Reorganization Cases not been commenced.  Disputed Administrative Expenses will be determined and liquidated in the Bankruptcy Court.  Any such Disputed Claim or Disputed Administrative Expense, whether determined by the Bankruptcy Court or in a non-bankruptcy forum, will be deemed Allowed in such liquidated amount and satisfied in accordance with the provisions of the Plan when the order determining such Disputed Claim or Disputed Administrative Expense becomes a Final Order; *provided*, that to the extent that such a Claim or Administrative Expense is Allowed and is covered under any of the Debtors' insurance policies, such Claim or Administrative Expense will be paid from the insurance proceeds available to satisfy such liquidated amount.  At such time as a Disputed Claim or Disputed Administrative Expense becomes Allowed pursuant to a Final Order, the Disbursing Agent will distribute to the holder of such Claim or Administrative Expense, the distribution to which the Plan entitles such holder.  To the extent that all or a portion of a Disputed Claim or Disputed Administrative Expense is disallowed, the holder of such Claim or Administrative Expense will not receive any distribution on account of the portion of such Claim or Administrative Expense that is disallowed and all rights to any property, other than Holdings Common Stock, New Warrants, or distributions on or in respect of Holdings Common Stock (which will be distributed according to Section V.B.2 of the Plan), withheld pending the resolution of such Claim (other than a Class 5 Claim) or Administrative Expense will revert to Reorganized NWP.

### 5. Preservation of Causes of Action and Rights to Settle Claims

(a)     **Avoidance Actions**.  Except with respect to Claims Allowed pursuant to the Plan, as of the Effective Date, the Reorganized Debtors will be vested with the sole discretion to prosecute any claims or causes of action, including any avoidance or recovery actions under

Case 1:04-bk-02817-MDF    Doc 1356    Filed 09/21/05    Entered 09/21/05 12:38:08    Desc
Main Document      Page 50 of 94

sections 510, 542 through 551, and 553 of the Bankruptcy Code for the benefit of the holders of the Holdings Common Stock. No person or entity will have standing to commence, or to seek authority to commence, any such avoidance or recovery actions.

(b) **Disallowed Claims**. All Claims held by persons or entities against whom any Debtor or Reorganized Debtor has commenced a proceeding asserting a cause of action under sections 542, 543, 544, 545, 547, 548, 549, and/or 550 of the Bankruptcy Code, will be deemed "disallowed" Claims pursuant to section 502(d) of the Bankruptcy Code and, except as otherwise ordered by the Bankruptcy Court, holders of such Claims will not be entitled to vote to accept or reject the Plan. Claims that are deemed disallowed pursuant to Section V of the Plan will continue to be disallowed for all purposes until the avoidance action against such party has been determined, settled, or otherwise resolved by Final Order and all sums due to the Debtors or the Reorganized Debtors from such party have been paid.

(c) **Pursuit of Retained Rights and Settlements**. On the Effective Date, the Reorganized Debtors will be vested with the sole discretion to enforce, sue on, settle, or compromise (or decline to do any of the foregoing) all claims, rights, causes of action, suits, and proceedings, whether at law or in equity, whether known or unknown, that have been vested in the Debtors pursuant to Section V.E.1 of the Plan, in each case without the approval of the Bankruptcy Court. The Reorganized Debtors may pursue such retained claims, rights, or causes of action, suits, or proceedings as appropriate, for the benefit of the holders of Holdings Common Stock in accordance with their best interests.

## G. Executory Contracts and Unexpired Leases

### 1. General Treatment

Pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, on the Effective Date, all executory contracts and unexpired leases to which any of the Debtors is a party will be deemed assumed as of the Effective Date, except for any executory contract or unexpired lease that: (i) has been assumed or rejected pursuant to Final Order of the Bankruptcy Court entered prior to the Effective Date; (ii) is specifically designated or generally described on Schedule 6 in the Plan Supplement as a contract or lease to be rejected, or (iii) is the subject of a motion of the Debtors under section 365 of the Bankruptcy Code that is pending on the Effective Date. A non-Debtor party to an executory contract or unexpired lease that is to be rejected under the Plan may request that the Debtors assume such contract or lease by sending written notice to the Debtors, which notice will include a waiver of any defaults (including any payment defaults) and any right to any cure payment under such contract or lease. The Debtors may (but need not) assume such contract or lease without further action of the Bankruptcy Court. In addition, at all times prior to the Effective Date, the Debtors will retain their right to amend Schedule 6 in the Plan Supplement to delete any executory contract or unexpired lease therefrom or add any executory contract or unexpired lease thereto, in which event, such executory contract or unexpired lease will be, respectively, assumed or rejected. Notice of any amendments to Schedule 6 will be given by the Debtors to the counterparties affected thereby. Subject to the occurrence of the Effective Date, entry of the Confirmation Order will constitute approval of the assumption and rejection of all executory contracts and unexpired leases to be assumed or rejected pursuant to Section VI of the Plan.

Case 1:04-bk-02817-MDF    Doc 1356    Filed 09/21/05    Entered 09/21/05 12:38:08    Desc
Main Document    Page 51 of 94

### 2. Cure of Defaults

Except to the extent that different treatment has been agreed to by the non-Debtor party or parties to any executory contract or unexpired lease to be assumed pursuant to Section VI.A of the Plan, the Debtors or the Reorganized Debtors, as the case may be, will, pursuant to the provisions of sections 1123(a)(5)(G) and 1123(b)(2) of the Bankruptcy Code and consistent with the requirements of section 365 of the Bankruptcy Code, file with the Bankruptcy Court and serve upon each counterparty affected thereby, on or before the thirtieth (30th) day after the Confirmation Date, a list of the amount proposed to be paid in full and final satisfaction of the requirements of section 365(b) of the Bankruptcy Code with respect to the applicable executory contract or unexpired lease to be assumed pursuant to the Plan. Objections, if any, to such proposed cure amounts will be interposed on or before the thirtieth (30th) day after the date on which the list of proposed cure payments has been served and filed. If any objections are filed by such counterparties, the Debtors will schedule a hearing thereon before the Bankruptcy Court and give notice thereof to such objecting counterparty. In the event the Bankruptcy Court determines that the cure amount is greater than the cure amount proposed by the Debtors, the Debtors or Reorganized Debtors, as applicable, may elect to reject the contract or unexpired lease in lieu of assuming it.

### 3. Rejection Damage Claims

In the event the rejection of an executory contract or unexpired lease pursuant to the Plan results in damages to a counterparty to such contract or lease, a Claim for such damages, if not heretofore evidenced by a proof of Claim filed with the Bankruptcy Court, will be forever barred and will not be enforceable against the Debtors, the Reorganized Debtors, or their respective properties or interests in property as agents, successors, or assigns, unless a proof of Claim is filed with the Bankruptcy Court and served upon counsel for the Debtors or Reorganized Debtors on or before the Effective Date; *provided,* that if such rejection occurs pursuant to Section VI.B of the Plan, the last date to file and serve such a proof of Claim will be the thirtieth (30th) day after the date of such rejection.

### 4. Survival of Corporate Indemnification Obligations

Any obligations of the Debtors pursuant to their corporate charters and bylaws or agreements entered into any time prior to the Effective Date to indemnify (i) current directors, officers, agents, and/or employees, and (ii) former directors, officers, agents, and/or employees who acted in such capacities on or after the Commencement Date (collectively, the "Former Representatives") or who are Released Parties pursuant to Section VII.J of the Plan, with respect to all present and future actions, suits, and proceedings against the Debtors or such directors, officers, agents, and/or employees, based upon any act or omission for or on behalf of the Debtors taken or omitted to be taken will not be discharged or impaired by confirmation of the Plan; *provided* that any indemnification obligation to the Former Representatives will be limited to their actions or omissions to act occurring on or after the Commencement Date. Such obligations will be deemed and treated as executory contracts pursuant to the Plan and, except as set forth in Schedule 6 in the Plan Supplement, which are specifically rejected pursuant to the Plan, will continue in full force and effect as obligations of the Reorganized Debtors.

Case 1:04-bk-02817-MDF    Doc 1356    Filed 09/21/05    Entered 09/21/05 12:38:08    Desc
Main Document        Page 52 of 94

### 5. Compensation, Benefit, and Insurance Plans

All pension plans, savings plans, retirement plans, health care plans, performance-based incentive plans, retention plans, workers' compensation programs, and life, disability, directors' and officers' liability and other insurance plans and policies entered into prior to or after the Commencement Date and not since terminated, are treated as executory contracts under the Plan and, except as set forth in Schedule 6, will be assumed pursuant to Section VI.A of the Plan in accordance with sections 365(a) and 1123(b)(2) of the Bankruptcy Code. The Debtors' obligations under plans and programs that are assumed will survive confirmation of the Plan. Such plans, policies, and programs set forth in Schedule 6 in the Plan Supplement, which are specifically rejected pursuant to the Plan (to the extent such rejection does not violate sections 1114 and 1129(a) (13) of the Bankruptcy Code), and such plans, policies, and programs that previously have been rejected or terminated, are the subject of a motion to reject or terminate pending on the Effective Date, or that have been specifically waived by the beneficiaries thereof, will not be assumed by the Plan.

### 6. Retiree Benefits

On and after the Effective Date, pursuant to section 1129(a)(13) of the Bankruptcy Code, the Reorganized Debtors will continue to pay all retiree benefits of the Debtors (within the meaning of section 1114 of the Bankruptcy Code), at the level established in accordance with section 1114 of the Bankruptcy Code, at any time prior to the Confirmation Date, but solely for the duration of the period and at the level for which the Debtors have obligated themselves to provide such benefits. The Debtors assert that persons that have never worked for the Debtors are not retirees entitled to retiree benefits as that term is used in section 1114 of the Bankruptcy Code.

### H. Effectiveness of the Plan

### 1. Conditions Precedent to Confirmation

The Plan will not be confirmed unless and until the following conditions have been satisfied or waived by the Debtors in accordance with Section VII.C of the Plan:

1. The Confirmation Order and the documents included in the Plan Supplement shall be in form and substance reasonably satisfactory to the Debtors, the Term Lender, JLL, and the Creditors' Committee;

2. The Debtors will have obtained written commitments of the lenders under the Exit Facility, in form and substance reasonably satisfactory to the Debtors, the Term Lender, JLL, and the Creditors' Committee, and such commitments will not have expired or otherwise terminated; and

3. The Maximum Amount of (a) General Unsecured Claims and (b) Other Unsecured Claims does not exceed $200,000,000 in the aggregate.

## 2.    Conditions Precedent to the Effective Date

The Effective Date will not occur and the Plan will not become effective unless and until the following conditions have been satisfied in full or waived by the Debtors:

1.    The Clerk of the Bankruptcy Court shall have entered the Confirmation Order and there shall not be a stay or injunction in effect with respect thereto;

2.    The conditions precedent to the effectiveness of the Exit Facility and the New Warrant Agreement shall have been satisfied or waived by the parties thereto and the Reorganized Debtors shall have access to funding under the Exit Facility;

3.    All actions and documents necessary to implement the provisions of the Plan, to be effectuated on or prior to the Effective Date, shall have been effected or executed and delivered, as applicable, in form and substance satisfactory to the Debtors, the Term Lender, JLL, and the Creditors' Committee;

4.    All authorizations, consents, and regulatory approvals required in connection with the consummation of the Plan shall have been obtained and not revoked; and

5.    The Maximum Amount of (a) General Unsecured Claims and (b) Other Unsecured Claims does not exceed $200,000,000 in the aggregate.

## 3.    Waiver of Conditions

The Debtors, with the consent of the Creditors' Committee, which consent will not be unreasonably withheld, and to the extent not prohibited by applicable law, may waive one or more of the conditions precedent in Sections VII.A.3 and VII.B of the Plan (other than the condition specified in Sections VII.B.1 and VII.B.2 of the Plan), without (i) notice, (ii) leave or order of the Bankruptcy Court, and (iii) any formal action other than, in the case of the waiver of one or more conditions specified in Section VII.B of the Plan, proceeding to consummate the Plan.

## 4.    Revocation or Withdrawal of the Plan

The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date.  If the Debtors revoke or withdraw the Plan prior to the Confirmation Date, then the Plan will be deemed null and void.  In such event, nothing contained herein will constitute or be deemed a waiver or release of any Claims or Equity Interests by or against the Debtors or any other person, the allowance of any Claims, Administrative Expenses, or Equity Interests, or an admission against interests of the Debtors, nor will it prejudice in any manner the rights of the Debtors or any person in any further proceedings involving the Debtors.

### 5. Failure of Conditions to Effective Date

In the event that one or more of the conditions specified in Section VII.B. of the Plan will not have occurred or been waived on or before the date that is the later of 120 days after the Confirmation Date and such other date as may be established by Order of the Bankruptcy Court, (i) the Confirmation Order will be vacated, (ii) no distributions under the Plan will be made, (iii) the Debtors and all holders of Claims and Equity Interests will be restored to the *status quo ante* as of the date immediately preceding the Confirmation Date as though the Confirmation Date did not occur, and (iv) the Debtors' obligations with respect to Claims and Equity Interests will remain unchanged and nothing contained herein will constitute or be deemed a waiver or release of any claims or equity interests by or against the Debtors or any other person, the allowance of any Administrative Expense, Claims, or Equity Interests, or an admission against interests of the Debtors, nor will it prejudice in any manner the rights of the Debtors or any person in any further proceedings involving the Debtors.

### 6. Substantial Consummation

On the Effective Date, the Plan will be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

### 7. Amendments

The Plan may be amended, modified, or supplemented by the Debtors in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as the Bankruptcy Court may otherwise direct, and provided that no such amendment, modification, or supplement will be made without the prior written consent of the Creditors' Committee, which consent will not be unreasonably withheld.  In addition, after the Confirmation Date, so long as such action does not materially adversely affect the treatment of holders of Claims or Equity Interests under the Plan, the Debtors may institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes and intents of the Plan.  Prior to the Effective Date, the Debtors may make appropriate technical adjustments and modifications to the Plan with the consent of the Creditors' Committee, which shall not be unreasonably withheld, without further order or approval of the Bankruptcy Court.

### 8. Revesting of Assets

Upon the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all property of the Debtors' estates will revest in the Reorganized Debtors, free and clear of all Claims, liens, encumbrances, charges, and other interests, except with respect to liens granted pursuant to the Plan and the Exit Facility, and as otherwise provided herein or in the Confirmation Order.  The Reorganized Debtors may operate their businesses and may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules and in all respects as if there were no pending cases under any chapter or provision of the Bankruptcy Code, except as provided herein.

### 9. Preference and Fraudulent Transfer Claims

Section 547 of the Bankruptcy Code enables a debtor in possession to avoid transfers to a creditor based upon an antecedent debt, made within ninety (90) days of the petition date, which enables the creditor to receive more than it would under a liquidation. Creditors have defenses to the avoidance of such preferential transfers based upon, among other things, the transfers having occurred as part of the debtor's ordinary course of business, or that subsequent to the transfer the creditor provided the debtor with new value. Section 548 of the Bankruptcy Code allows a debtor in possession to avoid transfers to a creditor within one year of the petition date with actual intent to hinder, delay, or defraud other creditors or, if the debtor was or became insolvent or undercapitalized as a result of such transfer, a transfer for less than reasonably equivalent value. The Debtors do not believe that any fraudulent transfers have occurred.

The Debtors do not believe that any preferential transfers of a material value occurred, but are examining all payments made within the ninety-day period preceding the Commencement Date to determine whether any material transfers occurred as to which the recipients do not possess bona-fide defenses to such claims. Although the Debtors reserve all of their rights to bring actions to avoid payments made within the applicable preference period which the Debtors determine were preferential within the meaning of the Bankruptcy Code, they will consult with and seek a recommendation from the Creditors' Committee as to whether to bring such actions. If such claims are brought, any recoveries obtained, less costs associated with such claims, will inure to the benefit of the holders of Holdings Common Stock through such holdings.

### 10. Discharge

(a) **Discharge of Claims and Equity Interests**. Except as otherwise specified in the Plan or in the Confirmation Order, the rights afforded in the Plan and the payments and distributions to be made under the Plan will be in exchange for, and in complete satisfaction, discharge, and release of, all existing debts and Claims, and will terminate all Equity Interests, of any kind, nature, or description whatsoever against or in the Debtors, the Reorganized Debtors, or any of their assets or properties to the fullest extent permitted by section 1141 of the Bankruptcy Code. Except as otherwise specified in the Plan, upon the Effective Date, all existing Claims against, and Equity Interests in, the Debtors will be, and will be deemed discharged and terminated, and all holders of Claims and Equity Interests will be precluded and enjoined from asserting against the Debtors, the Reorganized Debtors, or any of their assets or properties, any other or further Claim or Equity Interest based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date, whether or not such holder has filed a proof of Claim or proof of Equity Interest and whether or not such holder is entitled to receive a distribution under the Plan.

(b) **Discharge of Debtors**. Upon the Effective Date and in consideration of the distributions to be made under the Plan, except as otherwise expressly provided in the Plan or in the Confirmation Order, each holder (as well as any trustees and agents on behalf of each holder) of a Claim or Equity Interest will be deemed to have forever waived, released, and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, rights, and liabilities that arose prior to the Effective Date. Upon

the Effective Date, all such persons forever will be precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against, or terminated Equity Interest in, the Debtors.

## 11. Limited Release

As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtors, the Reorganized Debtors, and any person seeking to exercise the rights of the Debtors' estates, including, without limitation, any successor to the Debtors or any estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, will release (i) the current directors, officers, agents, and/or employees of the Debtors, and (ii) the Former Representatives, the Term Lender, the Creditors' Committee, the present and former members of the Creditors' Committee, and JLL, and each of their respective principals, employees, agents, officers, directors, shareholders, members, partners, advisors (including any attorneys, financial advisors, investment bankers and other professionals retained by such persons or entities), Affiliates and representatives (all of the aforementioned released parties, the "Released Parties") from any and all claims, debts, obligations, rights, suits, damages, actions, causes of action, remedies, and liabilities whatsoever (including claims or causes of action arising under chapter 5 of the Bankruptcy Code), whether known or unknown, foreseen or unforeseen, concealed or disclosed, pending or not pending, existing as of the Effective Date, in law, at equity, or otherwise, that the Debtors would have been legally entitled to assert against the Released Parties in their own right (whether individually or collectively) or that any holder of a Claim or Equity Interest or other person or entity would have been able to assert on behalf of the Debtors against the Released Parties based in whole or in part upon any act or omission, transaction, agreement, event, or other occurrence, related to the Debtors, taking place on or before the Effective Date, provided, however, that the foregoing provisions of Section VII.J of the Plan will have no effect on the liability of any person or entity that results from any such act or omission that is determined by the Final Order to have constituted gross negligence or willful misconduct, except that nothing in the Plan will limit in any way the release of the Released Parties with respect to any Derivative Claims; *provided further*, *however*, that the release provided herein to the Former Representatives (and each of their respective principals, employees, agents, officers, directors, shareholders, members, partners, and advisors (including any attorneys, financial advisors, investment bankers and other professionals retained by such persons or entities) will be limited to their actions and omissions to act occurring on and after the Commencement Date.

As of the Effective Date, in consideration for the distributions received under the Plan, the adequacy of which is hereby confirmed, each holder of a Claim that affirmatively votes to accept the Plan (the "Releasing Parties") to the extent permitted by law will be deemed to have released, remised and forever discharged the Term Lender and JLL, from any and all claims, debts, obligations, rights, suits, damages, actions, causes of action (including any causes of action under Chapter 5 of the Bankruptcy Code), remedies, and liabilities whatsoever, whether known or unknown, pending or not pending, concealed or disclosed, foreseen or unforeseen, existing as of the Effective Date, in law, at equity, or otherwise, that the Releasing Parties have or hereafter shall or may have or that they would have been legally entitled to assert against the Term Lender or JLL in their own right (whether individually or collectively) based in whole or in part upon any act or omission, contract, instrument, indenture, transaction, agreement, event, or

other occurrence, related to the Debtors, taking place on or before the Effective Date. Nothing herein will be deemed to release any rights, claims or interests that any person or entity may be receiving or retaining pursuant to the Plan on or after the Effective Date, and holders of Allowed Class 5 Claims that do not accept the Plan or that vote to reject the Plan will, nevertheless, be entitled to receive the distributions provided for in Section II.D.3 of the Plan. Nothing in this paragraph will be deemed to release any direct claims (as opposed to derivative claims or claims that may be asserted on or behalf of any of the Debtors), if any, that any creditor individually may have against any current or former officer or director of the Debtors in their capacity as an officer or director of the Debtors.

Pursuant to the Plan, and in consideration for the Class 5 and 6 distributions, the waiver by the Term Lender of any distribution on account of the Term Lender Deficiency Claim and other benefits provided to holders of Allowed Claims in Classes 5 and 6 under the Plan, occurrence of the Effective Date will effect the release, discharge and extinguishment of all Derivative Claims against the Term Lender and JLL and all persons and entities with respect to the Derivative Claims, and the Term Lender will be entitled to receive a distribution pursuant to the Plan on account of an allowed claim in respect of the Term Loans, which for purposes of the Plan will be an allowed non-insider claim for voting purposes.

## 12. Exculpation

Pursuant to the Plan, as of and subject to the occurrence of the Confirmation Date: (i) the Debtors, the Creditors' Committee and the present and former members of the Creditors' Committee and each of their respective Affiliates, agents, directors, officers, employees, advisors, and attorneys will each be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including without limitation, section 1125(a) of the Bankruptcy Code, and any applicable non-bankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation, (ii) the Debtors, the Creditors' Committee, the present and former members of the Creditors' Committee, the Term Lender, and JLL and each of their respective affiliates, agents, directors, officers, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of any securities under the Plan, and therefore, are not, and on account of such offer, issuance, and solicitation will not be, liable at any time for any violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the offer and issuance of any securities under the Plan (except for willful misconduct or gross negligence), and (iii) the Debtors, the Reorganized Debtors, the Senior Lenders, the Creditors' Committee, the present and former members of the Creditors' Committee, the Term Lender, and JLL and their respective members, employees, agents, and professionals (acting in such capacity) will neither have nor incur any liability to any person or entity for any postpetition act taken, or omitted to be taken, in connection with, or related to formulating, negotiating, preparing, disseminating, implementing, administering, confirming or consummating the Plan, the Disclosure Statement, or any contract, instrument, release or any other agreement or document created, or entered into, in connection with the Plan, or any other postpetition act taken, or omitted to be taken, in connection with, or in contemplation of the Debtors' restructuring, *provided*, *however*, that the provisions of Section VII.K of the Plan will have no effect on the liability of any person or entity that results from any such act or omission that is determined by

Final Order to have constituted gross negligence, recklessness or willful misconduct, except that nothing in the Plan will limit in any way the exculpation of any party with respect to any Derivative Claims.

### 13. Injunction

Pursuant to section 524 of the Bankruptcy Code, the discharge provided by Section VII.I of the Plan, and section 1141 of the Bankruptcy Code will be and be deemed an injunction against the commencement or continuation of any action or act to collect, offset, or recover the Claims and Equity Interests discharged pursuant to the Plan, except as otherwise expressly provided in the Plan or in the Confirmation Order. Accordingly, except as otherwise expressly provided in the Plan or the Confirmation Order, all persons and entities who have held, hold, or may hold Claims against, or Equity Interests in, any or all of the Debtors, and other parties in interest, along with their respective present and former employees, agents, officers, directors, and principals, will be permanently enjoined on and after the Effective Date from (i) commencing or continuing in any manner any action or other proceeding of any kind against the Debtors or Reorganized Debtors with respect to any such Claim or Equity Interest, (ii) enforcing, attaching, collecting, or recovering by any manner or means of any judgment, award, decree, or order against the Debtors or Reorganized Debtors on account of any such Claim or Equity Interest, (iii) creating, perfecting, or enforcing any encumbrance of any kind against the Debtors or Reorganized Debtors or against the property or interests in property of the Debtors or Reorganized Debtors on account of any such Claim or Equity Interest, (iv) commencing or continuing in any manner any action or other proceeding of any kind with respect to any Claims and causes of action which are extinguished or released pursuant to the Plan, and (v) taking any actions to interfere with the implementation or consummation of the Plan, and the Confirmation Order shall so provide.

Any "fifty percent shareholder" within the meaning of section 382(g)(4)(D) of the Tax Code will be enjoined from claiming a worthless stock deduction with respect to any Equity Interests held by such entity for any taxable year of such shareholder ending prior to the Effective Date.

Except as otherwise expressly provided in the Plan or the Confirmation Order, all persons and entities who have asserted or may attempt to assert Derivative Claims, along with their respective present and former employees, agents, officers, directors, and principals, will be permanently enjoined on and after the Effective Date from (i) commencing or continuing in any manner any action or other proceeding asserting Derivative Claims of any kind against the Released Parties, (ii) enforcing, attaching, collecting, or recovering by any manner or means of any judgment, award, decree, or order against the Released Parties or their property based upon Derivative Claims, and (iii) creating, perfecting, or enforcing any encumbrance of any kind against the Released Parties or against the property or interests in property of the Released Parties based upon Derivative Claims.

## I.      Retention of Jurisdiction

### 1.      Jurisdiction of the Bankruptcy Court

On and after the Effective Date, the Bankruptcy Court will retain jurisdiction over all matters arising out of, and related to, the Reorganization Cases and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes:

(a)      To hear and determine pending applications for the assumption or rejection of executory contracts or unexpired leases and, as applicable, the allowance of cure amounts and rejection damage Claims resulting therefrom;

(b)      To determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on the Effective Date;

(c)      To ensure that distributions to holders of Allowed Administrative Expenses and Allowed Claims are accomplished as provided herein;

(d)      To resolve disputes as to the ownership of any Administrative Expense, Claim, or Equity Interest;

(e)      To hear and determine timely objections to, or requests for estimation of, Administrative Expenses, Claims, and Equity Interests;

(f)      To hear and determine any disputes or issues arising under any settlements approved by the Bankruptcy Court;

(g)      To enter, implement, and enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(h)      To issue such orders in aid of execution and consummation of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code;

(i)      To issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any person or entity with the consummation, implementation, or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(j)      To hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code, and to remedy any defect or omission or reconcile any inconsistency in the Plan, the Disclosure Statement, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and intents thereof;

(k)      To hear and determine all applications under sections 330, 331, and 503(b) of the Bankruptcy Code for awards of compensation for services rendered and reimbursement of expenses incurred prior to the Effective Date;

Case 1:04-bk-02817-MDF    Doc 1356    Filed 09/21/05    Entered 09/21/05 12:38:08    Desc
Main Document      Page 60 of 94

(l)     To hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Confirmation Order, any transactions or payments contemplated hereby or any agreement, instrument or other document governing or relating to any of the foregoing; provide that any dispute arising under or in connection with the Exit Facility or New Warrant Agreement will be determined in accordance with the governing law designated by the applicable document;

(m)     To hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including an expedited determination of tax under section 505(b) of the Bankruptcy Code for all tax periods of the Debtors ending after the Commencement Date through the Effective Date and all tax periods of the Disputed Class 5 Claims Reserve through the date of dissolution or termination of the reserve);

(n)     To determine any Claim of, or any liability to, a governmental unit that may be asserted as a result of the transactions contemplated by the Plan;

(o)     To recover assets of the Debtors and property of the Debtors' estates, wherever located;

(p)     To determine and enforce the scope of and enforce any discharge of any Debtor under the Plan or the Bankruptcy Code;

(q)     To enforce all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings entered in connection with the Reorganization Cases;

(r)     To determine such other matters and for such other purposes as may be provided in the Confirmation Order, and any other order, judgment, injunction, or ruling entered or made in the Reorganization Cases; and to hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code; and

(s)     To enter a final decree closing the Reorganization Cases.

## J.     Miscellaneous Provisions of the Plan

### 1.     Payment of Statutory Fees

On the Effective Date, and thereafter as may be required, the Reorganized Debtors will pay all fees payable pursuant to section 1930 of chapter 123 of title 28 of the United States Code.

### 2.     Term of Injunctions or Stays

Unless otherwise provided, all injunctions or stays arising under or entered during the Reorganization Cases under sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, will remain in full force and effect until the Effective Date.

Case 1:04-bk-02817-MDF    Doc 1356    Filed 09/21/05    Entered 09/21/05 12:38:08    Desc
Main Document      Page 61 of 94

### 3. Dissolution of Creditors' Committee

On the Effective Date, the Creditors' Committee will be dissolved and its members and advisors released of all duties and responsibilities in connection with the Reorganization Cases or the Plan and its implementation.

### 4. Certain Indenture Trustee Fees and Expenses

The reasonable fees and expenses of the Indenture Trustee incurred through the Effective Date, including the reasonable fees and expenses of its professionals, will be paid by NWP or Reorganized NWP on or immediately after the Effective Date, in discharge of the Indenture Trustee's lien under Section 7.07 of the Old Notes Indenture, without the need for any such parties or professionals to file an application for allowance with the Bankruptcy Court. Upon payment in full of the reasonable fees and expenses of the Indenture Trustee and its professionals in full, the Indenture Trustee will be deemed to have released its lien and priority rights for its fees and expenses under the Old Notes Indenture. Any dispute regarding the payment of fees and expenses under Section IX of the Plan will be submitted to the Bankruptcy Court for resolution.

### 5. Interest on Claims

Unless otherwise specifically required by the Plan or applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claim.

### 6. Expedited Determination of Taxes

The Debtors or the Reorganized Debtors, as applicable, are authorized to request an expedited determination of taxes of the Reorganized Debtors under section 505(b) of the Bankruptcy Code for any and all returns filed for, or on behalf of, the Debtors for all taxable periods (or portions thereof) ending after the Commencement Date through and including the Effective Date.

### 7. Waiver of Bankruptcy Rules 3020(e) and 7062

The Debtors may request that the Confirmation Order include (a) a finding that Bankruptcy Rules 3020(e) and 7062 will not apply to the Confirmation Order and (b) authorization for the Debtors to consummate the Plan immediately after entry of the Confirmation Order.

### 8. Severability

If, prior to the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors, with the consent of the Creditors' Committee, JLL, and the Term Lender, which consent will not be unreasonably withheld, will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision will then be applicable as altered or interpreted. Notwithstanding any

Case 1:04-bk-02817-MDF    Doc 1356    Filed 09/21/05    Entered 09/21/05 12:38:08    Desc
Main Document        Page 62 of 94

such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order will constitute a judicial determination and will provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

9.      **Governing Law**

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an Exhibit hereto or to the Plan provides otherwise, the rights, duties, and obligations arising under the Plan will be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of laws thereof.

10.     **Time**

In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth herein or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 will apply.

11.     **Notices**

All notices, requests, and demands to or upon the Debtors to be effective will be in writing (including by Telecopier transmission) and, unless otherwise expressly provided herein, will be deemed to have been duly given or made when actually delivered or, in the case of notice by Telecopier transmission, when received and telephonically confirmed, addressed as follows:

> NEW WORLD PASTA COMPANY
> 85 Shannon Road
> Harrisburg, Pennsylvania  17112
> Attn:  Cary A. Metz, Esq.
> Senior Vice President and General Counsel
> Telephone:  (717) 526-2200
> Telecopier:  (717) 526-2468
>
> - and -
>
> WEIL, GOTSHAL & MANGES LLP
> 767 Fifth Avenue
> New York, New York  10153
> Attn:  Alan B. Miller, Esq. and Stephen Karotkin, Esq.
> Telephone:  (212) 310-8000
> Telecopier:  (212) 310-8007
>
> - and -

Case 1:04-bk-02817-MDF    Doc 1356    Filed 09/21/05    Entered 09/21/05 12:38:08    Desc
Main Document      Page 63 of 94

SAUL EWING LLP
2 North Second Street, 7th Floor
Harrisburg, Pennsylvania 17101
Attn: Eric L. Brossman, Esq. and Robert J. Bein, Esq.
Telephone: (717) 257-7500
Telecopier: (717) 238-4622

## 12. Filing or Execution of Additional Documents

On or before the Effective Date, and without the need for any further order or authority, the Debtors or the Reorganized Debtors, as appropriate, will file with the Court or execute, as appropriate, such agreements and other documents that are in form and substance reasonably satisfactory to them, the Term Lender, JLL, and the Creditors' Committee, as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

## 13. Binding Effect

The Plan will be binding upon and inure to the benefit of the Debtors, the holders of Administrative Expenses, Claims, and Equity Interests, all other parties in interest, and each of their respective successors and assigns, including without limitation, the Reorganized Debtors.

## V.

## SECURITIES LAW MATTERS

### A. Issuance and Resale of New Securities under the Plan

Section 1145 of the Bankruptcy Code generally exempts from registration under the Securities Act the offer or sale of securities of a debtor or a successor to the debtor under a chapter 11 plan if such securities are offered or sold in exchange for a claim against, or equity interest in, such debtor. In reliance upon this exemption, the Holdings Common Stock, the New Warrants and the shares of Holdings Common Stock issuable upon exercise of the New Warrants generally will be exempt from the registration requirements of the Securities Act, and state and local securities laws. Accordingly, such securities may be resold without registration under the Securities Act or other federal securities laws pursuant to the exemption provided by Section 4(1) of the Securities Act, unless the holder is an "underwriter" with respect to such securities, as that term is defined in the Bankruptcy Code. In addition, such securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states. However, recipients of new securities issued under the Plan are advised to consult with their own legal advisors as to the availability of any such exemption from registration under state law in any given instance and as to any applicable requirements or conditions to such availability.

Section 1145(b) of the Bankruptcy Code defines "underwriter" for purposes of the Securities Act as one who (a) purchases a claim with a view to distribution of any security to be received in exchange for the claim other than in ordinary trading transactions, (b) offers to sell securities issued under a plan for the holders of such securities, (c) offers to buy securities issued

under a plan from persons receiving such securities, if the offer to buy is made with a view to distribution, or (d) is a control person of the issuer of the securities.

Notwithstanding the foregoing, statutory underwriters may be able to sell securities without registration pursuant to the resale limitations of Rule 144 under the Securities Act which, in effect, permit the resale of securities received by statutory underwriters pursuant to a chapter 11 plan, subject to applicable volume limitations, notice and manner of sale requirements, and certain other conditions. Parties who believe they may be statutory underwriters as defined in section 1145 of the Bankruptcy Code are advised to consult with their own legal advisors as to the availability of the exemption provided by Rule 144.

**B.    Listing**

On the Effective Date, shares of Holdings Common Stock and the New Warrants issued pursuant to the Plan will not be listed or traded on any nationally recognized market or exchange. Accordingly, no assurance can be given that a holder of Holdings Common Stock or New Warrants will be able to sell such securities in the future or as to the price at which any sale may occur.

**C.    Legends**

Certificates evidencing shares of Holdings Common Stock and New Warrants received by holders of at least 10% of the outstanding Holdings Common Stock will bear a legend substantially in the form below:

**THE [SHARES OF HOLDINGS COMMON STOCK] [NEW WARRANTS] REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION AND MAY NOT BE SOLD, OFFERED FOR SALE OR OTHERWISE TRANSFERRED UNLESS REGISTERED OR QUALIFIED UNDER SUCH ACT AND APPLICABLE STATE SECURITIES LAWS OR UNLESS HOLDINGS RECEIVES AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO IT THAT SUCH REGISTRATION OR QUALIFICATION IS NOT REQUIRED.**

Certificates evidencing all shares of Holdings Common Stock will bear a legend to the effect that "THE SHARES OF HOLDINGS COMMON STOCK THAT ARE REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO, AND ALL HOLDERS THEREOF ARE BOUND BY, THE PROVISIONS OF THE SECURITYHOLDERS' AGREEMENT, WHETHER OR NOT THEY HAVE EXECUTED SUCH AGREEMENT."

# VI.

## FINANCIAL INFORMATION, PROJECTIONS AND VALUATION ANALYSIS

**A.**   **Historical Financial Information**

      The audited consolidated balance sheets for each of the four fiscal years ended December 31, 2001, December 31, 2002, December 31, 2003, and December 31, 2004 and the related consolidated statements of operations and consolidated statements of cash flows of the Debtors are annexed hereto as Exhibit C to this Disclosure Statement and the full text of which is incorporated herein by reference.  This financial information is provided to permit the holders of Claims against and Equity Interests in the Debtors to better understand the Debtors' historical business performance and the impact of the Reorganization Cases on the Debtors' businesses.

**B.**   **Consolidated Projected Financial Statements**

**1.**   **Purpose of the Projections**

      The Debtors and their advisors developed a set of consolidated projected financial statements (the "Projections," attached hereto as Exhibit D) to assess the enterprise value of the Reorganized Debtors, generally.  The Projections are based on a number of significant assumptions, including the successful reorganization, an assumed Effective Date of November 26, 2005, and no significant downturn in the specific markets in which the Debtors operate.

      **BECAUSE THE PROJECTIONS ARE BASED UPON A NUMBER OF SIGNIFICANT ASSUMPTIONS, ACTUAL OPERATING RESULTS AND VALUES MAY VARY.**

      The Projections cover the estimated effect of the transactions contemplated by the Plan on the Debtors' capitalizations, results of operations, and cash flow, as of and for the five-year period ending December 31, 2009.  The Debtors do not, as a matter of course, publicly disclose Projections as to their future revenues, earnings, or cash flow.  In connection with the Debtors' consideration of the Plan, certain projections of the future financial performance of the Debtors' operating business were prepared.  Accordingly, after the Effective Date, the Reorganized Debtors do not intend to update or otherwise revise the Projections.  Furthermore, the Reorganized Debtors do not intend to update or review the Projections to reflect changes in general economic or industry conditions.  Significant assumptions underlying the Projections are set forth below and should be read in conjunction with the Debtors' historical financial information.

      The Projections were prepared by the Debtors to analyze their ability to meet their obligations under the Plan and to assist each holder of a Claim in Class 3, 5, or 6 in determining whether to accept or reject the Plan.  The Projections have not been compiled, or prepared for examination or review, by the Debtors' independent auditors (who accordingly assume no responsibility for them), and were not prepared to conform to the guidelines established by the American Institute of Certified Public Accountants regarding financial forecasts.  While presented with numerical specificity, these Projections are based upon a variety of assumptions (which the Debtors believe are reasonable), and are subject to significant business, economic,

and competitive uncertainties and contingencies, many of which are beyond the control of the Debtors. Consequently, the inclusion of the Projections herein should not be regarded as a representation by the Debtors (or any other person) that the Projections will be realized, and actual results may vary materially from those presented below. Due to the fact that such projections are subject to significant uncertainty and are based upon assumptions which may not prove to be correct, neither the Debtors nor any other person assumes any responsibility for their accuracy or completeness.

Moreover, the dry pasta industry is highly competitive and subject to the actions of the Debtors' customers and consumers, and the Debtors' earnings may be significantly adversely affected by the actions of its competitors or customers, either through competitive influx, price pressure, business expansion or the choices of consumers. The Projections generally assume that no material change in the competitive environment which presently exists will occur and that no significant changes in the dry pasta industry will occur as a result of shifting consumer demand or other factors.

2.        **Summary of Significant Assumptions**

(a)        **Plan Terms and Consummation**

The Projections assume an Effective Date as of November 26, 2005, with Allowed Administrative Expenses, Claims and Equity Interests treated in accordance with the treatment provided in the Plan with respect to such Allowed Administrative Expenses, Claims and Equity Interests. Although the Debtors will seek to cause the Effective Date to occur as soon as practicable, there would be no assurance as to when the Effective Date actually will occur. With respect to the projection of expenses to be incurred during the Reorganization Cases, if the Effective Date does not occur by November 26, 2005, additional bankruptcy expenses will be incurred until such time as a Plan is confirmed. These expenses could significantly impact the Debtors' results of operations and cash flows.

(b)        **General Economic Conditions**

The Projections were prepared assuming that economic conditions in the markets served by the Debtors do not differ markedly over the next five (5) years from current economic conditions.

(c)        **Additional Assumptions[12]**

1.        **Market Assumptions:**  The U.S. dry pasta grocery category, based on total pounds sold, has experienced declines of 3.2% in 2003 and 3.6% in 2004. This decline was based in part on the low-carbohydrate dietary trend, which the Company believes to be subsiding based on the 1.7% positive year-to-date June 26, 2005 performance of the category versus the same time period in 2004. In order to present a conservative outlook, the Company has projected a 1.0% annual decline in the U.S. dry pasta grocery category for the years 2005, 2006 and 2007 and a flat category for the years 2008 and 2009.

---

[12]   Dollars and percentages discussed below for fiscal years 2003 and 2004 are preliminary and unaudited.

Case 1:04-bk-02817-MDF    Doc 1356    Filed 09/21/05    Entered 09/21/05 12:38:08    Desc
Main Document      Page 67 of 94

The Canadian dry pasta retail category, based on total pounds sold, has been plus or minus 1% over the last several years. Therefore, the Company has projected a flat Canadian dry pasta retail category for the years 2005 to 2009.

2.    **Net Sales:**  Net sales are calculated as gross sales less all invoice deductions such as payment term discounts, product returns, trade promotional expenses, coupon expenses and freight allocations.  Net sales and the related growth percentages for the period 2002 to 2009 are included in the below chart:

| (in millions) | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|---|---|---|
| Net Sales | $356.3 | $299.0 | $292.1 | $303.7 | $312.9 | $324.7 | $336.7 | $346.7 |
| % Growth | 17.2% | (16.1%) | (2.3%) | 4.0% | 3.1% | 3.8% | 3.7% | 3.0% |

The net sales growth is primarily based on the growth of the Healthy Harvest brand, which is the Company's healthy pasta alternative.  Healthy Harvest growth projections are based on continued organic growth, new product introductions and a modest price increase in 2007.  The Company's Healthy Harvest brand has experienced year to date May 2005 growth, based on sales dollars, of 47%.  Net sales growth will also occur through non-grocery related retail channels, such as mass merchandisers and club stores.  The Company is also utilizing tools that will help to maximize and more efficiently utilize its trade promotional spending, which will increase net sales.  There is no significant net sales growth projected for the Company's industrial, food service or export distribution channels.

3.    **Cost of Sales:**  Cost of sales includes raw and packaging materials, direct labor wages and benefits, variable and fixed manufacturing expenses, manufacturing depreciation, purchased product, transportation, warehousing and the supply chain workforce.  Cost of sales and the percent of net sales for the period 2002 to 2009 is included in the below chart.

| (in millions) | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|---|---|---|
| Cost of Sales | $337.6 | $275.7 | $258.3 | $303.7 | $312.9 | $324.7 | $336.7 | $346.7 |
| % of Net Sales | 94.7% | 92.2% | 88.4% | 80.3% | 75.8% | 74.5% | 73.7% | 72.8% |

The Company has signed agreements with packaging vendors and third party warehouse providers to obtain part of this reduction in costs.  Additional savings will be achieved through headcount reductions and improved operational efficiencies.  The Company has assumed the effect of any significant price increases in raw materials will have a zero net effect on the Company as those price increases will be passed on to customers.  The cost of sale expense categories, except raw and packaging materials, include an inflationary increase of approximately 2.5% per year during the projection period.

Case 1:04-bk-02817-MDF    Doc 1356    Filed 09/21/05    Entered 09/21/05 12:38:08    Desc
Main Document      Page 68 of 94

4.     **Selling and Marketing**:  Selling and marketing expenses include consumer marketing, the Company's sales and marketing workforce and retail broker commissions.  Selling and marketing expenses and the percent of net sales for the period 2002 to 2009 are included in the below chart.

| (in millions) | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|---|---|---|
| Sales & Mtking | $35.6 | $26.0 | $23.5 | $26.1 | $27.8 | $29.5 | $31.1 | $31.5 |
| % of Net Sales | 10.0% | 8.7% | 8.0% | 8.6% | 8.9% | 9.1% | 9.2% | 9.1% |

Commissions paid to the Company's U.S. retail broker network are projected to remain relatively flat as a percent of net sales through the projection period.  The Company's U.S. and Canadian sales team expenses are projected to increase by approximately 2.0% per year during the projection period.  The primary driver in the increased selling and marketing costs is related to an increase in the consumer marketing spending as the Company shifts its marketing focus from the trade group to the consumer group.

5.     **General and Administrative**:  General and administrative expenses include expenses related to executive management, legal, information technology, accounting, finance and treasury.  Corporate depreciation is also included in general and administrative expenses.  General and Administrative expenses and the percent of net sales for the period 2002 to 2009 are included in the below chart.

| (in millions) | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|---|---|---|
| G&A | $22.8 | $25.8 | $18.2 | $16.7 | $17.7 | $18.1 | $18.3 | $18.7 |
| % of Net Sales | 6.4% | 8.6% | 6.2% | 5.5% | 5.6% | 5.6% | 5.4% | 5.4% |

All expenses are projected to increase by approximately 2.0% each year of the projection period.  Fiscal year 2006 also includes an increase of approximately $1,900,000 as the Company annual incentive plan replaces the Key Employee Retention Plan.

6.     **Restructuring Expenses**:  Restructuring related expenses only occur in fiscal year 2005 of the projection period.  The 2005 restructuring expenses total $27,960,000 and include $22,013,100 for bankruptcy related professional fees, $5,207,834 of IT Systems re-installations and write-offs, $410,350 for Key Employee Retention Program payments and $328,280 for other restructuring expenses.

7.     **Emergence Costs**:  Emergence costs are estimated costs related to the Debtors' emergence from chapter 11.  These costs include fees to be paid in connection with the Exit Financing, certain professionals' fees, payments to be made under the Key Employee Retention Program, certain payments to the Debtors' critical vendors and other estimated administrative expenses.

8. **Interest Expense and Long-Term Debt:** The Company expects to enter into an Exit Facility for a $240,000,000 senior secured revolving and term credit facility having principal terms and conditions consistent with the market for such credit facilities. The Projections assume that approximately $206,400,000 of the Exit Facility will be funded upon the Debtors' emergence from chapter 11. Structure and terms of the Exit Facility are to be determined and, therefore, have not been assumed in the Projections.

9. **Working Capital:** The Company is not projecting any significant improvements to working capital, which include accounts receivable, inventory, prepaid expenses, accounts payable, and accrued expenses, during the projection period.

10. **Capital Expenditures:** The projections include capital expenditures associated with equipment rebuilds, repairs or replacements, upgrade of the Company's ERP system, safety or regulatory issues and other miscellaneous expenditures. The Company's supply chain group completed a detailed analysis of these lines, factoring in the age of the equipment, the overall equipment effectiveness ("OEE") and the last time the line was rebuilt to determine the appropriate time to overhaul the equipment to increase the OEE of each line. Depreciation expense was based on capital expenditure projections, historical book values and estimated remaining life projections.

### 3. Special Note Regarding Forward-Looking Statements

Some matters discussed herein contain forward-looking statements that are subject to certain risks, uncertainties or assumptions and may be affected by certain other factors which may impact future results and financial conditions. In some cases, you can identify forward-looking statements by terminology such as "may," "should," "could," "expects," "plans," "projected," "anticipates," "believes," "estimates," "predicts," "potential," or "continues," or the negative of these terms or other comparable terminology. In addition, except for historical facts, the Projections and Valuation provided in this section, and the "Certain Factors Affecting the Debtors" provided in Section VII of the Disclosure Statement, should be considered forward-looking statements. Should one or more of these risks, uncertainties or other factors materialize, or should underlying assumptions prove incorrect, actual results, performance or achievements of the Debtors may vary materially from any future results, performance or achievements expressed or implied by such forward-looking statements.

Forward-looking statements are based on beliefs and assumptions of the Debtors' management and on information currently available to such management. Forward-looking statements speak only as of the date they are made, and the Debtors undertake no obligation to update publicly any of them in light of new information or future events. Undue reliance should not be placed on such forward-looking statements, which are based on current expectations. Forward-looking statements are not guarantees of performance.

### C. Valuation

In connection with certain matters relating to the Plan, the Debtors directed Rothschild to prepare a valuation analysis of the Debtors' businesses. The valuation analysis was prepared by Rothschild based on the Projections and financial and market conditions prevailing as of

September 12, 2005.  Specifically, the valuation was developed for purposes of assisting the Debtors in evaluating (i) the relative recoveries of holders of Allowed Claims and Equity Interests and (ii) whether the Plan met the "best interests test" under the Bankruptcy Code.

In preparing its analysis, Rothschild has, among other things:  (i) reviewed certain recent publicly available financial results of the Debtors; (ii) reviewed certain internal financial and operating data of the Debtors; (iii) discussed with certain senior executives the current operations and prospects of the Debtors; (iv) reviewed certain operating and financial forecasts prepared by the Debtors, including the Projections; (v) discussed with certain senior executives of the Debtors key assumptions related to the Projections; (vi) prepared discounted cash flow analyses based on the Projections, utilizing various discount rates and terminal value multiples; (vii) considered the market multiples of certain publicly-traded companies in businesses reasonably comparable to the operating businesses of the Debtors; (viii) considered the transaction multiples of acquisitions involving companies in businesses reasonably comparable to the operating businesses of the Debtors; and (ix) considered such other analyses as Rothschild deemed necessary under the circumstances.

Rothschild assumed, without independent verification, the accuracy, completeness and fairness of all of the financial and other information available to it from public sources or as provided to Rothschild by the Debtors or their representatives.  Rothschild also assumed that the Projections have been reasonably prepared on a basis reflecting the Debtors' best estimates and judgment as to future operating and financial performance.  The Projections assume the Debtors will achieve certain customer growth and pricing levels for their product offerings. To the extent that the Debtors do not meet such customer growth and/or pricing levels during the projected period, such variances may have a material impact on the Projections and on the valuation. Rothschild did not make any independent evaluation of the Debtors' assets, nor did Rothschild verify any of the information it reviewed. To the extent the valuation is dependent upon the Reorganized Debtors' achievement of the Projections, the valuation must be considered speculative.

In addition to the foregoing, Rothschild relied upon the following assumptions with respect to the valuation of the Debtors:

- The Effective Date occurs on or about November 26, 2005;

- The pro forma debt level of the Reorganized Debtors estimated as of November 26, 2005, would be approximately $206,400,000 upon consummation of the Plan;

- As of November 26, 2005, the Debtors and their Non-Debtors Subsidiaries would have an estimated $1,000,000 in cash after making all distributions required pursuant to the Plan; and

- General financial and market conditions as of the date of this Disclosure Statement do not differ materially from those conditions prevailing as of September 12, 2005.

As a result of such analyses, review, discussions, considerations and assumptions, Rothschild presented to the Debtors estimates that the total enterprise value ("TEV") of the

Debtors is a range of approximately $250,000,000 to $305,000,000 with a mid-point value of $277,500,000 (the "TEV Range"). Rothschild reduced such mid-point TEV estimate by the estimated pro forma net debt levels of the Reorganized Debtors as of November 26, 2005 (approximately $205,400,000) and the value of the warrants described below to calculate the implied reorganized equity value of the Reorganized Debtors. Upon confirmation of the Plan, the holders of Allowed Class 5 Claims would be granted New Class A Warrants convertible into 10% of Holdings Common Stock at a $275,000,000 TEV and New Class B Warrants convertible into 10% of Holdings Common Stock at a $300,000,000 TEV (New Class A Warrants and New Class B Warrants collectively referred to as the "New Warrants"). Based on a Black-Scholes analysis and utilizing the terms of the New Warrants and a 30.0% volatility, Rothschild estimates that the New Class A Warrants will have a value range of $900,000 to $5,400,000 with a value of $2,800,000 at the mid-point of the TEV Range and the New Class B Warrants will have a value range of approximately $600,000 to $4,600,000 with a value of $2,200,000 at the mid-point of the TEV Range.

Rothschild estimates that the Debtor's mid-point total reorganized equity value is $67,100,000 or $8.94 per share of Holdings Common Stock, after the impact of the New Warrants described above and before the impact of any Management Incentive Plan.

The estimated range of values represents a hypothetical value that reflects the estimated intrinsic value of the Debtors derived through the application of various valuation methodologies. The equity value ascribed in the analysis does not purport to be an estimate of the post-reorganization market trading value. Such trading value may be materially different from the implied equity value ranges associated with Rothschild's valuation analysis. Rothschild's estimate is based on economic, market, financial and other conditions as they exist on, and on the information made available as of September 12, 2005. It should be understood that, although subsequent developments may affect Rothschild's conclusions, Rothschild does not have any obligation to update, revise or reaffirm its estimate.

The summary set forth above does not purport to be a complete description of the analyses performed by Rothschild. The preparation of an estimate involves various determinations as to the most appropriate and relevant methods of financial analysis and the application of these methods in the particular circumstances and, therefore, such an estimate is not readily susceptible to summary description. The value of an operating business is subject to uncertainties and contingencies that are difficult to predict and will fluctuate with changes in factors affecting the financial conditions and prospects of such a business. As a result, the estimate of implied equity value set forth herein is not necessarily indicative of actual outcomes, which may be significantly more or less favorable than those set forth herein. In addition, estimates of implied equity value do not purport to be appraisals, nor do they necessarily reflect the values that might be realized if assets were sold. The estimates prepared by Rothschild assume that the Reorganized Debtors will continue as the owners and operators of their businesses and assets. Depending on the results of the Debtors' operations or changes in the financial markets, actual total enterprise value may differ from Rothschild's valuation analysis disclosed herein.

In addition, the valuation of the Holdings Common Stock and New Warrants is subject to additional uncertainties and contingencies, all of which are difficult to predict. Actual market

prices of such securities at issuance will depend upon, among other things, prevailing interest rates, conditions in the financial markets, the anticipated initial securities holdings and the uncertainty as to whether some initial holders may prefer to liquidate their investment rather than hold it on a long-term basis, and other factors that generally influence the prices of securities. Actual market prices of such securities also may be affected by other factors not possible to predict. Accordingly, the implied equity value estimate by Rothschild does not necessarily reflect, and should not be construed as reflecting values that will be attained in the public or private markets. Rothschild does not make any representation or warranty as to the fairness of the terms of the Plan.

**THE SUMMARY SET FORTH DOES NOT PURPORT TO BE A COMPLETE DESCRIPTION OF THE ANALYSES PERFORMED BY ROTHSCHILD. THE PREPARATION OF AN ESTIMATE INVOLVES VARIOUS JUDGMENTS AND DETERMINATIONS AS TO THE MOST APPROPRIATE AND RELEVANT METHODS OF FINANCIAL ANALYSIS AND THE APPLICATION OF THESE METHODS IN THE PARTICULAR CIRCUMSTANCES AND, THEREFORE, SUCH AN ESTIMATE IS NOT READILY SUSCEPTIBLE TO SUMMARY DESCRIPTION. IN PERFORMING ITS ANALYSES, ROTHSCHILD AND THE DEBTORS MADE NUMEROUS ASSUMPTIONS WHICH ARE INHERENTLY SUBJECT TO SIGNIFICANT UNCERTAINTIES AND CONTINGENCIES BEYOND THE CONTROL OF THE DEBTORS. ACCORDINGLY, THERE CAN BE NO ASSURANCE THAT THE RANGES REFLECTED IN THE VALUATION WOULD BE REALIZED IF THE PLAN WHERE TO BECOME EFFECTIVE, AND ACTUAL RESULTS COULD VARY MATERIALLY FROM THOSE SHOWN HERE.**

## VII.

## CERTAIN FACTORS AFFECTING THE DEBTORS

A.      <u>Certain Bankruptcy Law Considerations</u>

      1.      **Risk of Non-Confirmation of the Plan**

Although the Debtors believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion. Moreover, there can be no assurance that modifications of the Plan will not be required for confirmation or that such modifications would not necessitate the resolicitation of votes.

      2.      **Nonconsensual Confirmation**

In the event any impaired class of Claims or Equity Interests does not accept the Plan, the Bankruptcy Court may nevertheless confirm the Plan at the Debtors' request if at least one impaired class has accepted the Plan (with such acceptance being determined without including the vote of any "insider" in such class), and as to each impaired class that has not accepted the Plan, the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes. For a more detailed description

see Section IX of the Disclosure Statement, entitled "Confirmation of the Plan." The Debtors believe that the Plan satisfies these requirements, and pursuant to the Plan, will request such nonconsensual confirmation with respect to any class that rejects or is deemed to reject the Plan in accordance with subsection 1129(b) of the Bankruptcy Code.

### 3. Risk of Non-Occurrence of the Effective Date

Although the Debtors believe that the Effective Date may occur on November 26, 2005, there can be no assurance as to such timing. Moreover, if the conditions precedent to the Effective Date have not occurred or been waived by the Debtors on or before January 31, 2006, or such later date as is proposed and approved after notice and a hearing by the Bankruptcy Court, then upon motion of the Debtors, the order confirming the Plan may be vacated by the Bankruptcy Court, in which event the Plan would be deemed null and void, and the Debtors may propose and solicit votes on an alternative plan that may not be as favorable to parties in interest as the Plan.

### 4. Risk of Competing Plans of Reorganization

As set forth in Section III.K of the Disclosure Statement, entitled "Lapse of Exclusivity; Case Management Stipulation," the Debtors do not enjoy an exclusive right to file a plan of reorganization and solicit acceptances thereof under section 1121 of the Bankruptcy Code. As a result, any party in interest in these chapter 11 cases may file a competing plan of reorganization with terms less favorable to the Debtors' general unsecured creditors in Classes 5 and 6.

## B. Factors Affecting Reorganized Debtors

The dry pasta industry is highly competitive. The success of the Reorganized Debtors depends to a large extent upon the Debtors' ability to effectively compete with other manufacturers and marketers of dry pasta. If the Debtors' competitors were to lower the prices of their brands or more successfully market their brands, the Debtors' businesses could suffer. In addition, new competitors may enter the market and such additional competition could be detrimental to the Debtors' businesses.

The Debtors' businesses depend on maintaining good relations with their suppliers of wheat and other raw materials used in making dry pasta. A deterioration in the relationship with any of the major raw material suppliers could disrupt the Debtors' manufacturing process, and therefore, harm the Debtors' businesses. In addition, other factors, including but not limited to the possible decreased demand for the Debtors' products, non-collection of accounts receivable, inability to derive cost savings or productions and logistical efficiencies as planned, and increased capital requirements could have a negative impact on the Debtors' reorganization.

## C. Variances from Projections

Finally, the fundamental premise of the Plan is the de-leveraging of the Debtors and the implementation and realization of the Debtors' business plan, as reflected in the Projections. The Projections reflect numerous assumptions concerning the anticipated future performance of the Reorganized Debtors, some of which may not materialize. Such assumptions include, among other items, assumptions concerning the general economy, the ability to make necessary capital

expenditures, the ability to maintain market strength, consumer preferences, and the ability to increase gross margins and control future operating expenses. The Debtors believe that the assumptions underlying the Projections are reasonable. However, unanticipated events and circumstances occurring subsequent to the preparation of the Projections may affect the actual financial results of the Reorganized Debtors. Therefore, the actual results achieved throughout the periods covered by the projections necessarily may vary from the projected results, and such variations may be material and adverse.

**D.**     **Certain Tax Matters**

For a summary of certain federal income tax consequences of the Plan to certain holders of claims and to the Debtors, see Section XI of the Disclosure Statement, entitled "Certain Federal Income Tax Consequences of the Plan."

**E.**     **Pending Litigation or Demands Asserting Prepetition Liability**

As of the date of this Disclosure Statement, there were pending legal proceedings asserting prepetition liabilities against the Debtors. These legal proceedings arose in the ordinary course of business operations, and the Debtors believe these proceedings will not have a material adverse effect upon the operations or financial position of the Debtors or the Reorganized Debtors.

**VIII.**

**VOTING PROCEDURES AND REQUIREMENTS**

**A.**     **Classes Entitled to Vote under the Plan**

Only holders of Claims in the following classes are authorized to vote to accept or reject the Plan:

| | |
|---|---|
| Class 3 | Term Lender Claims |
| Class 5 | General Unsecured Claims |
| Class 6 | Other Unsecured Claims |

**B.**     **Voting Requirements**

**IT IS IMPORTANT THAT HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN EXERCISE THEIR RIGHT TO VOTE TO ACCEPT OR REJECT THE PLAN**. All holders of Claims entitled to vote on the Plan have been sent a Ballot together with this Disclosure Statement. Such holders should read the Ballot carefully and follow the instructions contained therein. Please use only the Ballot (or Ballots) that accompanies this Disclosure Statement.

**FOR YOUR VOTE TO COUNT, YOUR BALLOT MUST BE RECEIVED BY NEW WORLD PASTA COMPANY BALLOT PROCESSING, C/O FINANCIAL BALLOTING GROUP LLC, AT THE ADDRESS LISTED ON THE BALLOT, NO LATER THAN 4:00 P.M. (EASTERN TIME), ON [_____], 2005**. If you return your

Ballot to your agent, you must return your Ballot to such agent in sufficient time for it to process such Ballot and return it to New World Pasta Company Ballot Processing by the Voting Deadline.

**IF YOU MUST RETURN YOUR BALLOT TO YOUR BANK, BROKER OR OTHER NOMINEE, OR TO THEIR AGENT, YOU MUST RETURN YOUR BALLOT TO THEM IN SUFFICIENT TIME FOR THEM TO PROCESS IT AND RETURN IT TO THE VOTING AGENT BEFORE THE VOTING DEADLINE.**

**IF A BALLOT IS DAMAGED OR LOST, YOU MAY CONTACT THE DEBTORS' VOTING AGENT AT THE NUMBER SET FORTH BELOW. ANY BALLOT THAT IS EXECUTED AND RETURNED BUT WHICH DOES NOT INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN WILL NOT BE COUNTED.**

**IF YOU HAVE ANY QUESTIONS CONCERNING VOTING PROCEDURES, YOU MAY CONTACT THE VOTING AGENT AT:**

> **FINANCIAL BALLOTING GROUP LLC**
> **757 THIRD AVENUE, THIRD FLOOR**
> **NEW YORK, NEW YORK 10017**
> **ATTN: NEW WORLD PASTA BALLOT TABULATION**
>
> **TEL: (800) 609-4408**

Additional copies of this Disclosure Statement are available upon request made to the Voting Agent, at the address and telephone number set forth immediately above.

C.     **Acceptance by Classes of Claims**

The Bankruptcy Code defines acceptance of a chapter 11 plan by a class of claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of the allowed claims of that class that cast ballots for acceptance or rejection of a plan. Thus, acceptance of the Plan by impaired classes will occur only if at least two-thirds in dollar amount and a majority in number of the holders of Claims in each Class that timely return their Ballots vote in favor of acceptance.

D.     **Withdrawal of Ballot or Master Ballot**

Any voter that has delivered a valid Ballot may withdraw its vote by delivering a written notice of withdrawal to the Voting Agent before the Voting Deadline. To be valid, the notice of withdrawal must (a) describe the claim to which it relates, (b) be signed by the party who signed the Ballot to be revoked, and (c) be received by the Voting Agent before the Voting Deadline. The Debtors may contest the validity of any withdrawals.

Any holder that has delivered a valid Ballot may change its vote by delivering to the Voting Agent a properly completed subsequent Ballot so as to be received before the Voting

Case 1:04-bk-02817-MDF    Doc 1356    Filed 09/21/05    Entered 09/21/05 12:38:08    Desc
Main Document      Page 76 of 94

Deadline.  In the case where more than one timely, properly completed Ballot is received voting the same Claim, only the Ballot that bears the latest date will be counted.

## IX.

## CONFIRMATION OF THE PLAN

## A.    The Confirmation Hearing

Section 1128 of the Bankruptcy Code requires the Bankruptcy Court, after notice, to conduct a confirmation hearing before a Plan may be confirmed.  The Confirmation Hearing in respect of the Plan has been scheduled for [_____], 2005 at [__:___ _.m.] (Eastern Time), before The Honorable Mary D. France, United States Bankruptcy Judge, in Room 320 of the United States Bankruptcy Court for the Middle District of Pennsylvania, Harrisburg Division, Federal Building, 228 Walnut Street, Harrisburg, Pennsylvania 17101.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any subsequent adjourned Confirmation Hearing.  Any objection to confirmation must be made in writing, must conform to the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules of the Bankruptcy Court (the "Local Rules"), must specify in detail the name and address of the objector, the nature and amount of the Claim or number of shares of Old NWP Common Stock or other Equity Interests held by the objector, the basis of the objection and the specific grounds therefor.  Any such objection must be filed with the Bankruptcy Court in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, and be served so that it is received by the Bankruptcy Court and the following parties on or before [_____], 2005 at 4:00 p.m. (Eastern Time):  (i) the Office of the United States Trustee for the Middle District of Pennsylvania, 228 Walnut Street, Suite 1190, Harrisburg, Pennsylvania 17101 (Attn:  Anne Fiorenza, Esq.); (ii) New World Pasta Company, 85 Shannon Road, Harrisburg, Pennsylvania 17112 (Attn:  Cary M. Metz, Esq); (iii) Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn:  Alan B. Miller, Esq. and Stephen Karotkin, Esq.), co-attorneys for the Debtors and Debtors in Possession; (iv) Saul Ewing LLP, Penn National Insurance Plaza, 2 North Second Street, 7th Floor, Harrisburg, Pennsylvania 17101 (Attn:  Eric L. Brossman, Esq. and Robert J. Bein, Esq.), co-attorneys for the Debtors and Debtors in Possession; (v) Fried, Frank, Harris, Shriver & Jacobson, LLP, One New York Plaza, New York, New York 10004 (Attn:  Bonnie Steingart, Esq. and Vivek Melwani, Esq.), co-attorneys for the Creditors' Committee; (vi) Blank Rome LLP, 1201 Market Street, Suite 800, Wilmington, Delaware 19801 (Attn:  Bonnie Glantz Fatell, Esq. and Mark J. Packel, Esq.), co-attorneys for the Creditors' Committee; (vii) Simpson Thacher & Bartlett LLP, 425 Lexington Avenue, New York, New York 10017 (Attn:  Peter Pantaleo, Esq.), attorneys for JLL; (viii) Sidley Austin Brown & Wood LLP, 787 Seventh Avenue, New York, New York 10019 (Attn:  Lee S. Attanasio, Esq.), attorneys for BNY; (ix) Luskin, Stern & Eisler LLP, 330 Madison Avenue, New York, New York 10017 (Attn:  Michael Luskin, Esq.), attorneys for BNS; (x) Latham & Watkins LLP, Sears Tower, Suite 5800, 233 S. Wacker Drive, Chicago, Illinois 60606 (Attn:  David S. Heller, Esq. and Keith A. Simon, Esq.), co-attorneys for Black Diamond; (xi)Wolf, Block, Schorr & Solis-Cohen LLP, 213 Market Street, 9th Floor, Harrisburg, Pennsylvania 17101 (Attn:  Dino A. Ross, Esq.), co-attorneys for Black Diamond; (xii) Paul, Hastings, Janofsky & Walker LLP, 600 Peachtree Street, N.E., Twenty-Fourth Floor, Atlanta, Georgia 30308 (Attn:  Jesse H. Austin, III,

Esq.) and 515 South Flower Street, Twenty-Fifth Floor, Los Angeles, CA 90071 (Attn: Hydee R. Feldstein, Esq.), attorneys for the Exit Lenders; and (xiii) those parties listed on the "Master Service List" as set forth in paragraph 4 of the Order under 11 U.S.C. §§ 102 and 105 and Fed. R. Bankr. P. 2002(m) and 9007 Establishing Notice, Case Management and Administrative Procedures, entered by the Court on July 8, 2004.

Unless an objection to confirmation is timely served and filed, it may not be considered by the Bankruptcy Court.

## B.    Requirements for Confirmation of the Plan

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met. Among the requirements for confirmation of a Plan are that the Plan is: (i) feasible, (ii) in the "best interests" of creditors and stockholders that are impaired under the Plan, and (iii) accepted by all impaired classes of Claims and Equity Interests or, if rejected by an impaired class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such class.

### 1.    Consensual Confirmation

#### (a)    General Requirements

At the confirmation hearing, the Bankruptcy Court will determine whether the following confirmation requirements specified in section 1129 of the Bankruptcy Code have been satisfied:

(i)    The Plan complies with the applicable provisions of the Bankruptcy Code.

(ii)    The Debtors have complied with the applicable provisions of the Bankruptcy Code.

(iii)    The Plan has been proposed in good faith and not by any means proscribed by law.

(iv)    Any payment made or promised by the Debtors or by a person issuing securities or acquiring property under the Plan for services or for costs and expenses in, or in connection with, the Reorganization Cases, or in connection with the Plan and incident to the Reorganization Cases, has been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable.

(v)    The Debtors have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director, officer, or voting trustee of the Debtors, an affiliate of the Debtors participating in the Plan with the Debtors, or a successor to the Debtors under the Plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors

and equity holders and with public policy, and the Debtors have disclosed the identity of any insider that will be employed or retained by the Debtors, and the nature of any compensation for such insider.

(vi)     With respect to each Class of Claims or Equity Interests, each holder of an impaired Claim either has accepted the Plan or will receive or retain under the Plan on account of such holder's Claim, property of a value, as of the Effective Date of the Plan, that is not less than the amount such holder would receive or retain if the Debtors were liquidated on the Effective Date under chapter 7 of the Bankruptcy Code. For a more detailed discussion, see the discussion of "Best Interests Test," in Section IX.B.1.b of the Disclosure Statement.

(vii)    Except to the extent the Plan meets the "Nonconsensual Confirmation" standards discussed in Section IX.B.2 of this Disclosure Statement, each Class of Claims has either accepted the Plan or is not impaired under the Plan.

(viii)   Except to the extent that the holder of a particular Claim has agreed to a different treatment of such claim, the Plan provides that Allowed Administrative Expenses and Allowed Priority Claims other than Priority Tax Claims will be paid in full on the Effective Date and that holders of Allowed Priority Tax Claims will receive on account of such Claims deferred cash payments, over a period not exceeding six years after the date of assessment of such Claims, of a value, as of the Effective Date, equal to the allowed amount of such Claims with interest from the Effective Date.

(ix)     At least one class of impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in such class.

(x)      Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan. For a more detailed discussion of "feasibility," see Section IX.B.1.b of the Disclosure Statement, entitled "Feasibility."

(xi)     The Plan provides for the continuation after the Effective Date of payment of all Retiree Benefits (as defined in section 1114 of the Bankruptcy Code), at the level established pursuant to subsection 1114(e)(1)(B) or 1114(g) of the Bankruptcy Code at any time prior to confirmation of the Plan, for the duration of the period the Debtors have obligated themselves to provide such benefits.

The Debtors believe that each of the foregoing elements will be satisfied.

(b)     **Feasibility**

The Bankruptcy Code requires a debtor to demonstrate that confirmation of a plan of reorganization is not likely to be followed by the liquidation or the need for further financial reorganization of a debtor unless so provided by the plan. For purposes of determining whether

Case 1:04-bk-02817-MDF    Doc 1356    Filed 09/21/05    Entered 09/21/05 12:38:08    Desc
Main Document      Page 79 of 94

the Plan meets this requirement, the Debtors have analyzed their ability to meet their obligations as contemplated thereunder. As part of this analysis, the Debtors have prepared the Projections contained in Section VI of the Disclosure Statement, entitled "Financial Information, Projections and Valuation Analysis." These Projections are based upon the assumption that the Plan will be confirmed by the Bankruptcy Court, and for projection purposes, that the Effective Date of the Plan and its substantial consummation will take place on or about November 26, 2005. The Projections include balance sheets, statements of operations and statements of cash flows. Based upon the Projections, the Debtors believe they will be able to make all payments required to be made pursuant to the Plan, and the Reorganized Debtors will be able to service their post-reorganization debt obligations, including those obligations under the Exit Financing.

(c) **Best Interests Test**

As described above, section 1129(a)(7) of the Bankruptcy Code requires that each holder of a claim or equity interest either (i) accepts the plan or (ii) receives or retains under the plan property of a value, as of the effective date, that is not less than the value such holder would receive or retain if the debtors were liquidated under chapter 7 of the Bankruptcy Code on the effective date. To enable the Bankruptcy Court to make this determination, the Debtors have performed a chapter 7 liquidation analysis (the "Liquidation Analysis") which is annexed hereto as Exhibit E.

The first step in meeting this test is to determine the dollar amount that would be generated from the liquidation of the Debtors' assets and properties in the context of chapter 7 liquidation cases. The total amount available would be the sum of the proceeds from the disposition of the Debtors' assets and the cash held by the Debtors at the time of the commencement of the chapter 7 cases. The next step is to reduce that total by the amount of any claims secured by such assets, the costs and expenses of the liquidation, and such additional administrative expenses and priority claims that may result from the termination of the Debtors' businesses and the use of chapter 7 for the purposes of liquidation. Finally, the present value of that amount (taking into account the time necessary to accomplish the liquidation) is allocated to creditors and shareholders in strict priority in accordance with section 726 of the Bankruptcy Code (see discussion below) and can then be compared to the value of the property that is proposed to be distributed under the Plan on the Effective Date.

The Debtors' costs of liquidation under chapter 7 would include the fees payable to and expenses of a trustee in bankruptcy, as well as those which might be payable to attorneys and other professionals that such a trustee may engage, plus any unpaid expenses incurred by the Debtors during a chapter 11 case and allowed in the chapter 7 case, such as compensation for attorneys, financial advisors, appraisers, accountants and other professionals, and costs and expenses of members of any statutory committee of unsecured creditors appointed by the U.S. Trustee pursuant to section 1102 of the Bankruptcy Code and any other committee so appointed. In addition, claims would arise by reason of the breach or rejection of obligations incurred and executory contracts entered into by the Debtors both prior to, and during the pendency of, the chapter 11 cases. The foregoing types of claims, costs, expenses, and fees and such other claims which may arise in a liquidation case or result from a pending chapter 11 case would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay pre-chapter 11 priority and unsecured claims.

In applying the "best interests test," it is possible that claims and equity interests in the chapter 7 case may not be classified according to the seniority of such claims and equity interests as provided in the Plan. In the absence of a contrary determination by the Bankruptcy Court, all pre-chapter 11 unsecured claims which have the same rights upon liquidation would be treated as one class for purposes of determining the potential distribution of the liquidation proceeds resulting from the Debtors' chapter 7 cases. The distributions from the liquidation proceeds would be calculated ratably according to the amount of the claim held by each creditor. Therefore, creditors who are or claim to be third-party beneficiaries of any contractual subordination provisions might be required to seek to enforce such contractual subordination provisions in the Bankruptcy Court or in another forum. Section 510 of the Bankruptcy Code specifies that such contractual subordination provisions are enforceable in a chapter 7 liquidation case.

The Debtors believe that the most likely outcome of liquidation proceedings under chapter 7 would be the application of the rule of absolute priority of distributions. Under that rule, no junior creditor receives any distribution until all senior creditors are paid in full, with interest, and no equity holder receives any distribution until all creditors are paid in full with interest. Consequently, the Debtors believe that in a liquidation, holders of Claims and Equity Interests in Classes 1, 3, 4, 5, 6 and 7 would receive no distributions of property and holders of Claims in Class 2 would receive less than their anticipated recovery under the Plan.

After consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors in a chapter 11 case, including (i) the increased costs and expenses of a liquidation under chapter 7 arising from fees payable to a trustee in bankruptcy and professional advisors to such trustee, (ii) the erosion in value of assets in a chapter 7 case in the context of the expeditious liquidation required under chapter 7 and the "forced sale" atmosphere that would prevail, (iii) substantial increases in claims which would be satisfied on a priority basis or on a parity with creditors in a chapter 11 case, the Debtors have determined that confirmation of the Plan will provide each holder of a Claim with a recovery that is not less than it would receive pursuant to a liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

As noted, the Liquidation Analysis is annexed hereto as Exhibit E. The information set forth in Exhibit E provides a summary of the liquidation value of the Debtors' assets, assuming a chapter 7 liquidation in which a trustee appointed by the Bankruptcy Court would liquidate such assets. Please refer to the Liquidation Analysis for a complete discussion of this material.

2.      **Nonconsensual Confirmation**

The Bankruptcy Court may confirm the Plan over the dissent of any impaired class if all the requirements for consensual confirmation under section 1129(a) of the Bankruptcy Code, discussed above, are met and if the following requirements of section 1129(b) of the Bankruptcy Code are satisfied as well:

(a)     **Acceptance**

Classes 3, 5, 6, and 7 are impaired under the Plan.  Because Class 7 is deemed to reject the Plan, and is not entitled to vote, acceptance of the Plan by either Classes 3, 5 or 6 is necessary to confirm the Plan.  Classes 3, 5 or 6 will have accepted the Plan if the holders of at least two-thirds in dollar amount and a majority in number of the claims in such classes actually voting on the Plan vote in favor of the Plan (provided such holders have not been designated pursuant to section 1126(e) of the Bankruptcy Code as entities whose acceptances or rejections of the Plan were not in good faith, or were not solicited in good faith or in accordance with the provisions of the Bankruptcy Code).

In addition to acceptance of the Plan by one unimpaired class (determined without including any acceptance of the Plan by any insider), in order for the Plan to be confirmed, the "no unfair discrimination" and "fair and equitable" tests, described below, must be satisfied as to any class that rejects or is deemed to reject the Plan.

(b)     **No Unfair Discrimination / Fair and Equitable Tests**

A plan does not discriminate unfairly if the legal rights of a dissenting class are treated in a manner consistent with the treatment of other classes whose legal rights are substantially similar to those of the dissenting class, and if no class receives more than it is entitled to for its claims or equity interests.  The Plan does not discriminate unfairly because the legal rights of the holders of Claims in any potentially dissenting class would be treated in a manner consistent with the treatment of other Classes whose legal rights are substantially similar to those of the dissenting Class.

The Bankruptcy Code establishes different "fair and equitable" tests for secured and unsecured claims and equity interests, as follows:

(i)     **Secured Claims**.  Each holder of an impaired secured claim either (i) retains its liens on the property, to the extent of the allowed amount of its secured claim and receives deferred cash payments having a value, as of the effective date of a plan of reorganization, of at least the allowed amount of such claim, (ii) has the right to credit bid the amount of its claim if its property is sold and retains its liens on the proceeds of the sale (or if sold, on the proceeds thereof), or (iii) receives the "indubitable equivalent" of its allowed secured claim.

(ii)     **Unsecured Claims**.  Either (i) each holder of an impaired unsecured claim receives or retains under the plan of reorganization property of a value, as of the effective date of the plan, equal to the amount of its allowed claims or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive or retain any property under the plan, subject to the applicability of the "new value" exception.

(iii)     **Equity Interests**.  Either (i) each equity interest holder will receive or retain under the plan of reorganization property of a value, as of the effective date of the plan, equal to the greater of (a) the fixed liquidation preference or redemption price, if any, of such stock or (b) the value of the stock, or (ii) the holders of interests that

are junior to the equity interests will not receive any property under the plan on account of such interests.

In the event Class 3 rejects the Plan, the fair and equitable test is satisfied because the holders of Claims in Class 3 will receive the indubitable equivalent of their Allowed Claims.

In the event either Class 5 or 6 rejects the Plan, the fair and equitable test is satisfied, because the holders of Claims in any classes junior to the rejecting class will receive no distribution under the Plan.

Equity Interests in Class 7 will receive no distribution and are deemed to reject the Plan. For this reason, the Plan also must be "fair and equitable" with respect to the holders of Claims in Class 7. The Debtors believe that the Plan satisfies the fair and equitable test because no value is attributable to NWP Common Stock and there is no class junior to Class 7.

## X.

## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtors have evaluated alternatives to the Plan, including the liquidation of the Debtors. After studying these alternatives, the Debtors have concluded that the Plan is the best alternative and will maximize recoveries by parties in interest, assuming confirmation of the Plan. The following discussion provides a summary of the Debtors' analysis leading to their conclusion that a liquidation or alternative Plan would not provide the highest value to parties in interest.

## A.    Liquidation Under Chapter 7

If no Plan can be confirmed, the Debtors' Reorganization Cases may be converted to cases under chapter 7 of the Bankruptcy Code in which one or more trustees would be elected or appointed to liquidate the assets of the Debtors for distribution to their creditors in accordance with the priorities established by the Bankruptcy Code. A discussion of the effect that a chapter 7 liquidation would have on the recovery of holders of Allowed Claims and Allowed Equity Interests is set forth in Section IX.B.1.(c) of the Disclosure Statement, entitled "Best Interests Test." The Debtors believe that liquidation under chapter 7 would result in: (a) smaller distributions being made to the Senior Lenders than those provided for by the Plan; (b) no distributions being made to holders of other Claims or Equity Interests; and (c) the failure to realize the greater going concern value of the Debtors' assets.

## B.    Alternative Plan

If the Plan is not confirmed, the Debtors or any other party in interest could attempt to formulate a different plan. Such a plan might involve either a reorganization and continuation of the Debtors' businesses or an orderly liquidation of their assets. The Debtors believe that the Plan, as described herein, enables holders of Claims to realize the greatest recovery under the circumstances. In a liquidation under chapter 11, the Debtors' assets would be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7, resulting in greater proceeds than under chapter 7. Further, if a trustee were not appointed, because one is

not required in chapter 11 cases, the expenses for professional fees would most likely be lower than in chapter 7 cases. Although preferable to a chapter 7 liquidation, the Debtors believe that a liquidation under chapter 11 is a much less attractive alternative to holders of Claims than the Plan because the return to holders of Claims provided for in the Plan is likely to be greater than the returns under a chapter 11 liquidation.

**XI.**

**CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN**

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtors and certain holders of Claims. The following summary does not address the U.S. federal income tax consequences to holders whose Claims are unimpaired or otherwise entitled to payment in full in cash under the Plan (*e.g.*, Administrative Expenses, Priority Non-Tax Claims, Senior Lender Claims, and Other Secured Claims), and to the holder of the Term Lender Claims (who the Debtors understand has engaged independent counsel to advise it with respect to the Plan). The consequences to holders of NWP Equity Interests are also not addressed, such interests being extinguished without a distribution in exchange therefor.

The following summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury Regulations promulgated thereunder, judicial decisions, and published administrative rules and pronouncements of the Internal Revenue Service (the "IRS"), all as in effect on the date hereof. Changes in such rules or new interpretations thereof may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below.

The U.S. federal income tax consequences of the Plan are complex and are subject to significant uncertainties. The Debtors have not requested a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the Plan. Thus, no assurance can be given as to the interpretation that the IRS will adopt. In addition, this summary generally does not address foreign, state or local tax consequences of the Plan, nor does it address the U.S. federal income tax consequences of the Plan to special classes of taxpayers (such as foreign taxpayers, broker-dealers, banks, mutual funds, insurance companies, other financial institutions, small business investment companies, regulated investment companies, tax-exempt organizations, persons holding an equity interest as part of an integrated constructive sale or straddle, and investors in pass-through entities). This summary also does not address any tax consequences to secondary purchasers of Holdings Common Stock or New Warrants.

**Accordingly, the following summary of certain U.S. federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon the individual circumstances pertaining to a holder of a Claim.**

*IRS Circular 230 Notice***:** ***To ensure compliance with IRS Circular 230, holders of Claims and Equity Interests are hereby notified that: (a) any discussion of federal tax issues contained or referred to in this Disclosure Statement is not intended or written to be used, and***

*cannot be used, by holders of Claims or Equity Interests for the purpose of avoiding penalties that may be imposed on them under the Internal Revenue Code; (b) such discussion is written in connection with the promotion or marketing by the Debtors of the transactions or matters addressed herein; and (c) holders of Claims and Equity Interests should seek advice based on their particular circumstances from an independent tax advisor.*

## A.     Consequences to the Debtors

For federal income tax purposes, the Debtors are members of an affiliated group of which NWP is the common parent that join in the filing of a consolidated federal income tax return, or whose operations and activities are otherwise includible in such return (collectively, the "U.S. Group"). The U.S. Group currently expects to report consolidated net operating loss ("NOL") carryforwards and certain deferred deductions as of December 31, 2004 for U.S. federal income tax purposes upwards of approximately $380,000,000 (substantially all of which is attributable to NWP). The U.S. Group expects to incur additional losses for the 2005 taxable year. The amount of the U.S. Group's NOL carryforwards and other tax attributes remains subject to audit and adjustment by the IRS.

As discussed below, in connection with the implementation of the Plan, the amount of the Debtors' NOL carryforwards and current year losses will be significantly reduced, and, additionally, the Debtors' tax basis in their assets may be reduced. Although the Debtors do not expect the Plan to result in any current limitation on the U.S. Group's ability to utilize any remaining NOL carryforwards and other tax attributes against future income, there is no assurance that the utilization of such attributes would not be limited as a result of subsequent changes in the stock ownership of Holdings (as further discussed below).

### 1.     Cancellation of Debt

In general, the Tax Code provides that a debtor in a bankruptcy case must reduce certain of its tax attributes – such as NOL carryforwards and current year NOLs, tax credits, and tax basis in assets – by the amount of any cancellation of debt ("COD"). COD is the amount by which the indebtedness discharged (reduced by any unamortized discount) exceeds any consideration given in exchange therefor. Certain statutory or judicial exceptions can apply to limit the amount of COD and attribute reduction (such as where the payment of the canceled debt would have given rise to a tax deduction).

This reduction in tax attributes (if any) occurs only after the determination of tax for the taxable year in which the COD occurs and, consequently, COD occurring in a bankruptcy generally does not impair the debtor's ability to use its tax attributes (to the extent otherwise available) to reduce the tax liability, if any, it otherwise would incur in the year the COD occurs. If advantageous, a debtor can elect to reduce the basis of depreciable property prior to any reduction in its NOLs or other tax attributes. Where the debtor joins in the filing of a consolidated federal income tax return, applicable Treasury Regulations require, in certain circumstances, that the tax attributes of the consolidated subsidiaries of the debtor and other members of the group also be reduced.

As a result of the discharge of Claims pursuant to the Plan, the Debtors are expected to realize significant COD and tax attribute reduction. Based on the estimated TEV of the Reorganized Debtors and an assumed Effective Date of November 26, 2005, it is anticipated that the Debtors will incur approximately $315,000,000 of COD as a result of the implementation of the Plan, with a corresponding reduction in the tax attributes of the Reorganized Debtors, particularly current year NOLs and NOL carryforwards.

## 2. Applicability of Changes in Ownership Rules on NOL Carryforwards and Other Tax Attributes

Under section 382 of the Tax Code, if a corporation undergoes an "ownership change," the amount of the corporation's loss and tax credit carryforwards as well as certain other tax attributes (including current year losses) allocable to periods prior to the ownership change (collectively, "pre-change losses") that may be utilized to offset future taxable income generally is subject to an annual limitation. The Debtors do not anticipate that the implementation of the Plan will result in an ownership change for this purpose. However, there can be no assurance that such an ownership change will not occur in the future, thereby subjecting to limitation the Reorganized Debtors' use of any NOL carryforwards (including NOLs that may arise after the Effective Date), as well as any other pre-change losses, remaining at the time of such an ownership change.

A loss corporation generally undergoes an ownership change if the percentage of stock of the corporation owned by one or more 5% shareholders has increased by more than 50 percentage points over a three-year period (with certain groups of less-than-5% shareholders treated as a single shareholder for this purpose). Although the Debtors do not believe that the U.S. Group will undergo an ownership change on the Effective Date, subsequent changes in Holdings' stock ownership, depending on the magnitude — including the purchase or sale of common stock by JLL, changes in the indirect beneficial ownership of such stock, and issuances or redemptions of common stock — could, either alone or taken together with prior changes in the stock ownership of Reorganized Debtors (including changes resulting from implementation of the Plan), result in an ownership change that would trigger the imposition of limitations under section 382.

### (a) General Section 382 Limitation

In general, the amount of the annual limitation to which a corporation (or consolidated group) that undergoes an ownership change would be subject is equal to the product of (i) the fair market value of the stock of the corporation (or, in the case of a consolidated group, the common parent) immediately before the ownership change (with certain adjustments) multiplied by (ii) the "long term tax exempt rate" in effect for the month in which the ownership change occurs (4.24% for ownership changes occurring in September 2005). Certain special rules apply when a corporation (or consolidated group) that is in bankruptcy undergoes an ownership change, but only when the change occurs *pursuant to* a confirmed plan. Accordingly, such rules would not be applicable to the Reorganized Debtors if there is a later ownership change.

Case 1:04-bk-02817-MDF    Doc 1356    Filed 09/21/05    Entered 09/21/05 12:38:08    Desc
Main Document        Page 86 of 94

In the event of an ownership change, any portion of the annual limitation that is not used in a subsequent year may be carried forward to later years, thereby increasing the annual limitation for the subsequent taxable year. However, if the corporation (or the consolidated group) does not continue its historic business or use a significant portion of its historic assets in a new business for at least two years after the ownership change, the annual limitation resulting from the ownership change is reduced to zero, thereby precluding any utilization of the corporation's pre-change losses (other than any increased limitation due to a net unrealized built-in gain which is subsequently realized, as discussed below).

      (b)      **Built-In Gains and Losses**

The annual limitation imposed by section 382 also may apply to certain losses or deductions "built-in" (*i.e.*, attributable to periods prior to the ownership change but not yet taken into account for tax purposes) as of the date of the ownership change that are subsequently recognized. Generally, if a loss corporation (or consolidated group) has a net unrealized built-in loss at the time of an ownership change (taking into account most assets and items of "built-in" income and deductions), then built-in losses recognized during the following five years (up to the amount of the original net unrealized built-in loss) will be treated as pre-change losses and similarly will be subject to the annual limitation. Conversely, if the loss corporation (or consolidated group) has a net unrealized built-in gain at the time of an ownership change, any built-in gains recognized during the following five years (up to the amount of the original net unrealized built-in gain) generally will increase the annual limitation in the year recognized, such that the loss corporation (or consolidated group) would be permitted to use its pre-change losses against such built-in gain income in addition to its regular annual allowance. Although the rule applicable to net unrealized built-in losses generally applies to consolidated groups on a consolidated basis, certain corporations that join the consolidated group within the preceding five years may not be able to be taken into account in the group computation of net unrealized built-in loss. In general, a loss corporation's (or consolidated group's) net unrealized built-in gain or loss will be deemed to be zero unless it is greater than the lesser of (i) $10,000,000 or (ii) 15% of the fair market value of its assets (with certain adjustments) before the ownership change.

      3.      **Formation of Holdings**

Pursuant to the Plan, and in accordance with the Restructuring Transactions, Holdings will acquire all of the common stock of Reorganized NWP. As a result, Holdings will become the common parent of a new consolidated group for federal income tax purposes, and the existing NWP consolidated group will terminate. As a consequence, among other things, the taxable year of the U.S. Group will close on the Effective Date, and the Debtors anticipate that, as a general rule, any NOL carryforwards and other pre-change losses of the Debtors remaining following the Effective Date (and after applicable attribute reduction for COD) will be available only to offset future income of the existing U.S. corporate debtors (and their successors) and will not be available to offset any future income of Holdings (although none is expected) or any corporate subsidiary acquired in the future by the Holdings consolidated group.

### 4.    Alternative Minimum Tax

In general, a U.S. alternative minimum tax ("AMT") is imposed on a corporation's U.S. alternative minimum taxable income at a 20% tax rate if and to the extent such tax exceeds the corporation's regular federal income tax. For purposes of computing taxable income for AMT purposes, certain tax deductions and other beneficial allowances are modified or eliminated. For example, a corporation is generally not allowed to offset more than 90% of its taxable income for AMT purposes by available NOL carryforwards (as computed for AMT purposes).

In addition, if a corporation (or consolidated group) undergoes an "ownership change" within the meaning of section 382 of the Tax Code and is in a net unrealized built-in loss position (as determined for AMT purposes) on the date of the ownership change, the corporation's (or consolidated group's) aggregate tax basis in its assets would be reduced for certain AMT purposes to reflect the fair market value of such assets as of the change date.

Any AMT that a U.S. corporation pays generally will be allowed as a nonrefundable credit against its regular federal income tax liability in future taxable years when the corporation is no longer subject to AMT.

### B.    Consequences to the Holders of Certain Claims

Pursuant to the Plan, and in accordance with the Restructuring Transactions, Allowed General Unsecured Claims (Class 5) will be satisfied in exchange for a portion of the common stock of Reorganized NWP, which stock will be immediately exchanged for common stock and warrants of Holdings. The following discussion assumes that these exchanges will be respected for federal income tax purposes in accordance with their form and consistent with certain previously issued administrative pronouncements. However, there can be no assurance that the IRS would not take a contrary position, in which event the tax consequences to the holders of certain Claims may vary from the tax consequences described below.

On the Effective Date, the holders of Allowed Other Unsecured Claims (Class 6) will receive a cash distribution in satisfaction and discharge of their Claims.

### 1.    Consequences to Holders of Allowed General Unsecured Claims

The U.S. federal income tax treatment to a holder of an Allowed General Unsecured Claim depends, in part, on whether the Claim (or a portion thereof) is a "security" of NWP for U.S. federal income tax purposes. The term "security" is not defined in the Tax Code or in the Treasury Regulations promulgated thereunder and has not been clearly defined by judicial decisions. The determination of whether a particular debt constitutes a "security" generally depends on an overall evaluation of the nature of the original debt. One of the most significant factors considered in determining whether a particular debt is a security is its original term. In general, debt obligations issued with a weighted average maturity at issuance of five years or less (*e.g.*, trade debt and revolving credit obligations) do not constitute "securities," whereas debt obligations with a weighted average maturity at issuance of ten years or more constitute "securities." The Debtors' Old Notes most likely constitute "securities" for U.S. federal income tax purposes. For a more detailed description of the Old Notes, see Section II.C.2 of the

Disclosure Statement, entitled "9.25% Senior Subordinated Notes Due 2009." Nonetheless, holders of General Unsecured Claims are urged to consult their tax advisors regarding the status of their Claims as "securities" of NWP for U.S. federal income tax purposes.

### (a)    Holders of Claims that do not Constitute "Securities"

In general, a holder of an Allowed General Unsecured Claim that does not constitute a security for U.S federal income tax purposes will recognize gain or loss in an amount equal to the difference between (i) the sum of the fair market value of Holdings Common Stock and New Warrants received (other than any stock or warrants the receipt of which is attributable to a Claim for accrued but unpaid interest, and excluding any portion required to be treated as imputed interest due to the post-Effective Date distribution of such consideration following the resolution of any Disputed Claims in the same class) and (ii) the holder's adjusted tax basis in its Claim (other than any Claim for accrued but unpaid interest). For a discussion of the U.S. federal income tax consequences to holders of any Claim for accrued but unpaid interest, see Section XI.B.3. of the Disclosure Statement, entitled "Distribution in Discharge of Accrued but Unpaid Interest." A holder's tax basis in the Holdings Common Stock and New Warrants received will equal the fair market value of such stock and warrants, and a holder's holding period for the Holdings Common Stock and New Warrants received generally will begin the day following the issuance of such stock.

It is possible that a holder of an Allowed General Unsecured Claim may receive additional distributions subsequent to the Effective Date in respect of any subsequently disallowed Disputed Claims or unclaimed distributions. Under the Tax Code, a portion of such later distributions to such holders may be treated as imputed interest. In addition, it is possible that any loss and a portion of any gain realized by such holders may be deferred until such time as such holder has received its final distribution. It is unclear whether a holder of an Allowed General Unsecured Claim who receives a post-Effective Date distribution on account of the resolution of Disputed Claims (including holders of previously Allowed Claims) that includes a cash distribution attributable to previously paid dividends should treat such cash distribution as an additional amount received for the purpose of determining gain and loss or, in fact, as dividends. All holders of Allowed General Unsecured Claims should consult their tax advisors as to the tax consequences of the receipt of additional distributions subsequent to the Effective Date.

Where gain or loss is recognized by a holder of an Allowed General Unsecured Claim that does not constitute a security for U.S. federal income tax purposes, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, whether the Claim constitutes a capital asset in the hands of the holder and how long it has been held, whether the Claim was originally issued at a discount, and whether and to what extent the holder had previously claimed a bad debt deduction in respect of such Claim. A holder that purchased its Claim from a prior holder at a market discount may be subject to the market discount rules of the Tax Code. Under those rules, assuming that the holder has made no election to amortize the market discount into income on a current basis with respect to any market discount instrument, any gain recognized on the exchange of such Claim (subject to a *de minimis* rule) generally

would be characterized as ordinary income to the extent of the accrued market discount on such Claim as of the date of the exchange.

Notwithstanding the foregoing, the IRS may attempt to characterize the receipt of Holdings Common Stock and New Warrants by a holder of an Allowed General Unsecured Claim that does not constitute a security for U.S. federal income tax purposes as part of a non-recognition transaction to the extent of the Holdings Common Stock received. If so treated, a holder would not be able to recognize any loss realized upon satisfaction of its Claim, but would be required to include in income any gain realized to the extent of the fair market value of the New Warrants received. In addition, in such event, the holder's aggregate tax basis in its Holdings Common Stock would equal its tax basis in its Claim decreased by the fair market value of any New Warrants received and increased by any gain recognized in respect of its Claim. In addition, the holder's holding period in the Holdings Common Stock received may, in whole or in part, include its holding period in its Claim. However, as previously indicated, the Debtors believe that the satisfaction of Allowed General Unsecured Claims that do not constitute securities for U.S. federal income tax purposes should be treated in accordance with its form and therefore would not be treated as part of a non-recognition transaction and generally should result in the full recognition of gain or loss.

(b) **Holders of Claims that do Constitute "Securities"**

In general, a holder of an Allowed General Unsecured Claim that constitutes a security for U.S federal income tax purposes will be required to recognize any gain realized (computed as described in the preceding section) to the extent of the fair market value of the non-stock consideration (*i.e.*, New Warrants) received, but will not be able to recognize any loss realized in respect of its Claim. For a discussion of the U.S. federal income tax consequences of any Claim for accrued but unpaid interest, see Section XI.B.3 of the Disclosure Statement, entitled "Distribution in Discharge of Accrued by Unpaid Interest."

In the case of Claims that constitute a security for U.S. federal income tax purposes, the holder's aggregate tax basis in its Holdings Common Stock will be equal to the tax basis of its Claim decreased by the amount of non-stock consideration (*i.e.*, the fair market value of the New Warrants) received and any deductions claimed in respect of any previously accrued interest, and increased by any gain and interest income recognized in respect of its Claim upon implementation of the Plan. The holder's tax basis in its New Warrants will be equal to the fair market value of such warrants. As set forth in Section VI.C of this Disclosure Statement, the value range of the New Warrants described in Section VI.C represents a hypothetical value that does not necessarily reflect, and should not be construed as reflecting, values that will be attained in the public or private markets. The holder's holding period for any Holdings Common Stock received will include the holder's holding period for its Claim, except to the extent that the Holdings Common Stock received was attributable to a Claim for accrued but unpaid interest (which stock will commence a new holding period). The holder will commence a new holding period with respect to any New Warrants received.

It is unclear whether a holder of an Allowed General Unsecured Claim who receives a post-Effective Date distribution on account of the resolution of Disputed Claims (including holders of previously Allowed Claims) that includes a cash distribution attributable to

previously paid dividends should treat such cash distribution as an additional amount received (and as additional non-stock consideration) for the purpose of determining gain and loss, or in fact as dividends.

The character and timing of any gain recognized, and the potential for imputed interest in respect of post-Effective Date distributions, would be determined in accordance with the principles discussed in the preceding section ("Holders of Claims that do not Constitute Securities").

2. **Consequences to Holders of Allowed Other Unsecured Claims**

In general, a holder of an Allowed Other Unsecured Claim will recognize gain or loss in an amount equal to the difference between (i) the amount of cash received by such holder in satisfaction of its Claim (other than in respect of any Claim for accrued but unpaid interest) and (ii) the holder's adjusted tax basis in its Claim (other than any Claim for accrued but unpaid interest). For a discussion of the U.S. federal income tax consequences to holders of any Claim for accrued but unpaid interest, see Section XI.B.3 of the Disclosure Statement, entitled "Distribution in Discharge of Accrued but Unpaid Interest."

Where gain or loss is recognized by a holder in respect of its Claim, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, whether the Claim constitutes a capital asset in the hands of the holder and how long it has been held, whether the Claim was originally issued at a discount or was acquired at a market discount, and whether and to what extent the holder had previously claimed a bad debt deduction in respect of such Claim.

3. **Distributions in Discharge of Accrued but Unpaid Interest**

Pursuant to the Plan, distributions to any holder of an Allowed Claim will be allocated first to the original principal amount of such Claim as determined for federal income tax purposes, and then, to the extent the consideration exceeds such amount, to accrued but unpaid interest. However, there is no assurance that the IRS would respect such allocation for federal income tax purposes.

In general, to the extent that an amount received by a holder of debt is received in satisfaction of accrued interest during its holding period, such amount will be taxable to the holder as interest income (if not previously included in the holder's gross income). Conversely, a holder generally recognizes a deductible loss to the extent any accrued interest claimed was previously included in its gross income and is not paid in full. Each holder is urged to consult its tax advisor regarding the allocation of consideration and the deductibility of unpaid interest for U.S. federal income tax purposes.

4. **Ownership and Disposition of New Warrants; Constructive Distributions to Holders of Holdings Common Stock**

A holder of a New Warrant generally will not recognize gain or loss upon the exercise of such warrant. A holder's tax basis in the Holdings Common Stock received upon

exercise of a New Warrant will be equal to the sum of the holder's tax basis in the New Warrant and the exercise price. The holder will commence a new holding period with respect to the Holdings Common Stock received.

If the terms of the New Warrant provide for any adjustment to the number of shares of Holdings Common Stock for which the New Warrant may be exercised or to the exercise price of the New Warrants, such adjustment may, under certain circumstances, result in constructive distributions that could be taxable to the holder of the New Warrants. Conversely, the absence of an appropriate adjustment may result in a constructive distribution that could be taxable to the holders of the Holdings Common Stock.

Upon the lapse or disposition of a New Warrant, the holder generally would recognize gain or loss equal to the difference between the amount received (zero in the case of a lapse) and its tax basis in the warrant. In general, such gain or loss would be a capital gain or loss, long-term or short-term, depending on whether the requisite holding period was satisfied.

5.    **Holdings Common Stock and New Warrants Held in Trust for Disputed Class 5 Claims**

Pursuant to the Plan, Holdings Common Stock and New Warrants retained by the Disbursing Agent on account of Disputed General Unsecured Claims shall be held in trust (the Disputed Class 5 Claims Reserve) pending the resolution of such Claims.

Under section 468B(g) of the Tax Code, amounts earned by an escrow account, settlement fund or similar fund must be subject to current tax. Although certain Treasury Regulations have been issued under this section, no Treasury Regulations have as yet been promulgated to address the tax treatment of such accounts in a bankruptcy setting. Thus, depending on the facts of a particular situation, such an account could be treated as a separately taxable trust, as a grantor trust treated as owned by the holders of Disputed General Unsecured Claims, or by the Debtor, or otherwise. In 1999, the IRS issued proposed Treasury Regulations that, if finalized in their current form, would specify the tax treatment of reserves of the type here involved that are established after the date such Treasury Regulations become final. In general, such Treasury Regulations would tax such a reserve as a "qualified settlement fund" under Treasury Regulation sections 1.468B-1 *et seq.* and thus subject to a separate entity level tax. As to escrows and the like established prior to the effective date of the final regulations, such Treasury Regulations would provide that the IRS would not challenge any reasonably, consistently applied method of taxation for income earned by the escrow or account, and any reasonably, consistently applied method for reporting such income.

Absent definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the issuance of applicable Treasury Regulations, the receipt by the Disbursing Agent of a private letter ruling if the Disbursing Agent so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Disbursing Agent), the Disbursing Agent shall (i) treat the Disputed Class 5 Claims Reserve as a discrete trust for federal income tax purposes, consisting of separate and independent shares to be established in respect of each Disputed General Unsecured Claim, in accordance with the trust provisions of the Tax Code (sections 641 *et seq.* of the Tax Code), and (ii) to the extent permitted by

applicable law, report consistently for state and local income tax purposes. In addition, pursuant to the Plan, all parties (including holders of Disputed General Unsecured Claims) shall report consistently with such treatment.

Accordingly, subject to issuance of definitive guidance, the Disbursing Agent will report as subject to a separate entity level tax any amounts earned by the Disputed Class 5 Claims Reserve, except to the extent such earnings are distributed by the Disbursing Agent during the same taxable year. Any amount earned by the Disputed Class 5 Claims Reserve that is distributed to a holder during the same taxable year will be includible in such holder's gross income.

Distributions from the Disputed Class 5 Claims Reserve will be made to a holder of a Disputed General Unsecured Claim if and when such Claim is subsequently Allowed, and to holders of previously Allowed Claims (whether such Claims were Allowed on or after the Effective Date) when any Disputed Claims are subsequently disallowed, as provided in the Plan. Such distributions (other than amounts attributable to earnings of the reserve) should be taxable to the recipient in accordance with the principles discussed above (see Sections XI.B.1. through XI.B.3, above).

Accordingly, each holder of a General Unsecured Claim is urged to consult its tax advisor regarding the potential tax treatment of the Disputed Class 5 Claims Reserve, distributions therefrom, and any tax consequences to the holder relating thereto.

## 6. Information Reporting and Withholding

All distributions to holders of Claims under the Plan are subject to any applicable tax withholding, including employment tax withholding. Under U.S. federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable withholding rate (currently 28%). Backup withholding generally applies if the holder (a) fails to furnish its social security number or other taxpayer identification number ("TIN"), (b) furnishes an incorrect TIN, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is a United States person that is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax and the appropriate information is supplied to the IRS. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

In addition, from an information reporting perspective, Treasury Regulations generally require disclosure by a taxpayer on its federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, the following: (1) certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds; and (2) certain transactions in which the taxpayer's book-tax differences exceed a specified threshold in any tax year. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the holders' tax returns.

Case 1:04-bk-02817-MDF    Doc 1356    Filed 09/21/05    Entered 09/21/05 12:38:08    Desc
Main Document      Page 93 of 94

**The foregoing summary has been provided for informational purposes only. All holders of Claims receiving a distribution under the Plan are urged to consult their tax advisors concerning the federal, state, local and foreign tax consequences applicable under the Plan.**

## XII.

## CONCLUSION AND RECOMMENDATION

The Debtors believe that confirmation and implementation of the Plan is preferable to any of the alternatives described above because it will provide the greatest recoveries to holders of Claims. Other alternatives would involve significant delay, uncertainty and substantial additional administrative costs. The Debtors urge holders of Claims entitled to vote to accept the Plan and to evidence such acceptance by returning their Ballots so that they will be received not later than [__:____ _.m.] (Eastern Time) on [_____], 2005.

Dated: September 21, 2005

NEW WORLD PASTA COMPANY,
a Delaware corporation (for itself and on behalf of each of the other Debtors)


By:      _/s/  Lisa S. Donahue_____
Name: Lisa J. Donahue
Title:   Chief Executive Officer